**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**LAURA HETTINGER,**

   **Plaintiff,**

      **v.**                                          Civil Action No. 23-3687 (JEB)

**BOZZUTO MANAGEMENT COMPANY,**

   **Defendant.**

---

<u>**MEMORANDUM OPINION**</u>

In recent years, an impressive array of multi-family high-rise apartments has reshaped the District of Columbia's skyline and attracted many residents with their amenity-rich rental units. All is not milk and honey in these new developments, however.  Plaintiff Laura Hettinger, a former tenant of the NOVEL South Capitol apartment building, brought this class action against the building's property manager, Bozzuto Management Company, in the Superior Court of the District of Columbia.  Alleging that Bozzuto violates the District's Consumer Protection Procedures Act through inaccurate advertising of rental costs, overcharging of water and sewer utilities, and unlawful submetering of gas and electricity, Hettinger requests damages and injunctive relief for herself and all those similarly situated.  After removing the case to this Court, Bozzuto contends that the advertisements and utility charges at issue were transparent and proper, and it thus moves to dismiss the Complaint for failing to state a claim.  Concluding that Plaintiff has largely carried her burden of pleading facially plausible claims, the Court will deny Bozzuto's Motion for the most part and grant it in part.

I.    **Background**

A.  Factual Background

The Court, as it must at this juncture, draws the following facts from the Complaint.  See Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000).  It also considers "documents upon which plaintiff's complaint necessarily relies[,] even if the document is produced . . . by defendant in a motion to dismiss."  Ward v. D.C. Dep't of Youth Rehab. Servs., 768 F. Supp. 2d 117, 119 (D.D.C. 2011) (citations omitted).

Bozzuto is a property-management company that operates and manages large residential housing complexes in the District of Columbia, including the NOVEL South Capitol building in the Navy Yard neighborhood.  See ECF No. 1-1 (Compl.), ¶¶ 1, 13, 57.  In June 2021, after viewing the floor plans of available units and their monthly rental prices on NOVEL's website, Hettinger toured the building with a Bozzuto representative.  Id., ¶¶ 59–60.  Neither the website nor the representative mentioned that tenants would be responsible for paying separate utility fees in addition to the fixed monthly rent listed online.  Id.  Following her visit, Plaintiff paid a non-refundable $75 application fee to submit an online rental application.  Id., ¶ 61.  The application specified that the fixed monthly rent would be $2,276 for the unit but made no mention of any additional utility charges.  Id.  Bozzuto approved the application a few days later, and Hettinger put down a $300 earnest-money deposit.  Id., ¶ 62.  Still no word about utilities. Id.

A few weeks later, Plaintiff received an electronic copy of Bozzuto's Standard Lease and accompanying addenda, including a Utility Addendum.  Id., ¶ 63.  The Standard Lease reveals that utilities for the apartment unit — electricity, water, sewer, cable, phone, and internet — would be paid by the tenant on top of the rental fee.  Id., Exh. 1 (Lease Contract) at 2.  It notes

2

that "failure to pay any utilities shall be deemed a breach of th[e] Lease Contract," id., and that

the tenant will "be in default of th[e] Lease Contract" if she does not "pay any rent or other

amounts that [she] owe[s] when due." Id. at 5.  Failure to "pay rent, or any other charge

hereunder otherwise defined rent," moreover, could lead to eviction proceedings. Id.  The Utility

Addendum further requires the tenant to pay a new-account fee and a monthly service fee to

Conservice, a private company that handles utility billing for Bozzuto. Id. at 9; Compl., ¶ 33.  It

also specifies that: (1) the tenant will pay for water and sewer services when "bills are billed by

the service provider to [Bozzuto] and then allocated to [the tenant]"; (2) the tenant will pay for

electricity directly to the electric utility company Pepco; and (3) the tenant will pay for HVAC

usage, which "is sub-metered per unit" and billed to the tenant's account through Conservice.

See Lease Contract at 9–10.  Beyond these provisions, the lease documents do not include any

other information that "would allow a tenant to make a reasonable estimate of the anticipated

[utility charges]." Compl., ¶ 34.  The Utility Addendum states, moreover, that "failure to pay

any utility bill is a material and substantial breach of the Lease and [Bozzuto] will exercise all

remedies available under the Lease, up to and including eviction for nonpayment." Lease

Contract at 9.

        Hettinger nonetheless eventually signed a 12-month lease to occupy one of the NOVEL

units. See Compl., ¶ 63.  While she lived there, Plaintiff received monthly electricity bills

directly from Pepco based on the reading of her unit-level public meter, id., ¶ 69; she also

received monthly statements from Conservice for the fixed rent and other utility charges,

including for HVAC, water, and sewage based on "submetering or the use of energy allocation

equipment." Id., ¶ 70; ECF Nos. 10-3 (September 2021 Monthly Statement); 10-4 (November

2021 Monthly Statement).  The Conservice statements contain a description of the HVAC

charge, stating that "[the tenant's] submetering system measures the amount of electricity used by the HVAC system in [the tenant's] unit" and that the tenant is "billed according to that consumption multiplied by the average electric rate of the local utility provider."  September 2021 Monthly Statement at 2; November 21 Monthly Statement at 2; Compl., ¶ 70 n.28.  On at least two occasions, moreover, the water and sewer services rates on the Conservice bills Plaintiff received were higher than the multi-family statutory rates prescribed by the D.C. Water and Sewer Authority (WASA).  See Compl., ¶ 66.

B.  Procedural Background

On December 5, 2023, Hettinger filed the instant class action against Bozzuto in the Superior Court of the District of Columbia.  Id. at 1.  On behalf of all current and former District of Columbia residential tenants of Bozzuto-managed properties who paid utility charges in the past three years, she alleged one count of CPPA violation that included 14 subcounts, all relating to Bozzuto's utility-billing practices.  Id., ¶¶ 90–97.

Six days later, Bozzuto removed the case to this Court on the grounds that the parties are diverse — Plaintiff is currently domiciled in Virginia and Defendant is incorporated and has its principal place of business in Maryland — and that the proposed class action, with more than 100 putative class members and an amount-in-controversy of over $5 million, meets the requirements for removal under the Class Action Fairness Act.  See ECF No. 1 (Notice of Removal) at 4–7.  Contending that all of Hettinger's allegations fall short of a plausible claim, Defendant now moves to dismiss the Complaint in its entirety.  See ECF No. 10 (MTD).

II.  **Legal Standards**

Rule 12(b)(6) provides for the dismissal of an action where a complaint fails to "state a claim upon which relief can be granted."  Although "detailed factual allegations" are not

necessary to withstand a Rule 12(b)(6) motion, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotations marks and citation omitted). In weighing a motion to dismiss, a court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the court] may take judicial notice." EEOC v. St. Francis Xavier Parochial School, 117 F.3d 621, 624 (D.C. Cir. 1997). The court "must treat the complaint's factual allegations as true and must grant [the] plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow, 216 F.3d at 1113 (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal citations omitted). It need not accept as true, however, "a legal conclusion couched as a factual allegation" or an inference unsupported by the facts set forth in the complaint. Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

## III.   Analysis

Hettinger advances four theories comprising the 14 subcounts, all of which Bozzuto believes are deficient. The Court first sets out the parameters of the CPPA and then examines Plaintiff's theories in turn to determine if the claims alleged in each are sufficiently plausible.

### A.  CPPA

The CPPA forbids a broad array of fraudulent and unfair business practices and grants an aggrieved consumer the right to bring an action for violations of its provisions. See D.C. Code §§ 28-3904, 28-3905(k)(1)(A). In 2018, the statute's coverage was expanded to include "trade practices arising from landlord-tenant relations." D.C. Code § 28-3905(k)(6); At-Risk Tenant Protection Clarifying Amendment Act of 2018, D.C. Law 22-206. Because here Bozzuto acts as

an agent for building owners in operating and managing multi-family apartment buildings in D.C., see Compl., ¶¶ 12–13, its transactions and course of dealing with Plaintiff and other tenants fall squarely within the statute's scope.

Section 28-3904 of the CPPA generally prohibits unfair or deceptive trade practices.  It also provides a non-exhaustive list of such practices, including when a merchant: "(e) misrepresents as to a material fact which has a tendency to mislead; (e-1) represent[s] that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; (f) fail[s] to state a material fact if such failure tends to mislead; and (f-1) use[s] innuendo or ambiguity as to a material fact, which has a tendency to mislead[.]"  When reviewing a claim of unfair practice under the CPPA, courts are advised to follow "basic common sense" and consider "how the practice would be viewed and understood by a reasonable consumer."  Pearson v. Chung, 961 A.2d 1067, 1075 (D.C. 2008).  The question of whether a reasonable consumer would consider a statement material or misleading, moreover, is generally a question of fact for the jury.  Saucier v. Countrywide Home Loans, 64 A.3d 428, 445 (D.C. 2013).

As mentioned above, Plaintiff's CPPA claims here are based on four theories.  First, Bozzuto engaged in a drip-pricing scheme, which takes its name from the accumulation of hidden charges.  Specifically, it failed to disclose to potential tenants — either in its advertising or application materials — their obligation to pay utility fees, and it then imposed utility charges typically covered by fixed rent, in violation of § 28–3904's prohibition on unfair and unlawful acts.  See Compl., ¶ 90 (Subcounts A–C).  Second, Bozzuto charged tenants for water and/or sewer services at a rate that exceeded the District's statutory maximum rate for multifamily residential properties without disclosing the fact to tenants, in violation of § 28–3904(e-1), (f), (f-

1), and the section's general prohibition on unfair and unlawful acts.  Id., ¶ 91(Subcounts D–H).

Third, Defendant assessed tenants electricity and/or gas fees using a submetering methodology

despite the Public Service Commission's ban on submetering in residential rental units, in

violation of § 28–3904(e-1), (f), (f-1), and the section's general prohibition on unfair and

unlawful acts.  Id., ¶ 92 (Subcounts I–M).  Last, Plaintiff also advances a catch-all theory, which

submits that all of Defendant's above-mentioned acts and practices violate § 28-3904's

prohibition on unfair acts.  Id., ¶ 93 (Subcount N).

 B.  Drip-Pricing Scheme

 Start with the drip-pricing theory.  Hettinger suggests that Defendant engages in a three-

step deceptive practice to lure prospective tenants.  It first discloses only the fixed rents to such

tenants, attracting them to apply for its units; it then charges them a nonrefundable application

fee and deposit to discourage them from looking at other housing options; and it finally hands

them a boilerplate lease that reveals for the first time that they are obligated to pay for a monthly

variable utility fee but still does not disclose the specific amounts of that charge.  See Compl.,

¶¶ 28–31; ECF No. 14 (Pl. Opp.) at 3–6.  This drip-pricing scheme, according to Plaintiff,

violates three provisions of the CPPA.  See Compl., ¶ 90; Opp. at 14–21.

 First, Hettinger contends that the belatedly disclosed utility charges qualify as "rent"

under D.C. Code § 42-3501.03(28) because Bozzuto's lease documents make clear that payment

of those charges is a condition of occupancy.  See Compl., ¶¶ 24–26; D.C. Code § 42-

3501.03(28) (defining rent as "the entire amount of money . . . charged by a housing provider as

a condition of occupancy or use of a rental unit, its related services, and its related facilities").

Because D.C. law requires the disclosure of the applicable rent "[a]t the time a prospective tenant

files an application to lease any rental unit," D.C. Code § 42-3502.22(b)(1), the theory goes,

Bozzuto's failure to do so violates the CPPA's prohibition on unlawful conduct.  See Compl., ¶¶ 27, 90 (Subcount A).

Second, Plaintiff submits that the scheme violates the CPPA's prohibition on unfair and deceptive acts because — in standard predatory drip-pricing fashion — Bozzuto "advertises a low monthly rental cost and sneaks in additional financial obligations once the prospective tenant has already invested money and resources into applying for a rental unit."  Opp. at 19; see also Compl., ¶ 90 (Subcount B).

 Third, regardless of whether Bozzuto's failure to disclose the utility charges at the time of application was unlawful or deceptive, Plaintiff argues that its practice "differs significantly from what a reasonable consumer would expect" by making tenants pay for common-area and building utilities traditionally covered by building owners and thus deprives tenants of safeguards against overbilling.  See Opp. at 18, 20; see also Compl., ¶ 90 (Subcount C).

In seeking dismissal of these claims, Bozzuto asserts as a general matter that the drip-pricing theory is a fallacy because "no usage-based fee can be disclosed prior to the utilities actually being used."  MTD at 6.  It reads Plaintiff as necessarily suggesting that all usage-based utility charges are illegal in D.C.  Id. at 6–7.  It thus cautions the Court that the D.C. Council could not have intended to outlaw usage-based utility fees through "an unspoken interplay of [] two [D.C.] code sections," as the legislature does not "hide elephants in mouseholes."  Id. at 7 (citation omitted).  Defendant also takes issues with Plaintiff's expansive reading of "rent" to include utility charges, arguing that the legislature intended to leave utility fees out of the initial disclosure requirement, id. at 8, and that D.C. law has long recognized "the fundamental differences between 'rent' and other charges a tenant may incur."  Id.

Defendant's arguments miss the mark.  At the outset, Hettinger's allegations do not, as Bozzuto claims, purport to outlaw all usage-based utility charges in the District of Columbia. Rather, she specifically alleges that Bozzuto's utility charges — which must be paid as a condition of occupancy — need to be disclosed at the time of the application pursuant to § 42-3502.22(b)(1).  See Opp. at 16.  While it is true that the exact amount of the fee cannot be determined until actually incurred, Defendant never discloses "good-faith estimates or a truthful methodology or formula for calculating [utility] charges" in the lease.  See Opp. at 17; Compl., ¶ 34.  In fact, Plaintiff's complaint here is that Bozzuto does not even disclose the fee's existence until after a tenant has paid a non-refundable application fee and put down a deposit for the rental unit.  See Compl., ¶¶ 28–30.  Attempting to undermine this point, Bozzuto offers a flier that it claims is a "copy of a portion of the actual application materials" to show that it discloses utility fees to potential tenants.  See MTD at 2 n.1; ECF No. 10-2 (NOVEL South Capitol Flier). Yet the Court cannot consider this on a motion to dismiss where the Complaint does not refer to or rely on the flier.

Having rejected Bozzuto's general premise, the Court turns now to Plaintiff's specific claims under the drip-pricing theory.  Subcount A — which posits that the utility charges at issue are "rent" under § 42-3501.03(28) and that Bozzuto's failure to properly disclose such charges violates § 42-3502.22(b)(1) — is plausibly alleged.  The plain language of Defendant's lease documents supports the contention that the utility charges are a "condition of occupancy" and thus qualify as "rent."  See § 42-3501.03(28).  The Utility Addendum unequivocally states that "failure to pay any utility bill" is a material breach of the lease and that Bozzuto will "exercise all remedies available under the Lease, up to and including eviction for nonpayment."  Lease Contract at 9.  The Standard Lease also provides that "failure to pay utilities shall be deemed a

breach of th[e] Lease Contract," id. at 2, and that if a tenant fails to pay rent or "any other charges . . . otherwise defined as rent," Bozzuto "may . . . file a non-payment suit for possession of the [a]partment."  Id. at 5.  Bozzuto's belated disclosure of these utility charges thus contravenes § 42-3502.22(b)(1)'s requirement that "applicable rent" be disclosed when "[a] prospective tenant files an application to lease any rental unit."  § 42-3502.22(b)(1).  Because Plaintiff has satisfied her burden of alleging that Defendant may have violated the law based on a plain reading of § 42-3501.03(28) and § 42-3502.22(b)(1), the claim can proceed notwithstanding Defendant's contention that "rent" should not be interpreted so expansively under those statutory provisions.  See MTD at 8.

As for Subcounts B and C's unfairness claims, the Court finds that both are plausibly alleged when viewed from a reasonable consumer's perspective.  See Pearson, 961 A.2d at 1075. By disclosing only the fixed rent at the time of advertising and application, and revealing utility fees only after the potential tenant has paid hundreds of dollars via an application fee and deposit, Bozzuto engages in a practice that makes a reasonable tenant more likely to follow through with the transaction and pay more than initially anticipated, as opposed to starting her search anew.  Cf., David Adam Friedman, Regulating Drip Pricing, 31 Stan. L. & Pol'y. Rev. 51, 53–54 (2020) (discussing similar dynamic when hotel chains wait until guests have arrived to disclose resort fees).  Because a reasonable tenant could be misled by such advertising and application practices, Subcount B plausibly states a claim of  CPPA violation.  Cf. Travelers United v. MGM Resorts International, Inc., No. 2021 CA 477 B (D.C. Super. Ct.), Order (Sept. 9, 2021) (denying motion to dismiss for failure to state claim under CPPA where plaintiff alleged that defendant hotel's advertisement of room rates without disclosing resort fee constitutes unfair

or deceptive trade practice); <u>District of Columbia v. Marriot International, Inc.</u>, 2019 CA 4497 B

(D.C. Super. Ct.), Order (Dec. 31, 2019) (similar).

Subcount C involves a slightly different but no less plausible claim.  It alleges that

Bozzuto's practice of charging tenants for utilities that are traditionally covered by the building

(*e.g.*, utilities used in common spaces, HVAC, and water heating) is unfair under the CPPA

because tenants are deprived of "safeguards against overbilling" when they pay these charges to

Bozzuto rather than to public utility companies.  <u>See</u> Opp. at 20; Compl., ¶¶ 49, 90.  Tenants also

have less time to pay a utility bill from Bozzuto than a bill from utility companies, have no

means to assess the accuracy of those common-area utility charges, and face late fees set by

Bozzuto that could amount to much more than the actual utility bill.  <u>Id.</u>, ¶¶ 51–54.  These

allegations, construed in the light most favorable to Plaintiff, state a plausible claim of CPPA

violation and thus survive a motion to dismiss.

The Court consequently concludes that Subcounts A, B, and C may proceed.

C.  <u>Water and Sewer Charges</u>

Next up is the overcharging of water and sewer services.  Plaintiff alleges that on at least

two occasions, Bozzuto charged her for sewer and water services at rates that exceeded D.C.'s

statutory maximum rates without disclosure and, in doing so, violated §§ 28-3904 (e-1), (f), (f-

1), and the section's prohibition on unlawful and unfair acts.  <u>Id.</u>, ¶¶ 66, 91 (Subcounts D-H).  In

response, Bozzuto offers two monthly bills that its biller Conservice sent to Plaintiff, <u>see</u>

September 2021 Monthly Statement; December 2021 Monthly Statement, and argues that these

bills "reflect aggregate water and sewer charges billed directly to the resident based on the rates

charged by the water utilities, not any rate determined by Bozzuto as an intermediary."  MTD at

13.  According to Defendant, the aggregate water and sewer rates determined by public utilities

are different from the statutory maximum rates because the former may include additional charges, including delivery.  Id.  In any event, Bozzuto rejoins, Plaintiff should dispute the rates with WASA since Defendant is not involved in their calculation.  Id.

The Court again finds that Hettinger has the better of the debate here.  Defendant does not cite any statutory provision permitting aggregate rates above the statutory maximum.  Indeed, the two monthly statements it submitted, which the Court considers because the Complaint necessarily relied on them, state that Hettinger was "billed at [water/sewer] service rates based on the amount of [water/sewer] used in [her] unit," but do not mention any "aggregate rate" or any "delivery charges" that Defendant suggests could explain the apparent mismatch between the rates charged and the statutory maximum rates.  See September 2021 Monthly Statement at 2; December 2021 Monthly Statement at 2; MTD at 13.  While Bozzuto claims that it has no role in setting those rates, it is indisputable that those bills do not originate from local utility providers and that Plaintiff paid these charges directly to Bozzuto.  See September 2021 Monthly Statement at 1–2 (stating that "[t]his bill is not from your local utility provider or from any other provider," and instructing that payment be made out to NOVEL South Capitol); December 2021 Monthly Statement at 1–2 (same); Lease Contract at 9 (noting that water and sewer services will be paid by tenant when bills "are billed by the service provider to [Bozzuto] and then allocated to [tenant]").  It is plausible, therefore, that Bozzuto could add on extra charges when it bills tenants, and the Court here must take Plaintiff's word for it at this stage.  See Twombly, 550 U.S. at 555 (all allegations in Complaint are assumed to be true even if "doubtful in fact").

Bozzuto's alternative argument that the D.C. water and sewer rates do not apply to it does not warrant a different outcome.  See Opp. at 25–26.  The regulation providing for maximum

sewer and water rates broadly covers "retail rates" for those services.  See D.C. Mun. Regs. tit. 21 § 4100.3.  Because Bozzuto directly bills and receives usage-based water and sewer fees from tenants, it is presumably subject to these statutory maximum rates.  See Opp. at 25–26.  While Defendant contends that Plaintiff should dispute the rates with WASA, it was Bozzuto, not local utility providers or WASA, that billed and charged Plaintiff for water and sewer services.

Granting Plaintiff "the benefit of all inferences that can be derived from the facts alleged," see Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979), and viewing the claims from the perspective of a reasonable consumer, Pearson, 961 A.2d at 1075, the Court finds that she has alleged a sufficiently plausible claim that Bozzuto overcharged its tenants for water and sewer services in violation of the CPPA's prohibition on unfair and unlawful acts.  She has similarly stated a plausible claim that Bozzuto misled its tenants about the nature of its water and sewer billing practices in violation of §§ 28-2904(e-1), (f), and (f-1).

Defendant's Motion to Dismiss with respect to Subcounts D-H does not prevail.

D.  Submetering of Gas and Electricity

The Court turns next to Plaintiff's illegal-submetering theory, which is more nuanced than the previous two.  By way of background, submetering is when an owner or landlord of a multi-unit building who is directly billed by utility companies based on a master meter then measures and charges individual units for their actual utility usage through submeters or other energy-allocation methods.  While the parties do not contest that submetering of water and sewer services is permissible in D.C., the Public Service Commission has long prohibited the submetering of gas and electric utilities in the District's residential buildings and requires public-utility companies to include the prohibition in their terms and conditions.  See Compl., ¶ 45; Submetering of Utility Services, Order No. 8700, 8 D.C. P.S.C. 109, 1987 WL 1497036 (D.C.

P.S.C. 1987) (PSC March 1987 Order).  In 1987, after undertaking an extensive investigation of the matter, the PSC declined to lift the ban, concluding that submetering in residential dwellings is "not in the public interest."  Submetering of Utility Services, Order No. 8897, 8 D.C. P.S.C. 471, 1987 WL 1497078 (D.C. P.S.C. 1987); see also Compl., ¶ 46.

Citing the PSC ban, Plaintiff alleges that Bozzuto's practice of submetering and assessing electric and gas utilities is illegal, unfair, and misleading and violates the CPPA.  See Compl., ¶¶ 45–48; 92 (Subcounts I-M).  According to Hettinger, certain types of utilities such as HVAC, water heating, and common-area utilities are traditionally billed to the building and covered by the tenants' fixed rent.  Id., ¶ 20.  Bozzuto, however, "bucks this traditional practice" and requires tenants to pay an additional utility fee to cover these costs.  Id., ¶ 21. Tenants are thus required to pay for the electricity used by the HVAC system in their units and for the gas used for unit-level water heating.  Id., ¶ 32.  Since the HVAC and heating charges are typically measured by the building's public meter and billed to the building, id., ¶ 20, Defendant uses private submeters to track the unit-level usage of electricity and gas and to calculate each unit's HVAC and heating fees.  Id., ¶¶ 48; 70–71.  Plaintiff alleges that Bozzuto lacks the legal authority to assess these fees on a submetering basis, id., ¶ 92 (Subcounts I-K, M), and that such a practice is unfair because unregulated utility charges pose risk to consumers.  Id. (Subcount L).

Defendant does not dispute that the PSC bans submetering in residential buildings but rejoins that the ban does not apply to it since the agency's jurisdiction is limited to electrical and gas companies.  See MTD at 11–12.  It further argues that it does not engage in "master-metered submetering," and that Plaintiff failed to allege that any such submetering is occurring.  Id. at 12–13.  Bozzuto further submits that "billing of residents is direct from the utilities to the

residents, through the billing contractor Conserve, [and] based on the resident's actual usage." Id. at 12.

Consider first Hettinger's factual allegations.  Contrary to Defendant's argument, she does allege that Bozzuto engages in master-metered submetering.  See Compl., ¶¶ 20 (suggesting that "traditional system," in which HVAC and water heating are often billed to building's public meter and included in fixed rent, is "contrary to Bozzuto's practices"); 47–48 (alleging that Bozzuto uses private submeters to allocate costs of tenants' gas and electric utilities, including in NOVEL South Capitol); 58 ("At N[OVEL] South, Bozzuto engages in Straight Submetering of HVAC, water and sewer services.").  The Utility Addendum and the monthly Conserve bills, moreover, explicitly state that electricity used by the HVAC system is submetered.  See Lease Contract at 9–10 (providing that while tenant must pay for electric service directly to the utility service provider, she must also pay for "HVAC usage," which is "sub-metered per unit and [] billed to resident account through Conserve monthly in arrears"); see also Plaintiff's September 2021 Monthly Statement at 2 ("HVAC service is provided by Pepco. Your submetering system measures the amount of electricity used by the HVAC system in your unit. . . . You are billed according to that consumption multiplied by the average electric rate of the local utility provider."); Compl., ¶ 70 n.28.  Based on these alleged facts, Plaintiff's theory that Bozzuto engages in private submetering to tabulate and charge tenants for additional electricity and gas utility is plausible and must be credited as true by the Court.

Hettinger is not home free, however, because whether she sufficiently alleges CPPA violations based on submetering is a different question.  Four of her subcounts posit that Bozzuto's submetering practice is illegal or that by not disclosing to tenants that it had no legal authority to assess electricity on a submetering basis, it violates the CPPA's prohibition on

illegal acts and misrepresentations.  Id., ¶ 92 (Subcounts I-K, M).  As Defendant points out, however, it is doubtful that the PSC's ban on submetering in residential dwellings applies to and is privately actionable against property-management companies like itself.  See MTD at 11–12. The PSC's jurisdiction is limited to the supervision of gas and electrical companies, see D.C. Code § 34-301(1)-(3), and does not extend to regulation of landlord-tenant relationships or the "methods that building owners choose to adopt for utility billing."  MTD at 11; see also Submetering of Utility Services, Order No. 9213, 10 D.C. P.S.C. 248, 1989 WL 1786075 (D.C. P.S.C. 1989)(PSC 1989 Order) ("The Commission regulates gas and electrical corporations doing business in the District of Columbia.  Owners of master-metered buildings, who may choose to submeter, do not fit within the definition of such corporations.") (internal citations omitted).  Hettinger nevertheless invites the Court to apply the PSC ban to Bozzuto because doing so "would effectuate [the] purpose" of the ban and address the PSC's concern that "submetering could create the situation in which a landlord . . . could profit at the expense of tenants."  Opp. at 22 (quoting PSC March 1987 Order).

The Court will not take up Plaintiff's invitation.  As the PSC recognizes in its 1989 order, the agency is "a creature of statute" and cannot "act outside the scope of its statutory authority."  See PSC 1989 Order (citing Chesapeake & Potomac Telephone Co. v. Public Service Commission, 378 A.2d 1085 (D.C. 1977)).  Its ban on submetering thus does not apply directly to property-management companies, which fall outside of its regulatory perimeter.  And while public-utility companies have incorporated the submetering ban in their general terms and conditions with their customers (including building managers), see Compl., ¶ 45 (citing Pepco's general terms and conditions, which prohibit customers from remetering or submetering electric service), Plaintiff has not pointed to anything to show that the breach of those terms by building

managers is enforceable by a private third party like herself.  Her claims that are premised on the illegality of the submetering practice (Subcounts I, J, K, and M) must therefore be dismissed.

All hope is not yet lost for Plaintiff's submetering theory.  While the PSC ban does not reach Defendant to make its submetering practice *per se* illegal, Plaintiff's claim that such practice is nevertheless unfair, id., ¶ 92 (Subcount L), may still proceed.  Because submetering by a landlord removes tenants from protections set by the PSC against public-utility companies, see PSC March 1987 Order, a reasonable tenant may find this practice unfair.  See D.C. Code §§ 28-3904; Pearson, 961 A.2d at 1075.  In the instant case, Bozzuto's submetering practice is even more susceptible to such an unfairness finding because Defendant did not inform tenants of the additional utility charge until lease signing and because its charging of additional gas and electric utilities in the form of water heating and HVAC fees is potentially misleading and deceptive.

E.  Catch-All Theory

The last claim remaining is Hettinger's catch-all theory in Subcount N.  She argues that Bozzuto violated the CPPA's general prohibition on unfair acts "through each of the aforementioned acts and practices."  Compl., ¶ 93.  Defendant does not separately address this unfairness challenge to its "broader utility rent scheme."  Opp. at 21; see MTD at 10, 13, 14 (summarily arguing that subcount N should be dismissed together with other subcounts).  The Court thus concludes that to the extent that the other subcounts survive, subcount N also may proceed.

**IV.     Conclusion**

For the foregoing reasons, Defendant's Motion to Dismiss will be granted in part and

denied in part.  A separate Order consistent with this Opinion will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  April 26, 2024