## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LAURA HETTINGER,

     Plaintiff,

       v.                                                    Civil Action No. 23-3687 (JEB)

BOZZUTO MANAGEMENT COMPANY,

     Defendant.

## MEMORANDUM OPINION

For most people, renting an apartment and supplying it with utilities — the electricity, water, sewer, and gas that make modern life possible — are two separate financial burdens. The former typically goes to the landlord or property manager for the right to occupy the premises; the latter, to utility companies for use of their resources. Some people, conversely, pay a fixed monthly sum to the property owner, covering both rent and utilities. Still others confront a third scenario: they pay the property manager a sum for rent as well as a variable fee covering the use of certain utilities, calculated on a pro-rated basis.

This case is about that third category of renters. Plaintiff Laura Hettinger, formerly a tenant of the NOVEL South Capitol apartment building managed by Defendant Bozzuto Management Company, asserts that Bozzuto neglected to adequately inform her of the requirement to pay it utility fees — plus an associated service charge — when she applied to rent an apartment in the NOVEL. In so doing, she argues, Bozzuto violated D.C.'s Rental Housing Act, which requires disclosure of the "applicable rent" for an apartment "[a]t the time a

prospective tenant files an application to lease" it.  See D.C. Code § 42-3502.22(b)(1)(A).  She

brought this potential class action against Defendant for that and other purportedly unlawful

trade practices, alleging a violation of the D.C. Consumer Protection Procedures Act.  See ECF

No. 1-1 (Compl.), ¶¶ 83–97.  Her Amended Complaint currently alleges one CPPA count

comprising 15 subcounts.  See ECF No. 41 (Am. Compl.), ¶¶ 90–94.  The parties have now

cross-moved for summary judgment on some of these subcounts.  See ECF Nos. 46 (MSJ)

(Subcounts A–C and O); 50 (Opp. & Cross-MSJ) (Subcounts A and O).  The Court delivers a

split decision, granting Plaintiff's Cross-Motion as to Subcount A only, while denying

Defendant's Motion in full.

I.      **Background**

        A.      Legal Background

        The Court begins with a brief explanation of the applicable legal framework, which will

aid the reader in understanding the various claims at issue.  The CPPA forbids fraudulent and

unfair trade practices and is to be "construed and applied liberally" to effectuate that purpose.

See D.C. Code §§ 28-3904, 28-3901(c).  As relevant here, it also grants an aggrieved consumer

the right to bring an action for violations of its provisions.  Id., § 28-3905(k)(1)(A).  Its coverage,

the D.C. Council has recently affirmed, includes "trade practices arising from landlord-tenant

relations."  Id., § 3905(k)(6); see At-Risk Tenant Protection Clarifying Amendment Act of 2018,

D.C. Law 22-206.  For those commercial relationships — as for many others — the statute

prohibits a range of trade practices, only a few of which are directly at issue here.

        First, while the statute generally prohibits "unfair or deceptive trade practice[s]," D.C.

Code § 28-3904, it also contains an enumerated, non-exhaustive list of such practices, including

"misrepresent[ing] as to a material fact which has a tendency to mislead," id., § 28-3904(e),

"fail[ing] to state a material fact if such failure tends to mislead," id., § 28-3904(f),

"us[ing] . . . ambiguity as to a material fact, which has a tendency to mislead," id.,

§ 28-3904(f-1), and "advertis[ing] or offer[ing] good or services . . . without the intent to sell

them as advertised or offered." Id., § 28-3904(h).  When reviewing a claim of unfair practice

under the CPPA, courts are advised to follow "basic common sense" and consider "how the

practice would be viewed and understood by a reasonable consumer." Pearson v. Chung, 961

A.2d 1067, 1075 (D.C. 2008).

Second, because "[a] main purpose of the CPPA is to 'assure that a just mechanism exists

to remedy all improper trade practices,'" any trade practices that "violate other laws" also "fall

within the purview" of the statute. Dist. Cablevision Ltd. P'ship v. Bassin, 828 A.2d 714, 723

(D.C. 2003) (quoting D.C. Code § 28-901(b)(1)); see D.C. Code § 28-905(b)(1)(B), (k)(1)(A).

Such "Bassin claim[s]," District of Columbia v. Equity Residential Mgmt., L.L.C., 2021 D.C.

Super. LEXIS 18, at *32 (D.C. Super. Ct. Apr. 23, 2021), have been based on a range of

predicate legal violations, including of the Rental Housing Act. See Equal Rights Ctr. v. Vesta

Corp., 2024 D.C. Super. LEXIS 44, at *13–15 (D.C. Super. Ct. Sept. 19, 2024).  As courts have

explained, violating another law or regulation in the context of a consumer transaction

constitutes a *per se* violation of the CPPA. See Martin v. Apt. Inv. & Mgmt. Co., 2021 D.C.

Super. LEXIS 213, at *26 (D.C. Super. Ct. May 26, 2021); District of Columbia v. Wash.

Hebrew Congregation, Inc., 2022 D.C. Super. LEXIS 88, at *13 (D.C. Super. Ct. Sept. 13,

2022); Vesta, 2024 D.C. Super. LEXIS 44, at *13–14; District of Columbia v. Evolve, LLC,

2020 D.C. Super. LEXIS 6, at *12 (D.C. Super. Ct. Feb. 25, 2020).

B.      Factual and Procedural Background

The following facts are not in dispute.  Bozzuto is a property-management company headquartered in Maryland that runs large residential housing complexes in the District of Columbia, including the NOVEL South Capitol building in the Navy Yard neighborhood.  See Am. Compl., ¶¶ 11–12; Hettinger v. Bozzuto Management Co., 2024 WL 1833855, at *1 (D.D.C. Apr. 25, 2024).  "In June 2021, after viewing the floor plans of available units and their monthly rental prices on NOVEL's website, Hettinger toured the building with a Bozzuto representative."  Id.  During that June tour, she received a hardcopy "[p]ricing [s]heet."  ECF No. 50-5 (Pl. Resp. to Interrog.) at 3.  Although she does not recall the precise contents of the sheet she received, Plaintiff does not dispute Bozzuto's reproduction of it during discovery.  Id.  The Pricing Sheet informs prospective tenants of various fees and charges associated with renting from Defendant, and it indicates that HVAC usage, water, and sewer charges would be "billed with [the] month[ly] rent statement."  ECF No. 46-4 (Pricing Sheet).  It does not, however, mention that there will be a separate, flat service charge billed alongside those utilities.  Id.; Pl. Resp. to Interrog. at 3.

After the tour, Plaintiff paid a non-refundable $75 application fee to submit an online rental application.  See Hettinger, 2024 WL 1833855, at *1.  The application specified that monthly rent would be $2,276 for the unit she desired but "made no mention" of any additional utility or service charges.  Id.; see ECF Nos. 50-6 (Rental Application); 54-1 (Def. Resp. to P. SMF), ¶ 5.  Hettinger was therefore surprised to discover, once she received an electronic copy of the lease, that she would be paying those utilities directly to Defendant along with a service fee.  See Hettinger, 2024 WL 1833855, at *1.  In particular, the lease states — under a section called "Rent and Charges" — that Plaintiff would pay $2,276 in monthly rent.  See ECF No.

50-9 (Lease Contract) at ECF p. 2.  Under "Utilities," the lease indicates that electricity, water/sewer, cable, phone, and internet would be paid by the tenant — though in that section, there is no indication of which charges are paid directly to Bozzuto and which to private companies.  Id. at ECF p. 3.  It additionally states that the "[f]ailure to pay any utilities shall be deemed a breach of" the lease, id., and that "any utility bill unpaid by [the tenant]" will be charged as "[a]dditional [r]ent."  Id. at ECF pp. 3–4 ("Ad Valorem Taxes/Fees and Charges — Additional Rent").

    A separate "Utility Addendum" provides further details.  It clarifies that water, sewer, HVAC, and trash are "billed by the service provider to" Bozzuto and then "allocated to" the tenant via either sub-metering or a flat rate.  Id. at ECF pp. 10–11.  The only utility that the tenant pays directly to the utility is electricity.  Id.; see also Pricing Sheet.  For the privilege of these services, the Addendum informs tenants that they will pay a monthly service fee of $4.30 and a new-account fee of $10.  Id. at ECF p. 10.  As for penalties, it states that "the late payment of a bill or failure to pay any utility bill is a material and substantial breach of the [l]ease," and Defendant "will exercise all remedies available under the Lease, up to and including eviction," in the event of nonpayment.  Id.

    Despite her surprise at these additional charges, Hettinger nonetheless signed a 12-month lease in July 2021.  See Hettinger, 2024 WL 1833855, at *1–2; Lease Contract at ECF pp. 2, 8, 11.  At the end of 2023, she filed the instant class action against Bozzuto in D.C. Superior Court, which Defendant promptly removed to this Court on the grounds that the parties are diverse and the suit meets the requirements for removal under the Class Action Fairness Act.  Hettinger, 2024 WL 1833855, at *2.  Plaintiff's original Complaint "advance[d] four theories" of liability (comprising 14 subcounts of CPPA violations), id.: (1) the allegation that Bozzuto never

discloses that tenants will have to pay the utility charges until they have already paid the application fee and are prepared to sign a lease (what Plaintiff calls a "drip-pricing" scheme, based on the theory that the real price of the rental unit is revealed only at successive stages of the purchase process); (2) the overcharging of water and sewer services; (3) the unlawful or unfair submetering of gas and electricity via the HVAC charge; and (4) a "catch-all theory" covering the remaining subcounts. Id. at *3–8. For these alleged violations, she requested damages and injunctive relief on a class-wide and individual basis. See ECF No. 1-1 (Compl.) at 31–32. After Defendant moved to dismiss the Complaint in its entirety, see ECF No. 10 (MTD), the Court dismissed Subcounts I, J, K, and M of her original Complaint — all premised on the illegality of submetering — for failure to state a claim, while permitting the rest to proceed to discovery. See Hettinger, 2024 WL 1833855, at *3–8; ECF No. 18 (Order) at 1.

During discovery, Plaintiff amended her Complaint to "clarify[] that [the] drip-pricing claims encompass" the monthly service fee, as well as to update the class and subclass definitions and add Subcount O, which alleges a violation of a provision of the CPPA prohibiting false advertising. See ECF No. 40 (Unopposed Mot. to Amend Compl.) at 2–3; see D.C. Code § 28-3904(h). The Amended Complaint also jettisons allegations that Bozzuto hides the fact that tenants must pay it certain utilities with their monthly rent and that it profits from inflated utility charges. See, e.g., ECF No. 40-2 (Redlined Am. Compl.), ¶¶ 1–7, 22, 28. As recast, then, the drip-pricing theory currently alleges that Defendant violates District of Columbia's housing laws by not providing "estimates" of utilities or a "formula by which utility charges would be calculated" at the time a prospective tenant submits an application, and for failing to disclose the service fee associated with those utilities. Id., ¶¶ 60, 64.

Defendant has now moved for summary judgment on Subcounts A–C and O of Plaintiff's Amended Complaint, which the Court explains below.  Plaintiff opposes while also cross-moving for summary judgment on Subcounts A and O only.  Those Motions are now ripe.

## II.    Legal Standard

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'"  Fam. Tr. of Mass., Inc. v. United States, 892 F. Supp. 2d 149, 154 (D.D.C. 2012) (quoting Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003)).  If the court determines that one party is not entitled to summary judgment, it "changes tack on the cross motion and gives the unsuccessful movant 'all of the favorable factual inferences that it has just given to the movant's opponent.'"  Nucap Indus., Inc. v. Robert Bosch LLC, 273 F. Supp. 3d 986, 998 (N.D. Ill. 2017) (quoting Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund, 778 F.3d 593, 603 (7th Cir. 2015)).  It is nonetheless still possible for a court to deny summary judgment to both sides.

Summary judgment is appropriate "only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed."  Airlie Foundation v. IRS, 283 F. Supp. 2d 58, 61 (D.D.C. 2003); see also Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); CEI Wash. Bureau, Inc. v. DOJ, 469 F.3d 126, 129 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  Liberty Lobby, 477 U.S. at 248; Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A dispute is "genuine" if the evidence is such that a reasonable factfinder could return a verdict for the non-moving party.  Liberty Lobby, 477 U.S. at 248; see Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895.  "A party asserting that a

fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. Potomac Elec. Power Co., 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*). The court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007). To defeat summary judgment, however, an opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(c), (e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The non-movant is required to provide evidence that would permit a reasonable factfinder to find in its favor. Laningham v. Navy, 813 F.2d 1236, 1241 (D.C. Cir. 1987). If the non-movant's evidence is "merely colorable" or "not significantly probative, summary judgment may be granted." Liberty Lobby, 477 U.S. at 249–50 (citations omitted).

## III.   Analysis

These Motions center principally on Hettinger's allegation that Bozzuto engaged in a "drip pricing scheme" whereby it hid the ball on charging prospective tenants a variable utility fee, plus a fixed service fee, until after they had already submitted their applications and paid the application fee. See Am. Compl., ¶ 90. That scheme forms the basis of three of the four CPPA subcounts at issue here: (1) Subcount A, which alleges a predicate violation of the Rental

Housing Act's disclosure provision; (2) Subcount B, which alleges a violation of the CPPA's general prohibition on deceptive and unfair trade practices; and (3) Subcount O, which alleges a violation of the CPPA's prohibition on advertising goods "without the intent to sell them as advertised or offered."  Am. Compl., ¶¶ 90, 94; see D.C. Code § 28-3904(h).

In addition, Plaintiff asserts that the company's practice of billing tenants a variable "[u]tility [r]ent" as part of their monthly rent unfairly deprives them of certain legal protections and benefits they would otherwise be afforded if they instead paid a fixed monthly rent and were billed for utilities directly by utility companies.  See Am. Compl., ¶ 90.  That practice forms the basis for Subcount C, which alleges a violation of the CPPA's general prohibition on unfair trade practices.  Id.

The Court discusses these two practices separately, addressing the relevant and applicable subcounts within those sections.

A.    Drip-Pricing Scheme

1.    Subcount A

As just mentioned, Plaintiff's Subcount A charges a violation of the CPPA via a predicate violation of the RHA.  Both parties have moved for summary judgment on this count.  See MSJ at 1; Opp. & Cross-MSJ at 1.  To resolve those Motions, the Court must determine whether any genuine disputes of material fact remain as to three core questions: (1) whether Defendant's utilities and service charges count as "rent" under the RHA; (2) if so, whether that rent was adequately disclosed to Hettinger before she applied for an apartment; and (3) whether a violation of the RHA qualifies as a predicate violation of the CPPA.

a.    Definition of Rent

The Court previously resolved the first question in Plaintiff's favor at the motion-to-dismiss stage, and it sees no reason to depart from its prior conclusion.  See Hettinger, 2024 WL 1833855, at *4.  "At the time a prospective tenant files an application to lease any rental unit," District law requires the "housing provider" to provide several pieces of information on a "disclosure form," "together with any documents corresponding to each item of information." D.C. Code § 42-3502.22(b)(1).  The first of those pieces of information is "[t]he applicable rent for the rental unit."  Id., § 42-3502.22(b)(1)(A).  Rent, in turn, has the following capacious definition: "the entire amount of money . . .  received[] or charged by a housing provider as a condition of occupancy or use of a rental unit, its related services, and its related facilities."  Id., § 42-3501.03(28).  Related services are those services "provided by a housing provider, required by law or by the terms of a rental agreement, to a tenant in connection with the use and occupancy of a rental unit, including  . . .  the provision of light, heat, hot and cold water, air conditioning,  . . . , or the removal of trash and refuse."  Id., § 42-3501.03(27).  In short, any money that a tenant pays to a housing provider as a condition for occupying the unit or for using any heat, light, water, HVAC, or trash services provided for in the lease counts as "rent" under D.C. law.

Under the terms of Hettinger's lease, the utility and service charges she complains of are "rent" within the meaning of these expansive statutory definitions.  To begin, they are paid directly to Bozzuto — unlike, for instance, electricity, see Lease Contract at ECF p. 10 — and thus constitute "money . . . received  . . . by" Defendant.  See D.C. Code § 42-3501.03(28).  They are also a "condition" of the occupancy of the unit and the use of NOVEL's related services or facilities.  Id.  The lease itself states that "failure to pay any utilities shall be deemed a breach of

th[e] Lease Contract," Lease Contract at ECF p. 3, and the Utility Addendum underscores that "failure to pay any utility bill" is a material breach of the lease and that Bozzuto will "exercise all remedies available under the Lease, up to and including eviction[,] for nonpayment." Id. at ECF pp. 10–11.  And what do the charges cover?  HVAC, water, sewer, and trash services — i.e., "the provision of . . . heat, hot and cold water, air conditioning, . . . [and] the removal of trash and refuse."  D.C. Code § 42-3501.03(27) ("related services").  Because the monthly service fee, moreover, is a mandatory charge associated with each of these utility charges, it, too, counts as a condition of occupancy or use, and thus rent.

Defendant parries this straightforward argument from the statutory language with several counter-arguments, but none changes the bottom line.  First, in the sole contention that actually takes the statutory definition on its own terms, Bozzuto maintains that because the disclosure provision "says nothing about utilities," it should not be read to require disclosure of those charges.  See ECF No. 54 (Opp. & Reply) at 5; see D.C. Code § 42-3502.22(b)(1).  That maneuver simply begs the question.  Since Plaintiff is correct that some payments denominated as "utilities" can constitute rent within the meaning of the RHA, then § 3502.22(b)(1) in fact does cover utilities when it requires disclosure of the "applicable rent for the rental unit."  The persuasive force of the various canons of statutory construction Defendant invokes, see Opp. & Reply at 7, therefore relies on first accepting Bozzuto's circular premise that § 3502.22(b)(1)(A)'s reference to "rent" must be understood always to exclude utility payments. Defendant attempts to justify that premise by appealing to the expectations of the "reasonable landlord," id. at 6, but courts "must adhere" to a statutory definition "even if it varies from a term's ordinary meaning."  Feliciano v. Dep't of Transp., 145 S. Ct. 1284, 1294 n.4 (2025) (quotation marks omitted).  Bozzuto has given no reason to disregard the RHA's definition of

rent other than to point out that it was enacted "decades earlier" than the disclosure provision. See Opp. & Reply at 5. That chronology points in the opposite direction, however, as the D.C. Council presumably legislated with the earlier-enacted definition in mind. See ECF No. 57 (Reply) at 4; Wolverine Power Co. v. FERC, 963 F.2d 446, 450 (D.C. Cir. 1992) ("[W]e must assume that Congress used 'licensee' in this section in the same way it had earlier defined the term in another part of the same act.").

Defendant next leans heavily on a recent decision from Judge Todd Edelman of the D.C. Superior Court that construed the definition of "rent" in § 42-3501.03(28). See ECF No. 46-1 (SJ Br.) at 6–7 (citing Nanan v. Hines, 2024 WL 4697067, at *2–6 (D.C. Super. Ct. Nov. 6, 2024)). In that decision, the court indeed found that, under the terms of the lease there at issue, utilities did not count as rent. See Nanan, 2024 WL 4697067, at *5–6. But its reasoning supports Hettinger's position. Judge Edelman understood § 42-3501.03(28) to "impl[y] that, in general, rent constitutes monetary payment" that "flows from the tenant to the landlord." Id. at *5. Because the lease agreement there both treated rent and utility payments as separate obligations and — more importantly for present purposes — required that utility bills "be paid directly to the utility providers," he concluded that the utility payments could not be considered rent. Id.

Bozzuto's Lease Contract, however, is different. While, like the lease in Nanan, it may facially treat rent and utilities as separate financial obligations, see, e.g., Lease Contract at ECF pp. 2, 3 (addressing them in separate sections); but see ECF pp. 3–4 (treating unpaid utility bills as "[a]dditional [r]ent"), the critical difference is that Hettinger must make most such payments directly to Defendant, who then conditions continued occupancy and use of the unit on the payment of those bills. Because the utility and service charges here "constitute[] monetary

payment[s]" that "flow[] from the tenant to the landlord," <u>Nanan</u>, 2024 WL 4697067, at *5, those charges qualify as rent under the logic of that decision.  <u>See also</u> <u>Murray v. Goodwin</u>, 791 A.2d 77, 78–79 (D.C. 2002) (holding that obligation to pay utilities constituted "rent" under oral agreement in which renter would "only . . . pay utility costs and invest 'sweat equity' to improve the property" as "a condition of his continued occupancy").  Indeed, Judge Edelman explicitly disagreed with the proposition that rent cannot ever encompass utility obligations.  <u>See</u> <u>Nanan</u>, 2024 WL 4697067, at *3 n.3

Bozzuto protests that paying utilities to it rather than a third party is a "distinction without a difference," Opp. & Reply at 7, especially in light of an affidavit from a NOVEL property manager that states that "Bozzuto does not receive more money from residents than it pays to Conservice and does not profit in any way from this arrangement."  ECF No. 46-2 (Affidavit of Madeline Dunn Wellerson), ¶ 12.  Even if this were true, <u>but see</u> Reply at 24, it does not change the picture.  That Bozzuto might act essentially as a pass-through for Conservice — the entity that bills the utility charges in the first place — does nothing to alter the fact that tenants like Hettinger pay that money directly to Defendant as a condition for occupying their units and using the building's related services.  Under the RHA's statutory definition, that arrangement categorizes those payments as rent.

Defendant also argues that it has treated nonpayment of utilities and nonpayment of rent as separate eviction-worthy offenses, dealt with by separate sections of the D.C. Code, and that this litigation practice should inform the interpretation of "rent" in the Lease Contract.  <u>See</u> SJ Br. at 8.  To begin, Bozzuto's litigation practice — reasonable or not — does not control the proper interpretation of the RHA.  The examples of such litigation that Defendant provides, moreover, do not even involve residents at the NOVEL, <u>compare</u> ECF No. 46-5 (suit for

nonpayment of rent at 701 2nd Street NE), <u>and</u> ECF No. 46-6 (suit for nonpayment of utilities at

same address), <u>with</u> Lease Contract at ECF p. 2 (stating NOVEL's address is 4 I Street SE), and

Bozzuto never claims that the lease agreements in those suits are the same as Plaintiff's with

respect to the payment of utilities.

It is true, of course, that the Rental Housing Act would treat Bozzuto's rent-based

evictions and utility-based evictions as separate actions, with distinct notice requirements and

procedural hurdles.  <u>See</u> <u>Nanan</u>, 2024 WL 4697067, at *4 (citing D.C. Code § 42-3505.01(a),

(b)).  Most critically, eviction for nonpayment of rent alone permits a "common law equitable

right of redemption," wherein tenants "can redeem their tenancy by paying all rent owed, right

up until the moment of eviction."  <u>Id.</u>; <u>see</u> <u>Trans-Lux Radio City Corp. v. Serv. Parking Corp.</u>, 54

A.2d 144, 146 (D.C. 1947).  In <u>Equity Residential Management, LLC v. Touw</u>, 2023 WL

9187029 (D.C. Super. Ct. May 18, 2023), for instance, Judge Edelman held that, given the

"muscular right" of redemption in the common law, and "even where the lease obligates a tenant

to pay for utilities and other fees, a landlord cannot pursue eviction for those fees under a theory

of nonpayment of rent."  <u>Id.</u> at *6–7; <u>see id.</u> at *7 (similar); <u>see also</u> Opp. & Reply at 10 (relying

on <u>Touw</u>).  That decision and the redemption right it explicates raise the thorny question of

whether, on this Court's reading of the RHA, plaintiffs with leases like Hettinger's must pay

both their unpaid monthly rent and their unpaid utility charges and service fees in order to

redeem their property — a conclusion at odds with the normal understanding of redemption.

Even if the answer to the question is "yes," <u>but cf.</u> <u>Touw</u>, 2023 WL 9187029, at *6–7

(explaining that redemption right arises from property law, "rather than the contractual

relationship formed by the lease," and thus may invalidate contractual provisions that encumber

the right), it is simply a consequence of the way Bozzuto has chosen to structure its business.  By

transforming ordinary utility payments into monthly payments made to <u>it</u> as a condition of continued occupancy of the unit and use of the NOVEL's services, Bozzuto has backed itself into the very statutory definitions it now seeks to avoid.  And relying on <u>Touw</u> is particularly inapposite here because, as previously noted, Judge Edelman in <u>Nanan</u> made clear that <u>Touw</u> was premised on the concession that the utility payments there at issue "did not constitute rent," and the case therefore "should not be taken as a holding that a utility obligation cannot <u>ever</u> comprise part of a tenant's obligation to pay rent."  <u>Nanan</u>, 2024 WL 4697067, at *3 n.3.

That utility payments made to a property manager constitute "rent" for the purposes of the RHA may appear counterintuitive.  The Court, however, is bound to apply the law as written — and this outcome is not so "absurd," Opp. & Reply at 7 (quotation marks omitted), that it calls for ignoring the clear meaning of the statutory text.  The Court thus concludes that, under the unique circumstances presented here, the utility payments and service fee made to Bozzuto qualify as "rent" that, under the RHA, had to be disclosed to Plaintiff when she applied for an apartment.

### b.    Adequacy of Disclosure

The question that naturally follows asks whether such charges <u>were</u> in fact disclosed within the meaning of the RHA.  As for the service charge, the question can be easily answered: the Pricing Sheet nowhere mentions it, and Defendant does not contest that it neglects to disclose the fee to prospective tenants at any point before they pay the application fee.  <u>See</u> Def. Resp. to P. SMF, ¶¶ 5, 8.   Instead, Bozzuto asserts that the service fee is merely "*de minimis*," MSJ at 2, 10; Opp. & Reply at 2, and "costs less than a gallon of milk."  Opp. & Reply at 2.  That is no answer to the RHA's categorical disclosure requirement.  If, for instance, Defendant had informed Plaintiff that her monthly rent was $2,272 — instead of the $2,276 it actually was — it

quite clearly would not have accurately disclosed the "applicable rent for the rental unit."  D.C.

Code § 42-3502.22(b)(1)(A).  Neglecting to disclose the $4.30 mandatory monthly service

charge is functionally equivalent.

It is a closer call, however, whether the Pricing Sheet meets the RHA's disclosure

requirement as to the utility charges.  Recall that Plaintiff originally alleged that she had never

received <u>any</u> information about the utility fees she would be paying directly to Bozzuto.  In

discovery, it was revealed that during her tour she had in fact received the Pricing Sheet, which

states that tenants are responsible for paying certain utilities to Defendant.  Admitting as much,

Plaintiff now argues that the Pricing Sheet constituted inadequate disclosure because the utility

charges were not subsequently disclosed "in a consolidated manner at the time [she filed her]

application," and, in any event, the Pricing Sheet did not "provide specific information about

Plaintiff's rent, nor any estimate or formula that would allow a tenant to calculate potential

charges for [u]tilities."  ECF No. 50-1 (Opp. & Cross-MSJ Br.) at 23, 26; <u>see</u> Am. Compl., ¶¶ 28,

90.  Bozzuto protests that this theory was not adequately pled, <u>see</u> Opp. & Reply at 11–12, and

that it "elevates format dramatically over substance" by requiring disclosure at the moment the

application is filed online, and not simply at some point beforehand.  <u>Id.</u> at 12.

While sympathetic to Defendant's interpretation, the Court thinks Plaintiff has the better

of the argument here, too.  There is no need to reach the question whether the Pricing Sheet was

sufficiently specific.  The problem for Bozzuto, once more, is the unforgiving language of the

RHA.  Consider again the full language of the disclosure provision:

> <u>At the time</u> a prospective tenant <u>files an application</u> to lease any
> rental unit, the housing provider shall provide on a disclosure form
> published by the Rent Administrator (or in another suitable format
> until a form is published) <u>together with</u> any documents
> corresponding to each item of information: [] the applicable rent for
> the rental unit.

16

D.C. Code § 42-3502.22(b)(1)(A) (emphasis added).  Hettinger rightly focuses on two aspects of the statutory language: the fact that the disclosure must occur "[a]t the time a prospective tenant files an application," and the fact that the disclosure must occur "together with any documents corresponding to each item of information."  The opening clause describes a discrete moment in time when a specific action occurs: disclosure must happen "<u>at</u> the time a prospective tenant <u>files</u> an application."  It does not, notably, state that the rent must be disclosed "<u>by</u> the time" such application is filed, nor does it require disclosure "at the time the prospective tenant <u>applies</u>." Either of those formulations might plausibly countenance disclosure at some point during the entire application process, as long as it happened before the application was actually submitted. But that is not what the D.C. Council drafted.  Instead, it mandated disclosure at the precise moment when a prospective tenant "files" the application.  As Defendant does not dispute, neither the website nor the rental application itself discloses the requirement to pay the utilities at issue.  <u>See</u> Def. Resp. to P. SMF, ¶¶ 5, 8; <u>see also</u> ECF Nos. 50-4 (screenshots from website); 50-6 (rental application).  As a result, not only did Hettinger not receive such disclosure "at the time" she "file[d]" an application, but any other prospective tenants who neglected to tour the building presumably <u>never</u> received such information prior to paying the application fee.

That such disclosure must occur "together with any documents corresponding to each item of information" lends further support to Plaintiff's interpretation.  Hettinger draws on caselaw interpreting the federal Truth in Lending Act, which "has the broad purpose of promoting 'the informed use of credit' by assuring 'meaningful disclosure of credit terms' to consumers."  <u>Ford Motor Credit Co. v. Milhollin</u>, 444 U.S. 555, 559 (1980) (quoting 15 U.S.C. § 1601); <u>see</u> Opp. & Cross-MSJ Br. at 25–26.  Regulations implementing that statute require that TILA disclosures be "grouped together," 12 C.F.R. § 226.17(a)(1), an instruction that courts

have construed to forbid piecemeal disclosures.  See, e.g., Warford v. Memphis City Emps.

Credit Union, 2020 WL 4819952, at *7 (W.D. Tenn. Aug. 19, 2020); Abel v. KeyBank USA,

N.A., 2003 WL 26132935, at *7 (N.D. Ohio Sept. 24, 2003).  That language differs, of course,

from the RHA's requirement that rent disclosure occur "together with" any supporting

documents, and the two statutes diverge in other respects.  See Opp. & Reply at 13.  But the

provisions echo each other, and they aim to accomplish the same task — namely, to provide

consumers with the relevant information to make an informed decision in a single place, with all

supporting documentation provided.  This language in the RHA, interpreted against the backdrop

of the TILA, thus provides modest support to Hettinger's position.

The Court, accordingly, concludes that Defendant violated the RHA's rent-disclosure

provision by failing to disclose the requirement to pay the service fee and utilities at issue "at the

time" Plaintiff "file[d]" her application.  Because that alone suffices to establish an RHA

violation, the Court need not reach the further question of whether such disclosure must include

an "estimate or formula that would allow a tenant to calculate potential charges for [u]tilities."

Opp. & Cross-MSJ Br. at 26.

c.    Violation of CPPA

What remains is to determine whether Bozzuto's violation of the RHA suffices to

establish a violation of the CPPA.  As the Court previously explained, the violation of other D.C.

laws or regulations, including in the housing context, may equally establish a violation of the

CPPA.  See supra Section I.A (citing cases).  That is because the CPPA itself provides a private

right of action to any "consumer . . . seeking relief from the use of a trade practice in violation of

a law of the District," and it specifies that this right of action "shall apply to trade practices

arising from landlord-tenant relations."  D.C. Code § 28-3905(k)(1)(A), (6) (first emphasis

added).  The weight of relevant authority, moreover, holds that (1) the violation of another D.C.

statute (2) in a consumer context constitutes a *per se* violation of the CPPA.  See Vesta, 2024

D.C. Super. LEXIS 44, at *13–14; Martin, 2021 D.C. Super LEXIS 213, at *26; Wash. Hebrew,

2022 D.C. Super. LEXIS 88, at *13; Evolve, 2020 D.C. Super. LEXIS 6, at *12.  As just

established, Defendant violated the RHA, and it did so in the context of advertising rental units

to prospective tenants — a consumer context.  It therefore violated the CPPA.

 Relying on Gomez v. Independence Management of Delaware, Inc., 967 A.2d 1276 (D.C.

2009), Bozzuto insists that Plaintiff cannot use the RHA to establish a *per se* violation of the

CPPA and instead "must shoehorn her allegations . . . into the CPPA's requirement of

commercially reasonable practices."  Opp. & Reply at 13–14; see *supra* Section II.B (discussing

this standard).  Gomez indeed held that the CPPA did not cover an action brought under the D.C.

Rental Housing Conversion and Sales Act, reasoning that the D.C. Council "did not

intend . . .  to extend the private right of action created by the CPPA into the realm of landlord-

tenant relations."  967 A.2d at 1286.  Defendant's reliance on that case, however, is misplaced.

As Plaintiff points out, the D.C. Council subsequently repudiated that understanding in 2018

when it clarified that the CPPA "shall apply to trade practices arising from landlord-tenant

relations."  D.C. Code § 28-3905(k)(6); see Vesta, 2024 D.C. Super. LEXIS 44, at *15–16

(recognizing as much).  Bozzuto has otherwise pointed to no reason why the violations of the

RHA at issue here should not qualify as predicate violations of the CPPA *per se*.

 The Court therefore concludes that, on the undisputed facts, Hettinger is entitled to

judgment as a matter of law on Subcount A.

2.      *Subcount B*

Subcount B alleges that the drip-pricing scheme just examined separately violates the CPPA as a "deceptive" trade practice.  See Am. Compl., ¶ 90 (citing D.C. Code § 28-3904). Plaintiff's Opposition and Cross-Motion specifies that D.C. Code § 29-3904(e), (f), and (f-1) serve as bases for this claim.  See Opp. & Cross-MSJ Br. at 35.  Those sections prohibit trade practices that "misrepresent as to a material fact which has a tendency to mislead," D.C. Code § 28-3904(e), "fail to state a material fact if such failure tends to mislead," id., § 28-3904(f), or "use . . . ambiguity as to a material fact, which has a tendency to mislead."  Id., § 28-3904(f-1).

Unlike *per* se violations of the CPPA based on violations of other D.C. laws, whether a given trade practice has a tendency to mislead the "reasonable consumer" is generally a question of fact for the jury.  Saucier v. Countrywide Home Loans, 64 A.3d 428, 445 (D.C. 2013); see Pearson, 961 A.2d at 1075–76 (D.C. 2008) (setting out reasonable-consumer standard).  A plaintiff also "need not allege or prove intentional misrepresentation or intentional failure to disclose to prevail on a claimed violation of § 28–3904(e) or (f)."  Saucier, 64 A.3d at 442. Under § 3904(e), however, she must "establish that [the] defendant made a misrepresentation," and under § 3904(f) she must establish that the defendant "failed to make a required disclosure." Id.  Practices that deceive "by implication," moreover, may fall within the reach of § 3904(f-1). Center for Inquiry, Inc. v. Walmart, Inc., 283 A.3d 109, 118 (D.C. 2022) (holding that "allegedly misleading product placement" is cognizable claim under CPPA).  As to materiality, an omission is material "if a significant number of unsophisticated consumers would find that information important in determining a course of action," a question that "[o]rdinarily . . .  should not be treated as a matter of law."  Saucier, 64 A.3d at 442 (first quotation marks omitted); see also id. (citing Restatement (Second) of Torts, § 538(2)).  Finally, although the D.C. Court of Appeals

has held that an "accurate statement . . . generally would not be actionable under § 28-3904(e) and (f)," id., it has also instructed that the prohibitions of those sections "extend[] beyond literal falsehoods and include[] any omissions, innuendos, or ambiguities that have a tendency to mislead reasonable consumers." Earth Island Inst. v. Coca-Cola Co., 321 A.3d 654, 664 (D.C. 2024) (cleaned up).

Bozzuto alone moves for summary judgment on this Subcount. See MSJ at 1. It argues that no reasonable consumer could be misled about the obligation to pay the utility and service charges in light of the disclosures in the Pricing Sheet. See SJ Br. at 11–12. Hettinger rejoins that such a determination "is usually a question of fact." Opp. & Cross-MSJ Br. at 35 (quotation marks omitted). She points to this Court's prior Opinion, which held that "a reasonable tenant could be misled by" the drip-pricing scheme there alleged, Hettinger, 2024 WL 1833855, at *5, and cites a bevy of cases denying motions to dismiss because consumer deception is normally a question for the jury. See Opp. & Cross MSJ at 37; see also District of Columbia v. DoorDash, Inc., 2020 D.C. Super. LEXIS 115, at *8 (D.C. Super. Ct. Mar. 2, 2020) (whether disclosure was misleading was "a question of fact for the jury"); Travelers United, Inc v. Sonesta Int'l Hotels Corp., 2024 D.C. Super. LEXIS 7, at *12–13 (D.C. Super. Ct. Mar. 21, 2024) (stating that "a reasonable juror" could find timing of disclosure was "material" to his decision).

Although Bozzuto is right that such cases are less helpful guidance at the summary-judgment stage, see Opp. & Reply at 21, it nonetheless has not shown that it is entitled to judgment as a matter of law on Subcount B. As for the utility charges, a genuine dispute of material fact remains over whether their disclosure would be material to the ordinary, unsophisticated consumer's decision to apply to rent an apartment at the NOVEL. The Court can certainly imagine that it would be, given Plaintiff's evidence that she has paid over $1,100 in

such fees to Defendant over the course of her tenancy, see Def. Resp. to P. SMF, ¶ 27, and also given the allegations (discussed below, see infra Section III.B) that Bozzuto's utility scheme deprives tenants of rights they would otherwise possess if they dealt directly with the utility companies.  See Am. Compl., ¶¶ 49–56.  So, too, a triable issue exists as to whether the disclosure of such charges on the Pricing Sheet, instead of on the website or in the online application, tends to mislead the reasonable consumer — especially in light of Bozzuto's implicit admission that the Pricing Sheet is distributed only to those applicants who choose to tour the property, and not to everyone who applies.  See Opp. & Reply at 16 (stating only that "every applicant who tours a Bozzuto-managed property" receives a pricing sheet) (emphasis added).

While it is true, moreover, that Plaintiff has not provided evidence speaking to the practices of "similarly situated property managers" or furnished "consumer surveys or other data" to demonstrate deception, id. at 20, Defendant points to no caselaw establishing that such evidence is necessary in order for a jury to find that an omission or misrepresentation tends to mislead.  Its own belated attempt to submit such evidence for the first time via its Reply, see ECF No. 54-2 (Decl. of Charles K. Schulman), will not be considered.  See Feld Ent. Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals, 873 F. Supp. 2d 288, 309 n.11 (D.D.C. 2012); McAllister v. District of Columbia, 689 F. App'x 646, 646–47 (D.C. Cir. 2017).  Granting Hettinger the benefit of all reasonable inferences, the Court is not persuaded that the current record permits judgment as a matter of law in Defendant's favor.

Similarly, a reasonable jury could find that the disclosure of a $4.30 service charge is also material to the reasonable consumer's decision to apply to rent an apartment at the NOVEL, and that the "fail[ure]" to disclose that charge pre-application "tends to mislead."  D.C. Code § 28-3904(f).  Bozzuto misconstrues the inquiry here, arguing that Plaintiff cannot argue that she

"would have walked away from [the] NOVEL" had she known about the fee, in light of the fact that she ultimately signed a lease after full disclosure.  See Opp. & Reply at 21.  The relevant question, however, is whether a "reasonable consumer" would have chosen to apply (thus incurring the financial costs of such application) if she had known about that charge.  "[T]here is no requirement that any consumer in fact be misled by the deceptive statements."  Earth Island Inst., 321 A.3d at 664 (citing D.C. Code § 28-3904).  The Court therefore cannot conclude that no triable issue exists as to those questions and will accordingly deny Defendant's Motion as to Subcount B.

> 3.    *Subcount O*

Hettinger's Subcount O alleges that the drip-pricing scheme also violated § 28-3904(h), which prohibits merchants from "advertis[ing] . . . goods or services . . . without the intent to sell them as advertised."  To succeed on this claim, Plaintiff must show that her rental unit was not leased to her "as advertised" and that Bozzuto "was aware" of that discrepancy.  Wetzel v. Cap. City Real Est., LLC, 73 A.3d 1000, 1005 (D.C. 2013) (first quotation marks omitted); see E.M. v. Shady Grove Reprod. Sci. Ctr. P.C., 496 F. Supp. 3d 338, 414 (D.D.C. 2020) ("intent element" is "necessary for a claim under subsection (h)").  Unlike the provisions just discussed, however, subsection (h) does not mention materiality.  The Court therefore joins the (slim) weight of authority in holding that this provision — like others with a similar omission — does not have a materiality element.  See Alce v. Wise Foods, Inc., 2018 WL 1737750, at *9 n.8 (S.D.N.Y. Mar. 27, 2018) (subsections (a), (h), (x)); Carroll v. Fremont Inv. & Loan, 636 F. Supp. 2d 41, 52 (D.D.C. 2009) (subsection (r)).

Both parties move for summary judgment on this Subcount.  See MSJ at 1; Opp. & Cross-MSJ at 1.  Plaintiff does not identify in her Amended Complaint which advertisements are

at issue, but her briefing takes aim at the rental application and the NOVEL's website.  See Opp.

& Cross-MSJ Br. at 28–29.  She points out that the "purchase flow" of the website and

application stated only the monthly rent for the unit, without mentioning the additional utility

and service fees she would have to pay Bozzuto.  Id. at 29.  That omission, she asserts,

constituted deceptive advertising as a matter of law, notwithstanding the Pricing Sheet's mention

of the utility fees.  Id. at 29–30.  Bozzuto's principal argument is that the "average housing

applicant" would not "understand the word 'rent' on Bozzuto's website to incorporate by

reference the capacious definition in" the RHA, and that its disclosure of utilities in the Pricing

Sheet, the application approval letter, and the Utility Addendum prove that its advertising

practices do not contravene the CPPA.  See Opp. & Reply at 15–16.  It also argues that, even

putting aside materiality, Plaintiff's decision to sign the lease shows that she did not

detrimentally rely on the purported deception, and it thus negates any Article III injury.  Id. at

17–20.

        The Court can agree with neither party.  A genuine dispute of material fact remains as to

whether a reasonable applicant would expect references to "rent" in Bozzuto's online materials

to include its utility and service fees.  Although, as the Court has just held, such sums qualify as

rent for the purposes of the RHA, Plaintiff has pointed to no undisputed evidence that the

average, unsophisticated consumer so construes the term or would otherwise be misled by

Bozzuto's advertising practices.  Nor has she shown as a matter of law that Defendant had no

"intent" to lease the unit "as advertised," D.C. Code § 28-3904(h), especially in light of the

disclosure of the utility fee in the Pricing Sheet.  To be sure, the Pricing Sheet does not mention

the service fee.  That omission, however, does not alone entitle Hettinger to judgment on this

Subcount, as a reasonable jury could conclude that the typical rental applicant would not

consider the service fee part of the "price" of a rental apartment, such that the all-in price differs from the advertised one. Hettinger's use of District of Columbia v. StubHub, Inc., 2025 D.C. Super. LEXIS 4 (D.C. Super. Ct. Feb. 13, 2025), moreover, gets her nowhere. That case held only that StubHub's practice of first disclosing its fulfillment and service fees at the final stage of a "drawn out" purchase process stated a plausible CPPA violation. Id. at *12–15. That limited holding provides little help to Plaintiff at the summary-judgment stage, where she must show more than plausibility.

For similar reasons, and in light of those enduring factual disputes, Bozzuto has not shown that it is entitled to judgment on this Subcount either. Its challenge to Plaintiff's Article III standing — which it dwells on only in relation to Subcounts A and O, see Opp. & Reply at 16–20, but which might apply to other Subcounts based on Defendant's alleged misrepresentations — does not move the needle. To begin, the Court agrees with Hettinger that it is a "dubious strategy" to remove a case to federal court and then argue that it should be dismissed for lack of standing. See Reply at 20 n.4 (quoting Collier v. SP Plus Corp, 889 F.3d 894, 897 (7th Cir. 2018)).

Even so, constitutional injury-in-fact is established here because, if Hettinger prevails on her claim, she will have shown a "concrete and particularized" invasion of a "legally protected interest." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). Courts have held that "bait-and-switch" pricing schemes — in which the price initially advertised to consumers is lower than the price shown at the "register" — can inflict a "concrete injury," Spokeo, Inc. v. Robins, 578 U.S. 330, 341 (2016), on consumers by causing them to either "spend more time searching for full pricing information" or "make uninformed decisions." Rector v. Walmart Inc., 2025 WL 671211, at *5 (D.D.C. Mar. 3, 2025) (Article III standing); cf. Kahn v. Walmart Inc., 107 F.4th

585, 603 (7th Cir. 2024) ("substantial injury" prong of state unfair-trade-practices law).  The injury is even more concrete in this case because Plaintiff had to pay $75 for full information — a classic pocketbook injury.  Through its private right of action, moreover, the CPPA "elevate[s]" that concrete injury, Spokeo, 578 U.S. at 341, into a legally protected interest in "being free from improper trade practices" — a "statutory right" that, on Plaintiff's theory, was invaded here.  Shaw v. Marriott Intern., Inc., 605 F.3d 1039, 1042 (D.C. Cir. 2010); see D.C. Code §§ 28-3904, 28-3905(k)(1)(A).

Defendant retorts by repeating its contention that Hettinger cannot claim that she was injured absent an allegation — missing here — that she would not have applied had she known about the service fee.  See Opp. & Reply at 19.  It cites no caselaw, however, in support of that but-for reliance rule.  Indeed, as previously explained, the CPPA itself does not require that the consumer detrimentally relied at all on the misrepresentation.  See D.C. Code § 28-3904 (unlawful to "engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived, or damaged thereby"); Earth Island Inst., 321 A.3d at 664.  The unspoken implication of Bozzuto's argument is that this aspect of the statutory scheme, to the extent it has any bite, is inconsistent with Article III standing.

Perhaps so; perhaps not.  The Court need not wade into those waters here, however, because Defendant's proposed but-for standard is stricter even than the standard for common-law fraud — a doctrine presumably consonant with standing doctrine — which requires only that the misrepresentation "played a substantial part . . . in influencing" the consumer's decision.  Virginia Acad. of Clinical Psychs. v. Grp. Hospitalization & Med. Servs., Inc., 878 A.2d 1226, 1238 (D.C. 2005) (quotation marks omitted); see Spokeo, 578 U.S. at 341 (harm with a "close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in

English or American courts" likely suffices to show injury-in-fact); accord TransUnion LLC v. Ramirez, 594 U.S. 413, 424–25 (2021).  Even assuming, therefore, that some amount of detrimental reliance is necessary for Article III purposes, the Court is satisfied that Plaintiff has shown that she relied in "substantial part" on Defendant's representations as to the price of the rental unit, even if she never alleges that she would not have consummated the transactions but for those representations.  See Am. Compl., ¶¶ 61–63.  That suffices here to establish standing.

B.      Utility-Billing Practices (Subcount C)

Putting aside the drip-pricing scheme, Plaintiff has also asserted that Bozzuto's practice of "partition[ing] out costs typically covered by fixed rent" is unfair under the CPPA because it "deprive[s] Class members of the protections and benefits they would enjoy with a single, predictable, monthly fixed rent and the standard legal protections afforded consumers when they are billed for utilities directly by utility companies."  Id., ¶ 90 (Subcount C) (citing D.C. Code § 28-3904).

Defendant moves for summary judgment on Subcount C, see MSJ at 1, asserting that it is "common" that "tenants [be] responsible for utility costs in residential multifamily communities."  SJ Br. at 12.  As Hettinger points out, however, her complaint is not that she must pay those utilities at all, but rather that Bozzuto's particular utility scheme results in a higher "per-gallon rate" for water and sewer than District regulations permit, as well as fewer disclosures about those costs and less time to pay her utility bills than she would otherwise have if paying the utility company directly.  See Opp. & Cross MSJ at 38–39.  Defendant's argument for summary judgment on this Subcount thus misconstrues the claim entirely.

In its Reply — and its Reply only — Bozzuto retorts that Plaintiff has "provide[d] zero evidence" that any of those practices is "atypical" and thus unfair from the perspective of the

reasonable consumer, see Opp. & Reply at 22 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)), and it attempts once again to leverage the Schulman declaration. Id. at 23–24. As already explained, the Court will not consider that declaration. See supra at p. 22. District courts also typically do not consider arguments raised for the first time in a reply, and it would be particularly inappropriate to do so here in order to grant summary judgment. See, e.g., Dorriz v. District of Columbia, 133 F. Supp. 3d 186, 196–197 (D.D.C. 2015) (citing Am. Wildlands v. Kempthorne, 530 F.3d 991 (D.C. Cir. 2008)). Even taking this argument on its terms, however, the Court rejects Bozzuto's assumption that a reasonable jury could find only "atypical" billing practices to be unfair trade practices. Common sense and experience attest that many unfair trade practices are widespread, and a reasonable jury could so find. Hettinger has also provided evidence that her per-gallon rates exceeded the regulatory rate, see Pl. Resp. to Interrog. at 4, and she has pointed to D.C. regulations that require more detailed disclosures and longer pay periods than those she received. See Opp. & Cross-MSJ Br. at 39 (citing D.C. Water Consumer Bill of Rights and D.C.M.R. 21-428.5). That showing is far from the "complete failure of proof" required under Celotex to grant a motion for summary judgment, see 477 U.S. at 323, especially in light of Defendant's decision to move before the close of discovery.

## IV.    Conclusion

For the foregoing reasons, the Court will deny Defendant's Motion for Summary Judgment as to Subcounts A–C and O, grant Plaintiff's Cross-Motion for Summary Judgment as to Subcount A, and deny it as to Subcount O. A separate Order so stating will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
Chief Judge

Date:  July 21, 2025