**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LAURA HETTINGER,

*Plaintiff,*

v.

BOZZUTO MANAGEMENT COMPANY,

*Defendant.*

Case No. 1:23-cv-03687-JEB

**ORAL HEARING REQUESTED**

**PLAINTIFF'S MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION APPOINTMENT AS CLASS REPRESENTATIVE, AND APPOINTMENT OF CLASS COUNSEL**

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. THE COURT'S SUMMARY JUDGMENT ORDER ..... 2

III. FACTS ..... 3

- A. The Drip-Pricing Class. ..... 3
- B. The Overcharge Class. ..... 5

IV. PROCEDURAL BACKGROUND ..... 7

V. MS. HETTINGER AND THE CLASSES ..... 8

VI. LEGAL STANDARD ..... 9

VII. ARGUMENT ..... 9

- A. Ms. Hettinger satisfies the Rule 23(a) requirements. ..... 9
  - 1. Rule 23(a)(1) numerosity is satisfied. ..... 9
  - 2. Rule 23(a)(3) typicality is satisfied. ..... 9
  - 3. Rule 23(a)(4) adequacy is satisfied. ..... 10
- B. Ms. Hettinger satisfies the Rule 23(a)(2) commonality and Rule 23(b)(3) predominance requirements to certify a damages class. ..... 11
  - 1. The Drip-Pricing Class: Common questions predominate on proving liability for Subcounts A & B. ..... 13
  - 2. Overcharge Class: Common questions predominate on proving liability for Subcounts H & G. ..... 20
  - 3. Class Members have common injuries. ..... 23
  - 4. Common questions predominate on proving damages. ..... 24
  - 5. Superiority is satisfied and this case is manageable. ..... 28
- C. The Court should certify an injunctive class under Rule 23(b)(2). ..... 31
- D. LCvR 23.1(c) statement regarding class notice. ..... 32
- E. The Court should appoint Ms. Hettinger's attorneys as Class Counsel. ..... 33

VIII. CONCLUSION ..... 34

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Amchem Prods v. Windsor*,
521 U.S. 591 (1997)....11, 12, 29

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
568 U.S. 455 (2013)....9

*Attias v. Carefirst, Inc.*,
346 F.R.D. 1 (D.D.C. 2024)....9

*Bakov. v. Consol. World Travel, Inc.*,
68 F.4th 1053 (7th Cir. 2023) ....33

*Beck v. Test Masters Educ. Servs. Inc.*,
994 F. Supp. 2d 98 (D.D.C. 2014)....11

*Burks v. Islamic Republic of Iran*,
2022 U.S. Dist. LEXIS 244554 (D.D.C. Sept. 30, 2022) ....30

*Ceccone v. Equifax Info. Servs. LLC*,
2015 U.S. Dist. LEXIS 127942 (D.D.C. Aug. 29, 2016) ....12

*Chem. Toxin Working Grp. Inc. v. Johnson & Johnson*,
2023 U.S. Dist. LEXIS 50953 (D.D.C. Mar. 24, 2023)....26

*Cline v. Sunoco, Inc. R&M*,
2025 U.S. App. LEXIS 29929 (10th Cir. 2025) ....3

*Coleman v. District of Columbia*,
306 F.R.D. 68 (D.D.C. 2015)....12, 25, 29

*Ctr. for Inquiry, Inc. v. Walmart, Inc.*
283 A.3d 109 (D.C. 2022) ....15, 17

*D.C. v. Equity Res. Mgmt.*,
2021 D.C. Super. LEXIS 90 (D.C. Super. Ct. Oct. 8, 2021) ....27

*D.C. v. Equity Res. Mgmt., LLC*,
2021 D.C. Super. LEXIS 18 (D.C. Super. Ct. Apr. 23, 2021)....16, 18

*D.C. v. Wash. Hebrew Congregation, Inc.*,
2022 D.C. Super. LEXIS 88 (D.C. Super. Ct. Sept. 13, 2022)....21

*D.L. v. District of Columbia*,
860 F.3d 713 (D.C. Cir. 2017) ....31

*D.C. v. StubHub, Inc.*,
2025 D.C. Super. LEXIS 4 (D.C. Super. Ct. Feb. 13, 2025) ....................................................11

*Ford v. ChartOne, Inc.*,
908 A.2d 72 (D.C. 2006) ....................................................................................................20

*FTC v. Windward Mktg.*,
1997 U.S. Dist. LEXIS 17114 (N.D. Ga. Sept. 30, 1997) ....................................................16

*Hanks v. Lincoln Life & Annuity Co.*,
330 F.R.D. 374 (S.D.N.Y. 2019) ........................................................................................13

*Hinojos v. Kohl's Corp.*,
718 F.3d 1098 (9th Cir. 2013) ............................................................................................16

*Howard v. Liquidity Servs.*,
322 F.R.D. 103 (D.D.C. 2017)...................................................................................10, 11, 25

*Hoyte v. District of Columbia*,
325 F.R.D. 485 (D.D.C. 2017)................................................................................................24

*J.D. v. Azar*,
925 F.3d 1291 (D.C. Cir. 2019) ..............................................................................................9

*Johns v. Rozet*,
141 F.R.D. 211 (D.D.C. 1992)................................................................................................12

*Keegan v. Am. Honda Motor Co*,
284 F.R.D. 504 (C.D. Cal. 2012)............................................................................................19

*Lindsay v. Gov't Emps. Ins. Co.*,
251 F.R.D. 51 (D.D.C. 2008).....................................................................................................9

*Lytle v. Nutramax Labs, Inc.*,
114 F.4th 1011 (9th Cir. 2024) ..............................................................................................25

*In re McCormick & Co.*,
422 F. Supp. 3d 194 (D.D.C. 2019) .................................................................15, 29, 30

*McFadden v. Nationstar Mortgage LLC*,
2022 WL 1001253 (D.D.C. Apr. 4, 2022) ................................................................................11

*Modern Mgmt. Co. v. Wilson*,
997 A.2d 37 (D.C. 2010) ........................................................................................................25

*Morgan v. District of Columbia*,
2025 U.S. Dist. LEXIS 152235 (D.D.C. Aug. 7, 2025) .........................................................31

*Nat'l ATM Council, Inc. v. Visa Inc.*,
2023 U.S. App. LEXIS 19028 (D.C. Cir. July 25, 2023) ....................25

*Novartis Corp. v. FTC*,
223 F.3d 783 (D.C. Cir. 2000) ....................16

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
934 F.3d 619 (D.C. Cir. 2019) ....................9

*Saucier v. Countrywide Home Loans*,
64 A.3d 428 (D.C. 2013) ....................16

*Schemmer v. ChartOne, Inc.*,
2007 U.S. Dist. LEXIS 45519 (N.D. Ohio 2007) ....................21

*Scott v. Apple, Inc.*,
757 F. Supp. 3d 1 (D.D.C. 2024) ....................22

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ....................24

*Thorpe v. D.C.*,
303 F.R.D. 120 (D.D.C. 2014) ....................10

*Travelers United, Inc. v. Sonesta Int'l Hotels Corp.*,
2024 D.C. Super. LEXIS 38 (D.C. Super. Ct. Dec. 5, 2024) ....................11, 26

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016) ....................12

*Veera v. Banana Republic, LLC*,
6 Cal. App. 5th 907 (Cal. Ct. App. 2016) ....................27

*Vvanti v. O'Reilly Auto Enterprises*,
LLC, 2023 U.S. Dist. LEXIS 119459 (C.D. Cal. July 10, 2023) ....................29

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ....................11

*Wells v. Allstate Ins. Co.*,
210 F.R.D. 1 (D.D.C. 2002) ....................12, 26

**Statutes**

D.C. Code § 28–3901 ....................21, 23

D.C. Code § 28–3904 ....................15, 23

D.C. Code § 28–3905 ....................20, 25

D.C. Code § 42-3501 ....................13

**Rules**

Fed. R. Civ. P. 23 ....................11, 30, 32

Fed. R. Civ. P. 23(b)(3) ....................28, 29

**Regulations**

D.C. Mun. Regs. Title 21, § 4100 (2022) ....................6

D.C. Mun. Regs. Title 21, § 4104 (2022) ....................5, 6

**Other Authorities**

*Newberg on Class Actions* § 3:29 (5th ed.) ....................9

Newberg on Class Actions § 4:72 (5th ed.) ....................29

## TABLE OF DECLARATIONS, REPORTS, AND EXHIBITS

**Declaration of F. Peter Silva II**

Silva Ex. 1: Spreadsheet of Bozzuto-managed properties with citations to application forms, websites, pricing sheets, and leases.

Silva Ex. 2: Ms. Hettinger's rental application to the Novel South Capitol building.

Silva Ex. 3: Screenshots depicting the Novel South Capitol building websites.

Silva Ex. 4: Pricing sheet for the Novel South Capitol building.

Silva Ex. 5: Ms. Hettinger's rental lease at the Novel South Capitol building.

Silva Ex. 6: Spreadsheet identifying properties managed by Bozzuto where tenants were charged water and/or sewer rates exceeding the regulatory cap.

Silva Ex. 7: D.C. Water and Sewer Authority Consumer Bill of Rights.

Silva Ex. 8: Excerpts from the deposition transcript of Alexa Sclavounos.

Silva Ex. 9: Excerpts from the deposition transcript of Laura Hettinger.

Silva Ex. 10: Tycko & Zavareei LLP's firm resume.

Silva Ex. 11: Migliaccio & Rathod LLP's firm resume.

Silva Ex. 12: Expert Report of Keith Wilcox.

Silva Ex. 13: October 2021 tenant complaint.

Silva Ex. 14: December 2021 tenant complaint.

Silva Ex. 15: December 2023 tenant complaint.

Silva Ex. 16: Expert Report of Arthur Olsen in Support of Ms. Hettinger's Motion for Class Certification.

Silva Ex. 17: Ms. Hettinger's ledger of payments made to Bozzuto.

Silva Ex. 18: Transcript of the discovery hearing held in this case on September 12, 2025.

**Expert Report of Keith Wilcox**

Wilcox Ex. A: Keith Wilcox Curriculum Vitae.

Wilcox Ex. B: List of materials considered in preparing report.

**Expert Report of Arthur Olsen**

Olsen Ex. A: Arthur Olsen Consultant Profile.

Olsen Ex. B: Cases in which Arthur Olsen has offered testimony in the past four years.

Olsen Ex. C: Calculation regarding Ms. Hettinger's actual damages using Drip-Pricing Formula.

Olsen Ex. D: D.C. regulatory water and sewer rate cap per gallon and per 1,000 gallons.

Olsen Ex. E: Calculation regarding Ms. Hettinger's actual damages using Overcharge Formula.

# I. INTRODUCTION

Common answers to common questions resolve this case. Plaintiff Laura Hettinger—a former tenant—brings this consumer protection class action under the D.C. Consumer Protection Procedures Act ("CPPA") against Defendant Bozzuto Management Company ("Bozzuto" or "BMC"). She challenges two uniform systemic practices that Bozzuto employed across its District of Columbia rental properties. Both challenges present quintessential common questions that warrant class treatment.

First, Ms. Hettinger alleges that Bozzuto violated the CPPA by engaging in a drip-pricing scheme that quoted a single price for "rent" on its rental applications while omitting mandatory utility-related fees that tenants were required to pay Bozzuto. The basis for commonality on this practice has already been established by the Court. On July 21, 2025, the Court granted partial summary judgment on Subcount A of the operative complaint, holding that these utility-related fees constitute "rent" under the D.C. Rental Housing Act ("RHA") and therefore must be disclosed "[a]t the time" of application—something Bozzuto failed to do for Ms. Hettinger. (ECF 61 ("SJ Order").) Since then, Bozzuto has stipulated that the same fees were uniformly omitted from rental applications throughout its D.C. portfolio. No further demonstration of commonality could be stronger: the dispositive legal and factual issues have already been resolved in Ms. Hettinger's favor and apply across the entire class. This claim readily satisfies Rule 23 because the answers given in the SJ Order resolve the liability question classwide.

Second, Ms. Hettinger challenges Bozzuto's practice of charging tenants per-gallon water and sewer rates to tenants that exceeded maximum rates permitted by District regulations. Here too, common questions predominate. Whether Bozzuto's charges violated regulatory rate caps is a single question susceptible to a single, classwide answer. The same is true for whether it is unfair

under the CPPA for Bozzuto to deprive tenants of the protections they would have received had they been billed directly by a publicly regulated utility.

In short, this case exemplifies why Rule 23 exists: common answers drive liability. Bozzuto's practices were standardized across all properties; the questions they raise are legal questions with uniform answers; and the evidence establishing both sets of violations is common to the class. The Court should grant class certification.

## II. THE COURT'S SUMMARY JUDGMENT ORDER

This Court granted Ms. Hettinger summary judgment on Subcount A of the First Amended Complaint on July 21, 2025. (SJ Order.) The Court ruled that Bozzuto's drip-pricing scheme violated the CPPA via a predicate violation of the D.C. Rental Housing Act ("RHA"), which requires housing providers to disclose a unit's "rent" "[a]t the time a prospective tenant files an application to lease any rental unit." (*Id.* at 10 (quoting RHA).) The hidden fees at issue in the SJ Order were a "fixed service fee" (the "Service Fee") and "variable utility fee[s]" (the "Utilities").

The SJ Order found Bozzuto liable under Subcount A by resolving the following "three core questions" of fact and law. (*Id.* at 9.)

- First, the Service Fee and Utilities were "rent" under the RHA because they were "paid directly to Bozzuto" as a "condition of occupancy or use" for the apartment (*Id.* at 10.)

- Second, Bozzuto violated the RHA's requirement that such "rent" be disclosed "[a]t the time" of application. (*Id.* at 18.) For the Service Fee, this was "easily answered" because Bozzuto "does not contest that it neglects to disclose the fee to prospective tenants at any point before they pay the application fee." (*Id.* at 15.) For the Utilities, the Court likewise found a violation that a pre-application disclosure of a hard copy "Pricing Sheet" was not compliant, as the RHA "mandated disclosure at the precise moment when a prospective tenant 'files' the application." (*Id.* at 17 (quoting RHA).)

- Third, Bozzuto's violation of the RHA constituted a "*per se* violation of the CPPA" because the violation occurred in the "consumer context" of "advertising rental units to prospective tenants." (*Id.* at 19.)

The SJ Order denied summary judgment as to the remaining subcounts at issue, which asserted alternative challenges that the drip-pricing scheme was a deceptive or unfair trade practice prohibited by the CPPA. (*Id.* at 21–22.) This Motion incorporates by reference all facts found in the SJ Order.

## III. FACTS

At issue in this case are 77 residential properties managed by Bozzuto in the District of Columbia (the "Properties"). These Properties are identified in Exhibit 1. (Decl. of F. Peter Silva II ("Silva Decl."), Ex-1, Summary from Form Documents (cited to as the "Property Spreadsheet").)[1] The Property Spreadsheet provides a summary table of form documents produced, with citations to each Property's produced application form, website, pricing sheet, and lease. (*Id.*)

### A. The Drip-Pricing Class.

Ms. Hettinger seeks to certify a class of current and former tenants of the Properties, who were all victims of an identical drip-pricing scheme (the "Drip-Pricing Class"). In Joint Stipulations of Fact filed with the Court, Bozzuto has admitted its drip-pricing practices were consistent across the Properties. (ECF 73, Joint Stip. of Fact ¶ 5 ("Stip.").[2]) Most critically,

[1] Ms. Hettinger has appended evidence relied upon in this Motion to the Silva Declaration. Citations in the format "Ex-#" refer to exhibits appended to the Silva Declaration. Documents with the Bates stamp prefix "BOZZUTO" were produced by Bozzuto in discovery.

[2] Bozzuto's stipulations apply to the "Sampled Properties," which cover 55 of the Properties for which Bozzuto produced sample form documents, such as an application form and website. (Stip. ¶ 5.) For the remaining 21 properties, Bozzuto did not produce form documents due to burden issues because Bozzuto no longer managed the property at the time of document collection. However, Bozzuto has produced no evidence that these properties differed from the Sampled Properties on issues relevant to class certification. As a result, this Motion properly relies on evidence provided for the Sampled Properties to establish common factual issues applicable to all Properties. *See, e.g.*, *Cline v. Sunoco, Inc. R&M*, 2025 U.S. App. LEXIS 29929, at *39 (10th Cir. 2025) ("[Defendant] cannot defeat class certification either by failing to keep proper records or failing to produce them.").

Bozzuto has stipulated that the SJ Order's core factual findings establishing liability for Subcount A are common to tenants across the Properties.

First, the Service Fee and Utilities "are paid by tenants to BMC," (Stip. ¶ 11), which brings them within the RHA's definition of "rent." Second, common evidence establishes that Bozzuto failed to disclose the Service Fee and Utilities at the time of application as required by the RHA. Bozzuto has stipulated that between December 5, 2020, and August 27, 2025, the Service Fee and Utilities "were not listed" on the application forms or websites of the Properties. (Stip. ¶¶ 8–9).

Third, Bozzuto's failure to disclose the Service Fee and Utilities at the time of the application as required by the RHA occurred in the "consumer context" of advertising rental units to prospective tenants through rental applications. The Court found that this was so with respect to Ms. Hettinger, and that consumer context is the same for each Property and each prospective tenant. (Stip. ¶ 6 ("For each of the Properties, BMC manages the application process for prospective tenants and requires prospective tenants to submit a rental application before leasing a unit, for which BMC charges an application fee.").)

Other relevant evidence is also common across the Drip-Pricing Class. Bozzuto uses standardized documents to lease rental units, which includes form applications, websites, pricing sheets, and lease agreements that "are representative" for tenants at each Property. (Stip. ¶ 5; see also Ex-1, Property Spreadsheet (summarizing produced form documents).) These form documents are substantially similar across the Properties; for reference purposes, Ms. Hettinger's application, website, pricing sheet, and lease are provided at Exhibits 2–5. (Ex-2 (rental application), Ex-3 (website), Ex-4 (pricing sheet), Ex-5 (lease).)

Once a tenant signs a lease, Bozzuto functions as their housing provider, "perform[ing] all delegable duties of [the property's] Owner as landlord under each such lease," which includes the

responsibility of "evict[ing] tenants in default." (Stip. ¶ 4(d)–(e).) Bozzuto asserts its right to charge tenants the Service Fee and Utilities stems from a form "Utility Addendum" incorporated into its lease agreement. (Ex-1, Property Spreadsheet.) As summarized in the Property Spreadsheet, each Property's lease requires tenants to pay a fixed Service Fee that ranges between $3.86-$12.00/month; for Utilities, all Properties require tenants to pay variable rates for water and sewer, while some also charge additional variable utility rates for HVAC and gas. (*Id.*) Moreover, in the lease for each Property, Bozzuto retains the contractual right to evict tenants for failing to pay the Service Fee or Utilities based on a common term that provides: "The late payment of a bill or failure to pay any utility bill is a material and substantial breach of the Lease and we will exercise all remedies available under the Lease, up to and including eviction for nonpayment." (*Id.*)

Tenants across the Properties were billed by a third-party billing company that itemized their monthly "rent" set out in their lease, as well as additional charges such as the Service Fee and Utilities. (Stip ¶ 7.) Tenants then paid all amounts billed, including the Service Fee and Utilities, directly to Bozzuto. (Stip. ¶ 11.) Bozzuto maintains ledgers in a similar format for each tenant at the Properties that records data for all amounts paid by the tenant, including an itemized breakdown of the monthly "rent," the Service Fee, and the Utilities. (Stip. ¶ 12.)

**B. The Overcharge Class.**

Ms. Hettinger also seeks to certify a separate "Overcharge Class" of tenants who paid to Bozzuto water or sewer charges based upon per-gallon rates that exceeded the cap set by District regulations. In the District, the D.C. Water and Sewer Authority ("WASA") sets maximum water and sewer per-gallon rates that consumers can be charged in multifamily properties for WASA's fiscal year, which runs from October 1 through September 30. *See* D.C. Mun. Regs. Tit. 21, § 4104.1(a)-(c).

For example, in FY 2023 (October 1, 2022, through September 30, 2023), the regulatory caps for water and sewer rates at multifamily properties were as follows:

| | **FY 2023 (Effective 10/1/2022)** |
|---|---|
| Rate Class | Per-1000 Gallons |
| **Multi-Family Water Rate** | $6.55 |
| **Multi-Family Sewer Rate** | $15.05 |

D.C. Mun. Regs. tit. 21, § 4100.3 (2022) (effective Oct. 1, 2022 to Sept. 30, 2024; superseded) (water); D.C. Mun. Regs. tit. 21, § 4101.1 (2022) (effective Oct. 1, 2022 to Sept. 30, 2024; superseded) (sewer)

Exhibit 6 identifies Properties where tenants were charged water and/or sewer rates exceeding the regulatory cap based on a sampling of bills produced in this litigation.[3] (Ex-6.) These standardized bills provide common evidence to identify overcharges, as the bills itemize the per-gallon water and sewer rates charged to the tenant, which can then be compared to the regulatory cap in effect at the time of usage. (*Id.*)

Bozzuto's practice of requiring tenants of the Properties to pay water/sewer utilities to Bozzuto rather than WASA also deprived Overcharge Class Members of regulatory protections. For example, the WASA Consumer Bill of Rights provides disclosure rights that ensure bills disaggregate applicable fees (such as metering and storm water fees), substantive appeal rights to dispute a water bill before a neutral third party, and a fixed 30-day window to pay bills before penalties are assessed. (Ex-7, WASA Consumer Bill of Rights at 14, 46, 29.)

[3] In discovery, Conservice, LLC (Bozzuto's most frequently used third-party utility billing company) produced a sample set of three water bills issued in November 2022, April 2023, and September 2023 for 38 of the Properties.

## IV. PROCEDURAL BACKGROUND

### A. Key events.

Ms. Hettinger filed this action in D.C. Superior Court on December 5, 2023, and Bozzuto removed it to this Court on December 11, 2023. (ECF 1.) The complaint, brought as a single count under the CPPA, consisted of subcounts organized in three categories:

- **Drip-Pricing Claims**. Alleged Bozzuto's failure to disclose the Service Fees and Utilities were unlawful, deceptive, and unfair trade practices (Subcounts A-C, N);

- **Overcharge Claims**. Alleged Bozzuto's charging of water/sewer per-gallon rates that exceed the District's regulatory maximums were unlawful, deceptive, and unfair trade practices (Subcounts D-H, N); and

- **Submetering Claims**. Alleged Bozzuto's submetering of electric and gas utility usage in violation of District regulations were unlawful, deceptive, and unfair trade practices (Subcounts I-M, N).

Bozzuto then moved to dismiss, which this Court granted in part and denied in part on April 26, 2024. (ECF 18.) The Court allowed the Drip-Pricing and Overcharge Claims to proceed, but dismissed parts of the Submetering Claims, permitting that claim to proceed only under an unfairness theory. (*Id.*) After several months of discovery, Ms. Hettinger filed the First Amended Complaint ("FAC") on January 2, 2025, which remains the operative complaint. (ECF 41.)

Before the close of discovery, on February 4, 2025, Bozzuto moved for partial summary judgment on Subcounts A-C and O. (ECF 46.) Ms. Hettinger cross-moved for summary judgment on Subcounts A and O, citing Circuit authority that a defendant's motion for summary judgment before class certification waives the one-way intervention rule's requirement that class certification be decided before the merits. (ECF 50-1 at 4.) As to Subcounts B–C, Ms. Hettinger opposed summary judgment and did not cross-move. (*Id.*) The Court issued the SJ Order on July

21, 2025, granting Ms. Hettinger summary judgment on Subcount A, but denying summary judgment to all parties on the remaining subcounts. (SJ Order.)

**B. The Court has limited discovery to class certification issues.**

Throughout discovery, the Court has adopted a bifurcated approach that has sought to sequence class certification and merits discovery. The Court's initial June 13, 2024, Scheduling Order, for example, provided that "[d]iscovery shall be limited to a subset of documents from each building." (ECF 24). Later, the Court denied as premature Ms. Hettinger's request to compel Bozzuto to produce contact information for Class Members and data related to the application fees, Service Fees, and Utilities paid by all Class Members, reasoning that such discovery was more appropriately dealt with after the class certification phase. (*See* Sept. 12, 2025 Hr'g Tr.)

## V. MS. HETTINGER AND THE CLASSES

Ms. Hettinger is a former tenant of one of the Properties, NOVEL South Capitol, where she lived from July 2021 through August 2022. Ms. Hettinger moves for class certification as to the following two Classes.

> **Drip-Pricing Class:** All current and former residential tenants at a Bozzuto-managed property who filed a rental application while Bozzuto managed that property and who were charged or paid a Service Fee or variable utility charges between December 5, 2020, and August 27, 2025.
>
> **Overcharge Class**: All current and former residential tenants of the Properties at a Bozzuto-managed property in the District of Columbia who were charged or paid a per-1,000 gallon rate for water or sewer service greater than the lawfully established regulatory cap at any point since December 5, 2020.

Liability for the Drip-Pricing Class is predicated on Subcount A (unlawful trade practice) and Subcount B (deceptive trade practice) of the FAC. Liability for the Overcharge Class is predicated Subcount G (unfair trade practice) and Subcount H (unlawful trade practice) of the FAC. Ms. Hettinger does not seek class certification on other subcounts or subclasses pleaded in the FAC.

## VI. LEGAL STANDARD

The party seeking class certification must demonstrate that the Rule 23 requirements are satisfied by a preponderance of the evidence. *Attias v. Carefirst, Inc.*, 346 F.R.D. 1, 6 (D.D.C. 2024). While "[t]his requires a rigorous analysis that often will overlap with the merits," *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 622–23 (D.C. Cir. 2019), "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage," *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 466.

## VII. ARGUMENT

### A. Ms. Hettinger satisfies the Rule 23(a) requirements.

#### 1. Rule 23(a)(1) numerosity is satisfied.

"Typically, a class in excess of 40 members is sufficiently numerous to satisfy this requirement." *Lindsay v. Gov't Emps. Ins. Co.*, 251 F.R.D. 51, 55 (D.D.C. 2008). Here, numerosity is established because the proposed Classes includes hundreds of tenants from NOVEL alone. (Ex-8, Def.'s R. 30(b)(6) Dep. Tr. 149:12–16.) The total number of Class Members is well into the tens of thousands, given that the Properties at which Bozzuto utilized the challenged practices have a total unit count exceeding 20,000. (Ex-1, Property Spreadsheet.) This number comfortably clears the 40-member threshold generally found sufficient to render joinder impractical.

#### 2. Rule 23(a)(3) typicality is satisfied.

The test for typicality is "not demanding." *Newberg on Class Actions* § 3:29. "Typicality is ordinarily met if the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct, or if they are based on the same legal or remedial theory." *J.D. v. Azar*, 925 F.3d 1291, 1322 (D.C. Cir. 2019). Typicality is "not destroyed merely

by factual variations," but instead "calls for sufficient factual and legal similarity between the class representative's claims and those of the class to ensure that the representative's interests are in fact aligned with those of the absent class members." *Howard v. Liquidity Servs.*, 322 F.R.D. 103, 118–19 (D.D.C. 2017). Indeed, even a defense unique to the class representative will not destroy typicality "unless it will skew the focus of the litigation and create a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Id.*

Typicality is satisfied here because Ms. Hettinger's and Class Members' claims arise from common courses of conduct and turn on the same legal theories. For the Drip-Pricing Class, the class members' claims turn on Bozzuto's common course of conduct that omitted the Service Fee and Utilities from rental application forms that Ms. Hettinger and class members used across the Properties, and they are brought under the same legal theories under the CPPA. (Stip. ¶ 8 (stipulating that Service Fee and Utilities "were not listed on the application forms used" at the Properties).) For the Overcharge Class, their claims likewise turn on a common course of conduct and legal theory that asserts Bozzuto charged Ms. Hettinger and Class Members per-gallon water or sewer rates exceeding the District's regulatory caps. (FAC ¶¶ 37-43, 66, 91.) Because Ms. Hettinger's claims closely align with those of both Classes, typicality is satisfied.

**3. Rule 23(a)(4) adequacy is satisfied.**

Adequacy requires that "(1) the named representative must not have antagonistic or conflicting interests with the unnamed members of the class, and (2) the representative must appear able to vigorously prosecute the interests of the class through qualified counsel." *Thorpe v. D.C.*, 303 F.R.D. 120, 150 (D.D.C. 2014). Ms. Hettinger meets both requirements.

First, Ms. Hettinger has no conflicts of interest with any Class Members. She is challenging common courses of conduct and seeking to vindicate common injuries arising from Bozzuto's

failure to disclose the Utilities and Service Fee and overcharging for water above the regulatory maximum. Her interests are therefore aligned with those of the Classes.

Second, Ms. Hettinger has vigorously prosecuted this case, assisting in responding to Bozzuto's extensive discovery requests and testifying at a deposition taken by defense counsel. (Ex-9, Hettinger Dep. Tr. 143:1–22.); *see also Howard*, 322 F.R.D. at 135 ("[O]nly a total lack of interest and unfamiliarity with the suit would be sufficient grounds to deny plaintiffs' motion to certify class.") (cleaned up). She has also retained counsel that has extensive experience in litigating complex class actions like this matter, including consumer cases under the CPPA.[4] (*See* Ex-10–11, firm resumes for Tycko & Zavareei LLP and Migliaccio & Rathod LLP.) Counsel has vigorously prosecuted this case by investing significant resources to reach this point, which has included defeating Bozzuto's motion to dismiss, a motion for summary judgment, and a motion for interlocutory appeal, as well as retaining experts to issue reports in this case. (ECF 18; ECF 61; ECF 69.) Adequacy is thus satisfied.

**B. Ms. Hettinger satisfies the Rule 23(a)(2) commonality and Rule 23(b)(3) predominance requirements to certify a damages class.**

Courts often examine commonality and predominance together, as Rule 23(a)(2) commonality is "subsumed under . . . the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions." *Amchem Prods v. Windsor*, 521 U.S. 591, 609 (1997) (quoting Fed. R. Civ. P. 23(b)(3)). Commonality looks to whether Ms. Hettinger's and Class Members' claims "depend upon a common contention . . . [whose] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*

[4] *See e.g. McFadden v. Nationstar Mortgage LLC*, 2022 WL 1001253, at *17 (D.D.C. Apr. 4, 2022); *Beck v. Test Masters Educ. Servs. Inc.*, 994 F. Supp. 2d 98, 102 (D.D.C. 2014); *Travelers United, Inc. v. Sonesta Int'l Hotels Corp.*, 2024 D.C. Super. LEXIS 38, at 35 (D.C. Super. Ct. Dec. 5, 2024); *D.C. v. StubHub, Inc.*, 2025 D.C. Super. LEXIS 4 (D.C. Super. Ct. Feb. 13, 2025).

*Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Evidence is common where all class members could rely upon it to "establish liability if he or she had brought an individual action." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 455 (2016).

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Coleman v. District of Columbia*, 306 F.R.D. 68, 85 (D.D.C. 2015). The inquiry requires a court to "characterize" the evidence at issue in the case, taking stock of evidence that is common (i.e., where "the same evidence can be used to prove an element of the cause of action for each member") or individualized (i.e., where members would need to "present evidence that varies from person to person"). *Id.* Then, the court engages in the qualitative exercising of "weighing" the common and individualized proof to "assess whether the common issues predominate." *Id.*

Courts "routinely find that common questions . . . predominate in the context of consumer challenges to standardized practices." *Ceccone v. Equifax Info. Servs. LLC*, 2015 U.S. Dist. LEXIS 127942, at *17 (D.D.C. Aug. 29, 2016) (citing cases); *see also Amchem*, 521 U.S. at 625 (predominance is "readily met in certain cases alleging consumer or securities fraud"). This precedent includes caselaw from this District where, as here, consumer plaintiffs challenge a uniform misrepresentation or omission. *See, e.g.*, *Wells v. Allstate Ins. Co.*, 210 F.R.D. 1, 12 (D.D.C. 2002) (certifying a CPPA claim predicated on a common omission where a defendant "fail[ed] to disclose material changes to its claims handling procedures"); *Johns v. Rozet*, 141 F.R.D. 211, 218 (D.D.C. 1992) (certifying a fraud claim brought by low income tenants because the owners "made identical promises to plaintiffs" and therefore "a large number of people were [allegedly] defrauded in an identical manner").

For the following reasons, both commonality and predominance are met for the Classes that Ms. Hettinger moves to certify.

**1. The Drip-Pricing Class: Common questions predominate on proving liability for Subcounts A & B.**

**i. Subcount A (Drip-Pricing Class: Unlawful Trade Practice).**

The SJ Order provides the following factual steps for establishing CPPA liability under Subcount A, which contends that Bozzuto violated the RHA and in turn, the CPPA, by failing to disclose the Service Fee and Utilities at the time tenants filed their rental applications across the Properties. Predominance is satisfied on this claim because common evidence resolves each factual contention in a single stroke for all Drip-Pricing Class Members at each step. This common evidence consists of Bozzuto's factual stipulations, and substantially similar form applications and leases Bozzuto used across the Properties, as detailed below.

First, the Court held that the Service Fee and Utilities are "rent" as defined by the RHA because they were paid to Bozzuto as either a "condition of occupancy" or a "condition of use." (SJ Order at 10–11 (quoting D.C. Code § 42-3501.03(28) (defining "rent" to mean "money . . . demanded, received, or charged by a housing provider as a condition of occupancy or use of a rental unit [and] its related services[.]"). The Court held the payment element was satisfied because Ms. Hettinger paid the Service Fee and Utilities "directly to Bozzuto." (SJ Order at 10). And Bozzuto has stipulated that this fact is common for tenants across the Properties. (Stip. ¶ 12 (Service Fee and Utilities "are paid by tenants to BMC").)

In concluding the payment of the Service Fee and Utilities were also a "condition of occupancy," the Court relied on terms in Ms. Hettinger's lease, which are common across the form leases signed by Drip-Pricing Class Members. *See Hanks v. Lincoln Life & Annuity Co.*, 330 F.R.D. 374, 380 (S.D.N.Y. 2019) ("Claims arising from interpretations of a form contract appear

to present the classic case for treatment as a class action."). The Court held that payment of the Service Fee and Utilities was a condition of occupancy because the lease provided that "failure to pay any utility bill" constituted a material breach that allowed Bozzuto to "exercise all remedies available under the Lease, up to and including eviction[,] for nonpayment." (SJ Order at 11 (quoting Hettinger lease terms).) This eviction clause provides common proof establishing the "condition of occupancy" element classwide, as the same term recurs in the form leases Bozzuto used for tenants across the Properties (*See* Ex-1, Property Spreadsheet, Column D.)

Common lease terms likewise establish that payment of the Service Fee and Utilities are a "condition of use" of the rental unit's "related services." For Ms. Hettinger, her lease's Utility Addendum made clear the Service Fee and Utilities were related to charges for "HVAC, water, and sewer"—which brought them within the RHA's definition of "related services" to include "'the provision of . . . heat, hot and cold water[.]'" (SJ Order at 11 (quoting RHA definition of "related services").) This Utility Addendum provides common proof establishing the "condition of use" element classwide, as the Service Fee and Utilities were charged to Drip-Pricing Class Members through a similar Utility Addendum. (*See* Ex-1, Property Spreadsheet, Columns D–G.)

Second, the Court held that the disclosure of "rent" must occur at the "discrete moment in time" when a tenant files their application. (SJ Order at 17.) The Court found that the disclosure was not provided to Ms. Hettinger at the time of the application because "neither the website nor the rental application itself discloses the requirement to pay the utilities at issue." (*Id.*) With respect to the class, Bozzuto has stipulated it likewise failed to do this across the Properties, conceding that the Service Fee and Utilities "were not listed" on the website and application form for each Property. (Stip. ¶ 8–9.) Thus, the same evidence that substantiated the ruling for Ms. Hettinger will also control the question for the Drip-Pricing Class Members.

Third, a housing provider's violation of the RHA's disclosure requirement constitutes a "per se violation of the CPPA" when it occurs "in a consumer context" of "advertising rental units to prospective tenants." (SJ Order at 18–19.) In Ms. Hettinger's case, this consumer context was established by her filing a rental application that advertised a quoted "rent" and paying a $75 application fee to Bozzuto. (*Id.* at 4–5.) Such a consumer context is also established for all Drip-Pricing Class Members because Bozzuto "requires prospective tenants to submit a rental application before leasing a unit, for which BMC charges an application fee." (Stip. ¶ 6.) In sum, common evidence establishes every element of liability for Subcount A.

**ii. Subcount B (Drip-Pricing Class: Deceptive Trade Practice).**

Subcount B contends that Bozzuto's drip-pricing scheme separately violates the CPPA's prohibitions on "fail[ing] to state" and "us[ing] . . . ambiguity" as to material facts that have a "tendency to mislead." D.C. Code § 28–3904 (f), (f-1). As discussed in the preceding section, common evidence establishes that Bozzuto systematically failed to disclose the Service Fees and Utilities from the websites and rental applications prospective tenants used to submit their rental applications. (Stip. ¶ 8–9.)

Next, whether the omission of the Service Fees and Utilities were material and had the tendency to mislead present common questions because they are evaluated under the "reasonable consumer" standard. *Ctr. for Inquiry, Inc. v. Walmart, Inc.* 283 A.3d 109, 120 (D.C. 2022). The reasonable consumer standard is an "objective" standard that is "ideal for class certification because [the standard] will not require the court to investigate class members' individual interaction with the product." *In re McCormick & Co.*, 422 F. Supp. 3d 194, 253 (D.D.C. 2019).

**Materiality.** Materiality under the CPPA is established where "a significant number of unsophisticated consumers would find that information important in determining a course of

action." *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 442 (D.C. 2013). "The liberally-construed CPPA only requires that a reasonable consumer would 'attach importance' to the existence or nonexistence of a fact in determining a choice of action; not that the fact is the most important part of the determination." *D.C. v. Equity Res. Mgmt., LLC*, 2021 D.C. Super. LEXIS 18, at *21 (D.C. Super. Ct. Apr. 23, 2021); *see also id.* at 24–25 (holding landlord liable under the CPPA for failing to disclose actual rent of apartments and finding materiality readily satisfied because "a reasonable consumer would attach importance to knowing the actual rent and concession information of an apartment prior to paying the application fee").

Here, materiality can likewise be proven with common evidence. To start, because price is so fundamental to consumer decision making, a reasonable jury can decide the materiality question based on the common proof of the price misrepresentation itself. The SJ Order recognized as much, leaving it for the jury to decide the materiality of the Service Fee and Utility omissions. (SJ Order at 21–22.) Such a result is consonant with precedent that has held price misrepresentations are presumptively material. *See, e.g.*, *FTC v. Windward Mktg.*, 1997 U.S. Dist. LEXIS 17114, at *28 (N.D. Ga. Sept. 30, 1997) ("[A]ny representations concerning the price of a product or service are presumptively material."); *Novartis Corp. v. FTC*, 223 F.3d 783, 786 (D.C. Cir. 2000) ("The [FTC] has historically presumed materiality for . . . a claim that concerns the . . . cost of the product[.]"); *see also Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1106 (9th Cir. 2013) ("Misinformation about a product's 'normal' price is, therefore, significant to many consumers[.]").

The common-sense notion that a product's price is material to a reasonable consumer is further corroborated by expert testimony. Dr. Keith Wilcox is a Professor of Marketing at the Mays Business School at Texas A&M University and his report ("Wilcox Report") provides expert analysis as to consumer psychology, behavior, and decision-making as applied to Bozzuto's drip-

pricing scheme. (Ex-12, Wilcox Report.) For example, Dr. Wilcox cites academic research that demonstrates when consumers are presented with a "base price that is lower than the actual price of a product or service, consumers report feeling deceived" and perceive such "dripped" price presentations as "less fair compared to when surcharges are revealed upfront." (*Id.* ¶ 16.) This effect is consistent with what actual renters report in industry surveys, with one large survey of 36,000 renters finding, "Nearly all renters (94%) agree that rental listings should clearly list all fees . . . . And 77% sa[y] that rental fees should be included in the total rent, rather than charged separately." (*Id.* ¶ 14.)

Finally, Ms. Hettinger's testimony provides additional common proof corroborating materiality, as she explained at her deposition the importance of a complete price disclosure to her decision-making process:

> Q: Would—having had those utility related fees been disclosed been important to your decision making process?
>
> A: Yes. Because whenever I will look for apartments, I really do an analysis of how much it's going to cost and how well it fits into my budget so I think I would have been able to make a more informed decision had I known how much it truly was going to cost me.

(Ex-9, Hettinger Dep. Tr. 141:4–12.)

Thus, because all Drip-Pricing Class Members could rely upon this common evidence to establish the materiality of Bozzuto's price omissions and ambiguities, predominance is satisfied on this element.

**Tendency to Mislead.** Whether a deceptive practice has the tendency to mislead under the CPPA is generally "a question of fact for the jury." *Ctr. For Inquiry, Inc.*, 283 A.3d at 120. A jury is capable of deciding whether a price omission in and of itself has the tendency to mislead. (*See* SJ Order at 22 (rejecting Bozzuto's argument that "consumer surveys or other data . . . [are] necessary in order for a jury to find that an omission or misrepresentation tends to mislead")); *see*

*also Equity Res.*, 2021 D.C. Super. LEXIS 18, at *19 (after bench trial, holding landlord liable under CPPA for misrepresenting rent prices in rental applications, which "had the tendency to mislead a reasonable consumer into applying for an apartment with inaccurate information and expectations"). Thus, Bozzuto's stipulation that it omitted the Service Fee and Utilities from the Properties' websites and application forms, (Stip. ¶¶ 8–9), provides sufficient common evidence for a jury to determine whether this practice had a tendency to mislead.

In addition, the Wilcox Report provides further common proof as to the tendency to mislead. Dr. Wilcox opines that the omission of the Service Fees and Utilities have the tendency to mislead consumers by leading them to "spend more on a rental unit than they would have if the charges . . . were disclosed upfront." (Ex-12, Wilcox Report ¶ 35.) This is because the Service Fees and Utilities are only disclosed after the point of application, where consumers have invested tangible time and money costs, including the payment of an application fee. (*Id.* ¶¶ 33–34.) Such cost investments make consumers "reluctant to switch options" due to the behavioral concept of the "loss aversion." (*Id.* ¶ 18.) When consumers invest resources in a product, they become "endowed with the option" such that "reversing their decision feels like a loss, making consumers hesitant to switch even when the actual time or monetary costs are minimal." (*Id.* ¶ 20.)

The Wilcox Report also provides common proof that rebuts any attempt by Bozzuto to rely on the Pricing Sheet to contend a reasonable consumer could not have been misled. NOVEL's Pricing Sheet discloses as follows:

Electric: PEPCO | Resident Responsible
HVAC Usage, Water, Sewer: billed with month rent statement

(*Id.* ¶ 26.) To begin, as Dr. Wilcox observes, the Pricing Sheet makes no mention of the Service Fee, so it cannot cure that omission.[5] (*Id.*) The Pricing Sheet's mention of the Utilities is further

[5] In all, the Pricing Sheets for 40 Properties were commonly deficient in failing to disclose the

confusing, as its disclosure—"HVAC Usage, Water, Sewer; billed with month rent statement"—"does not disclose that these utility charges will be billed in addition to the monthly rent." (*Id.*) Moreover, it is significant to consumer decision-making that the Pricing Sheet was systemically disclosed to tenants "at temporally separate points to the time of application." (*Id.* ¶¶ 42–43.) This piecemeal disclosure makes it "unlikely that consumers would have recalled the [Pricing Sheet] by the time they finalized their rental decision." (*Id.* ¶ 28.) This conclusion is reinforced by the "recency effect," which describes consumers' tendency to "more clearly remember information that appears last in a sequence," as well as studies showing that presenting multiple prices to consumers impairs their ability to recall the actual price. (*Id.* ¶¶ 27–29.)

Finally, Ms. Hettinger's testimony and complaints from other NOVEL tenants provide additional common proof that demonstrate the Pricing Sheet's disclosures were confusing and had the tendency to mislead. As Ms. Hettinger testified at her deposition, she was confused by the Pricing Sheet's disclosures, explaining:

> Q: Now that you've seen the price sheet and the utility addendum, you understand that Bozzuto does disclose the fact that it will charge tenants what you call utility rent?
>
> A: No, because it's not clear on the pricing sheet, too. It just says, like—it's very vague about how it's included. . . . Like, I—it seems like it's part of the base rent because it says residents are responsible for electric. It doesn't say residents are responsible for these ones [HVAC, Water, Sewer]. It just is—it makes it seem, like, it's part of the base rent.

(Ex-9, Hettinger Dep. Tr. 136:15–137:7.)

At the merits stage, Ms. Hettinger and the Class Members can also rely on complaints from NOVEL tenants to Bozzuto further demonstrate consumer confusion and outrage that the utilities they were ultimately charged did not align with their expectations. *See, e.g.*, *Keegan v. Am. Honda*

---

amount of the Service Fee. (Ex-1, Property Spreadsheet.)

*Motor Co*, 284 F.R.D. 504, 531 (C.D. Cal. 2012) (granting class certification and finding "consumer complaints" among other evidence that can prove materiality). The following examples are just a sampling of tenant complaints produced by Bozzuto in discovery, which Bozzuto limited to NOVEL.

- **October 2021 tenant complaint.** "[O]nce again, the fees are outrageously high. If this fleecing is going to continue then we need to have a significant conversation." (Ex-13, BOZZUTO008326–8334 at -8326.)

- **November 2021 tenant complaint.** "I'm sorry, but you are telling that my utilities for a tiny studio apartment (that do not include the electric bill I already pay for two months is $421.47? This is insane and there is no way this is correct. I am very worried that I have overpaid the entire year I have been at Novel and I will never see this money again." (Ex-14, BOZZUTO008268–8272 at -8271.)

- **December 2023 tenant complaint.** "Clearly there is an error with this bill for 171.96. Sewer for $94. No one is home all day and the water is high as well. . . . Better still I am requesting that DC Water come out and check my units meter readings as I have been overcharged." (Ex-15, BOZZUTO013424–13426 at -13425.)

As all Drip-Pricing Class Members could rely upon this common evidence to establish the tendency of Bozzuto's price omissions and ambiguities to mislead, predominance is satisfied on this element.

**2. Overcharge Class: Common questions predominate on proving liability for Subcounts H & G.**

**i. Subcount H (Overcharge Class: Unlawful Trade Practice).**

Subcount H, which contends that Bozzuto's practice of unlawfully charging per-gallon water/sewer rates exceeding the District's regulatory caps violated the CPPA, likewise turns on common proof. *See* D.C. Code § 28–3905(k)(1)(A). Courts routinely certify classes where overcharges to class members can be identified with a common formula. *See, e.g.*, *Ford v. ChartOne, Inc.*, 908 A.2d 72, 88 (D.C. 2006) ("Consumer actions alleging various types of

systematic overcharging often have been certified as (b)(3) class actions . . ."); *Schemmer v. ChartOne, Inc.*, 2007 U.S. Dist. LEXIS 45519, at *5 (N.D. Ohio 2007) ("While the amount each individual was allegedly overcharged may vary, the same mathematical formula . . . can be applied uniformly to all 360,000 annual transactions to determine overcharges."). As explained in the Expert Report of Arthur Olsen ("Olsen Report"), Overcharge Class Members can likewise be identified by applying a simple, common formula that compares the per-gallon water or sewer rate they were actually charged with the regulatory cap in effect at the time. (Ex-16, Olsen Report ¶ 30; *see also* Ex-6 (summary chart identifying Properties where tenants were charged per-gallon rates exceeding regulatory caps based on sampled bill production by Conservice).)

If the Court finds a regulatory violation, resolving the remaining legal question of whether that constitutes a CPPA violation also provides an answer common to the class. As the Court held in the SJ Order, the violation of a "law or regulation in the context of a consumer transaction constitutes a *per se* violation of the CPPA." (SJ Order at 3); *see also D.C. v. Wash. Hebrew Congregation, Inc.*, 2022 D.C. Super. LEXIS 88, at *13 (D.C. Super. Ct. Sept. 13, 2022) (violation of school licensing regulation "in the context of a consumer transaction is a violation of the CPPA"). The consumer context here is likewise established with common evidence, as all tenants paid for and received water and sewer services pursuant to standardized residential lease terms. (*See* Ex-1, Property Spreadsheet). The water and sewer services thus fall comfortably within the CPPA's definition of consumer goods and services to encompass "any and all parts of the economic output of society" that a person "purchase[s] [] or receive[s] and normally use[s] for personal household, or family purposes." D.C. Code § 28–3901(a)(2) (defining "consumer"); (7) (defining "goods and services").

**i. Subcount G (Overcharge Class: Unfair Trade Practice)**

Unfair trade practices under the CPPA are evaluated under a three-factor balancing test that weighs whether the practice is (1) likely to cause substantial injury, (2) is not reasonably avoidable by consumers, and (3) not outweighed by countervailing benefits to consumers or competition. *Scott v. Apple, Inc.*, 757 F. Supp. 3d 1, 15 (D.D.C. 2024).

First, common evidence establishes substantial consumer injury. As described in the preceding section, a common formula can be used to calculate the number of tenants who were overcharged water and sewer per-gallon rates that exceeded the regulatory cap. (Ex-16, Olsen Report ¶ 30.) This injury is substantial, as the sampled production alone revealed 23 Properties where Bozzuto had overcharged tenants for water and sewer, whose unit counts total over 5,000. (*See* Ex-6.)

In addition to monetary injury, the SJ Order recognized that other injuries in the form of depriving tenants of "standard legal protections afforded consumers when they are billed for utilities directly by utility companies" can also support an unfairness claim. (SJ Order at 27.) Such deprivations of legal protections that would otherwise apply had Overcharge Class Members been billed by WASA directly are common across the class, and include heightened disclosure rights that ensure water/sewer bills disaggregate applicable fees, the right to appeal a water bill to a neutral administrative third party, and a 30-day window to pay bills before incurring penalties and interest. (Ex-7, WASA Bill of Rights at 14, 46, 29.)

Second, Overcharge Class Members could not reasonably avoid being overcharged water/sewer rates that exceeded the regulatory cap. To start, an Overcharge Class Member would not learn they were being charged an excessive water/sewer rate until they received their first water bill, well after they signed their lease. Once in that position, they would be forced to pay the

excessive water/sewer rate under threat of eviction, as Bozzuto maintains an eviction right over all Overcharge Class Members through a common lease provision that provides: "The late payment of a bill or failure to pay any utility bill is a material and substantial breach of the Lease and we will exercise all remedies available under the Lease, up to and including eviction for nonpayment."[6] (Ex-1, Property Spreadsheet, Column D.)

Third, there is no evidence that overcharging tenants water/sewer rates exceeding the regulatory caps and depriving them of other regulatory protections has any countervailing benefit to consumers or competition.

Thus, because all Overcharge Class Members could rely upon this common evidence to establish the unfairness of Bozzuto's water/sewer billing practices, predominance is satisfied.

**3. Class Members have common injuries.**

Under the CPPA, consumers need not prove that they were "misled, deceived, or damaged" to bring a claim, D.C. Code § 28–3904, because they have an enforceable "right to truthful information . . . about consumer goods and services." D.C. Code § 28–3901(c). The D.C. Council explained in plain terms that Section 28–3901(c) "illuminate[s] that the kinds of harm actionable under the CPPA include the provision of untruthful or misleading information, whether or not measurable economic damages demonstrably result to any particular consumer." D.C. Council Comm. Report on Bill 19-0581 at 3 (Nov. 28, 2012), *available at* https://perma.cc/WS6K-AL52.

As held in the SJ Order, the CPPA's private right of action elevates this statutory right into a "legally protected interest in being free from improper trade practices." (SJ Order at 25–26 (citing

[6] The Utility Addendum for the Beckert's Park building's contains a functionally identical eviction clause, providing: "Resident's failure to pay the utility bill is a material and substantial breach of the Lease and shall entitle Management to exercise all remedies available under the Lease." (BOZZUTO 000659; *see also* BOZZUTO 000603 (Beckert's Park lease providing: "If you are in default, we may seek to end your right of occupancy. We may proceed to institute eviction proceedings at any time your rent is overdue.").

*Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016).) Put another way, a violation of a consumer's statutory right to truthful information is itself a sufficient injury to establish liability under the CPPA even without any proof that consumers were misled, deceived, or damaged. Here, such an injury is established classwide with common proof, as Bozzuto systematically omitted Service Fees and Utilities from rental applications across the Properties. (Stip. ¶¶ 8–9.) Such a result is in accord with precedent holding that "bait-and-switch pricing schemes . . . can inflict a concrete injury [] on consumers by causing them to either spend more time searching for full pricing information or make uninformed decisions." (SJ Order at 25 (collecting cases, cleaned up).)

That said, while not required, Class Members can also show they were harmed and damaged by a common pocketbook injury. In the SJ Order, the Court held that Ms. Hettinger's payment of a $75 application fee was a "classic pocketbook injury" because she paid for "full information," but received in inaccurate disclosure as to her apartment's rent. (SJ Order at 26.) Drip-Pricing Class Members have the same pocketbook injury based on Bozzuto's stipulation that it systematically omitted Service Fees and Utilities from rental applications and required all tenants to file a rental application and pay an application fee before signing a lease. (Stip. ¶¶ 6, 8–9.) Overcharge Class Members likewise can demonstrate a common pocketbook injury in the amounts they paid for water and/or sewer in excess of the regulatory caps. (Ex-16, Olsen Report ¶ 30.) Thus, common proof establishes classwide harm in this case.

**4. Common questions predominate on proving damages.**

A damages model satisfies predominance where it applies a "common formula [that] is used to calculate the individual damages" for all class members, even if damages awards vary between class members. *Id.*; *see also Hoyte v. District of Columbia*, 325 F.R.D. 485, 494 (D.D.C. 2017) ("A formulaic approach to determining individualized damages is indeed consistent with

Rule 23[.]"). "[T]he mere fact that damage awards will ultimately require individualized fact determinations is insufficient by itself to preclude class certification." *Coleman*, 306 F.R.D. at 87.

Where, as here, discovery has been bifurcated into class certification and merits phases and complete data regarding Service Fees and Utilities paid by Class Members has not yet been produced, plaintiffs may satisfy predominance by providing an "unexecuted damages model" that provides a common methodology for calculating damages. *Lytle v. Nutramax Labs, Inc.*, 114 F.4th 1011, 1024 (9th Cir. 2024) ("[C]lass action plaintiffs may rely on an unexecuted damages model to demonstrate that damages are susceptible to common proof so long as the district court finds, by a preponderance of the evidence, that the model will be able to reliably calculate damages in a manner common to the class at trial."); *see also Nat'l ATM Council, Inc. v. Visa Inc.*, 2023 U.S. App. LEXIS 19028, at *6 (D.C. Cir. July 25, 2023) (affirming certification of damages model where plaintiffs "offered common proof of injury [and] their methods of establishing injury were reasonable, well accepted, and reliable"); *Howard*, 322 F.R.D. at 139 (certifying class and rejecting challenge to proposed damages methodology that had not yet been executed).

Predominance is satisfied in this case because damages can be calculated with a uniform formula based on standardized evidence. The CPPA's damages provision provides that a consumer is entitled to "[t]reble damages, or $1,500 per violation, whichever is greater, payable to the consumer." D.C. Code § 28–3905(k)(2)(A)(I)[7]; *see also Modern Mgmt. Co. v. Wilson*, 997 A.2d 37, 62 (D.C. 2010) (CPPA authorizes multiple forms of monetary relief "to protect consumers from a broad spectrum of unscrupulous practices by merchants . . . ."). For the reasons below, the

---

[7] In addition, the CPPA allows for punitive damages, attorneys' fees, and "[a]ny other relief which the court determines proper" are available, and "[i]n representative actions, additional relief as may be necessary to restore to the consumer money or property, real or personal, which may have been acquired by means of the unlawful trade practice." D.C. Code § 28-3905(k)(2).

Statutory and Treble Damages Models set out in the Olsen Report both satisfy the predominance standard. (Ex-16, Olsen Report ¶¶ 20–34.)

**The Statutory Damages Model.** The CPPA's statutory damages amount of $1,500 per violation provides a common baseline that ensures predominance, as it permits even class members who "cannot prove the amount of pecuniary damage suffered as a result, to opt for the default payment of $1,500." *Wells*, 210 F.R.D. at 9 (certifying class); *Travelers United, Inc.*, 2024 D.C. Super. LEXIS 38, at 35 (certifying class where "class members will be entitled to $1,500 in [statutory] damages if that [challenged fee] is found to violate the CPPA"). "[A] 'violation' of the statute occurs each time a customer purchases [the] product." *Chem. Toxin Working Grp. Inc. v. Johnson & Johnson*, 2023 U.S. Dist. LEXIS 50953, at *7 (D.D.C. Mar. 24, 2023).

Here, a Statutory Damages Model for each Class will apply a common formula that multiplies $1,500 by the total number of violations. (Ex-16, Olsen Report ¶ 20.) For the Drip-Pricing Class, the Court awarded summary judgment to Ms. Hettinger on Subcount A, holding that Bozzuto's drip-pricing scheme in violation of the RHA constituted a *per se* violation of the CPPA. (SJ Order at 18–19). Thus, Ms. Hettinger has proven one CPPA violation and is entitled to statutory damages of $1,500. (Ex-16, Olsen Report ¶ 21.) As the same will be true for other Drip-Pricing Class Members, executing the Statutory Damages Model will be a straightforward task of multiplying $1,500 by the number of Drip-Pricing Class Members. (*Id.*) The number and identities of the remaining Drip-Pricing Class Members are maintained by Bozzuto and can be readily obtained in post-certification discovery. (*Id.*)

For the Overcharge Classes, the Statutory Damages Model is similarly straightforward. The number of violations for Overcharge Class Members will be drawn from standardized data that Bozzuto and Conservice maintain regarding per-gallon rates charged for water/sewer services,

tenant payments for water/sewer charges, and gallons consumed. (*Id.* ¶ 22.) Such data can likewise be readily obtained in post-certification discovery. (*Id.*)

**The Treble Damages Model.** In the alternative to statutory damages, the CPPA authorizes trebling of actual damages if those are greater than the $1,500 statutory damages award. If discovery reveals that treble damages exceed statutory damages, this information is also readily identifiable from Bozzuto's business records and can be calculated with common formulas for each Class. (*Id.* ¶¶ 24, 28.)

For Drip-Pricing Class Members, actual damages are calculated by summing two forms of pocketbook injury. First, the class member's application fee is recoverable as damages because it is a "classic pocketbook injury." (SJ Order at 26); *see also D.C. v. Equity Res. Mgmt.*, 2021 D.C. Super. LEXIS 90, at *16 (D.C. Super. Ct. Oct. 8, 2021) (awarding restitution to consumers, which included "disgorgement of application fees collected" by landlord who misrepresented apartment rents on rental applications). Second, the total amount of undisclosed Service Fees and Utilities over the tenant's lease term is another pocketbook injury which is recoverable as damages. *See Veera v. Banana Republic, LLC*, 6 Cal. App. 5th 907, 918 (Cal. Ct. App. 2016) ("The economic harm thus suffered is the difference between the advertised price plaintiffs should have been charged, and the full price plaintiffs actually paid."). This sum is then trebled under the CPPA. This methodology is expressed in the following common formula that can be applied to all Drip-Pricing Class Members:

$$Treble\ Damages = 3 * ((Application\ Fee\ Paid) + (Total\ Service\ Fees\ and\ Utilities\ Paid))$$

(Ex-16, Olsen Report ¶ 24.)

For Overcharge Class Members, actual damages can be calculated as the difference between the total amount paid for water and/or sewer at the unlawfully excessive rate and the

amount that should have been paid at the operative cap set by District regulations. (*Id.* ¶¶ 29–30.) This amount is then trebled pursuant to the CPPA. This methodology is expressed in the following common formula that can be applied to each Overcharge Class Member for both water and sewer charges:

$$Treble\ Damages = 3 * \left( - \begin{matrix} (Charged\ Per\ Gallon\ Rate) * (Gallons\ Used) \\ (Regulatory\ Cap\ Per\ Gallon\ Rate) * (Gallons\ Used) \end{matrix} \right)$$

(*Id.* ¶ 29.)

Applying these two formulas to the data available in Ms. Hettinger's ledger returns the following treble damages calculations for the respective claims. (*Id.* ¶¶ 27–28; 33–34; *see also* Ex-17, Hettinger Ledger (BOZZUTO002827–2829).) These formulas provide a common methodology that can be uniformly applied to all Class Members once their relevant data is produced following the certification stage. (Ex-16, Olsen Report ¶¶ 27–28; 33–34.)

| **Damages Calculations for Ms. Hettinger** | | |
|---|---|---|
| | **Actual Damages** | **Treble Damages** |
| **Drip-Pricing** | $1,255.39 | $3,766.17 |
| **Overcharge** | $215.08 | $645.25 |

As executing the Statutory Damages Model or Treble Damages Model is a straightforward task that simply requires applying a common formula uniformly to data that will be produced by Bozzuto, Ms. Hettinger satisfies commonality and predominance on damages as to both Classes.

**5. Superiority is satisfied and this case is manageable.**

The superiority requirement asks whether a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The "matters pertinent" to a finding of superiority include: "(A) the class members' interests in individually controlling the prosecution . . . of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the

desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *McCormick*, 422 F. Supp. 3d at 267 (quoting Fed. R. Civ. P. 23(b)(3)). Each of these requirements is met in this case.

First, individual Class Members' interest in individually controlling the prosecution is limited because their individual claims in this case are relatively small, with many falling under the D.C. Small Claims Court threshold of $10,000. And where there is a "low dollar value of any individual recovery, a class action will enable vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Id.*; *see also Amchem*, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.").

As to the second and third factors, Ms. Hettinger is unaware of any other case against Bozzuto making similar claims that this Motion seeks to certify for class treatment. This underscores the desirability of concentrating the litigation of such claims in this forum, where the challenged conduct occurred in a common manner as to thousands of Class Members. *See Coleman*, 306 F.R.D. at 87 ("A class action is superior when it may forestall an inefficient and uneconomical flood of individual lawsuits and/or prevent inconsistent outcomes in like cases.") (quotation omitted).

Finally, as predominance has been shown, there are no manageability concerns at play. *See Vvanti v. O'Reilly Auto Enterprises*, LLC, 2023 U.S. Dist. LEXIS 119459, at *38–39 (C.D. Cal. July 10, 2023) (quoting Newberg on Class Actions § 4:72 (5th ed.) (observing that analysis of the manageability factor "often simply echoes the predominance analysis")). Bozzuto employs standardized practices for disclosing and charging Service Fees and Utilities across all Class

Members. These practices and the identification of Class Members and their damages will be proven from common evidence, as Bozzuto maintains detailed records of tenant contact information, as well as the Service Fees, Utilities paid. (*See* Stip. ¶ 12.) Third-party utility billing companies such as Conservice also maintain detailed records on per-gallon water/sewer rates charged to tenants and total gallons consumed. Such records ensure that a class action will be manageable in this case.[8]

Ms. Hettinger intends to quickly move for summary judgment on the unlawful claims under Subcount A (rent) and Subcount H (water and sewer overcharge) in the event they are certified for class treatment. The only outstanding information necessary for summary judgment is the identities of the Class Members which Bozzuto has and will have to produce for class notice to be sent under Rule 23. *See* Fed. R. Civ. P. 23(c)(2); *See* (Stip. ¶ 11.) Upon class certification, the Court's grant of partial summary judgment as to liability will apply equally to the Drip-Pricing Class Members. Similarly, Ms. Hettinger's and the Classes' unlawful overcharge claims under Subcount H are primed for summary judgment. There are no material factual disputes about the amounts charged per gallon at the Properties nor as to the maximum regulatory rates allowed. All that remains is a decision on whether Bozzuto's actions violated the law. For both subcounts, Ms.

[8] Certain jurisdictions have imposed a heightened "ascertainability" requirement for class certification that requires that the class be defined by "objective criteria" and that it be "administratively feasible" for the court to determine whether an individual is a member of the class. *McCormick*, 422 F. Supp. 3d at 241. This requirement is not found in the plain text of Rule 23 and the D.C. Circuit has not adopted this requirement. *Id.* ("[T]he D.C. Circuit has not addressed whether Rule 23 contains an ascertainability requirement for class certification."); *Burks v. Islamic Republic of Iran*, 2022 U.S. Dist. LEXIS 244554, at *52 (D.D.C. Sept. 30, 2022) ("[T]he D.C. Circuit 'has not addressed whether Rule 23 contains an ascertainability requirement for class certification.'"). However, even were the Court to impose such a requirement, it would be met here because Bozzuto and Conservice maintain detailed records of Class Members' contact information and amounts paid for application fees, Service Fees, Utilities, as well as the per-gallon rates for payments made for water/sewer charges. (*See* Stip. ¶ 12; Ex-6 (summary chart identifying excessive per-gallon rates charged based on sampled bill production by Conservice).)

Hettinger and the Classes are entitled to summary judgment on damages based on the damages theories described above.

The remaining subcounts will proceed to trial after a short discovery period. Ms. Hettinger expects that the discovery phase will last no more than four months. As discussed in the Court's summary judgment decision, the contested issues at trial will largely involve whether Bozzuto's price omissions and ambiguities were material and had a tendency to mislead. Ms. Hettinger and the Classes' evidence on these issues will include testimony by Ms. Hettinger, Bozzuto, and Conservice employees, experts, and potentially other Class Members. Ms. Hettinger and the Classes will also present common evidence such as representative documents of Bozzuto's purchase flows, application, leases, monthly statements, and ledgers, or summaries of the same. And so, this case is manageable as a class action.

**C. The Court should certify an injunctive class under Rule 23(b)(2).**

Rule 23(b)(2) permits the certification of an injunctive class when a defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." "Courts may certify classes under this provision only when a single injunction or declaratory judgment would provide relief to each member of the class." *D.L. v. District of Columbia*, 860 F.3d 713, 723 (D.C. Cir. 2017). This requirement is generally met where the injunctive relief sought seeks a uniform modification to a practice or policy applicable to the class. *See, e.g.*, *id.* at 724 (affirming Rule 23(b)(2) class certification where injunction "required the [government defendant] to meet its statutory deadline [to provide special education eligibility determinations] 95 percent of the time"); *Morgan v. District of Columbia*, 2025 U.S. Dist. LEXIS 152235, at *20–21 (D.D.C. Aug. 7, 2025) (certifying Rule 23(b)(2) class in case alleging government defendant failed to comply with

Medicaid notice requirements in denying coverage where single injunction could "require the [defendant] to modify its existing notice policy").

A Rule 23(b)(2) injunctive class is thus appropriate because a single injunction would provide relief to both Drip-Pricing and Overcharge Class Members. As to the Drip-Pricing Class, Bozzuto recently added a disclaimer to Property websites on August 28, 2025, which provided that "[r]esidents are responsible for additional required fees . . . including . . . utility charges." (Stip. ¶ 10.) This disclaimer, however, remains inadequate for the basic reason that it continues to omit any reference to the Service Fee—a discrete monetary amount that is part-and-parcel of the price of the rental unit. A single injunction requiring Bozzuto to modify its practices to disclose the Service Fee for the Property at the time tenants file their rental applications would provide classwide relief and thus satisfies the injunctive class requirement.

Similarly, as to the Overcharge Class, Bozzuto has provided no evidence that it has ceased charging per-gallon water and sewer rates that exceed the caps set out in District regulations. Thus, a single injunction prohibiting Bozzuto from charging such excessive water and sewer rates would also provide classwide relief and warrant certification of an injunctive class.

**D. LCvR 23.1(c) statement regarding class notice.**

LCvR 23.1(c) provides that a plaintiff moving for class certification include a statement "proposing (1) how, when, by whom, and to whom the notice required by Fed. R. Civ. P. 23(c)(2) shall be given, (2) how and by whom payment therefore is to be made, and (3) by whom the response to the notice is to be received. In lieu of such a statement the movant may state reasons why a determination of these matters cannot then be made, and offer a proposal as to when the determination should be made." A court certifying a class action "may include in its order the provisions for notice . . . or may postpone a determination of the matter." LCvR 23.1(c).

At this time, Ms. Hettinger cannot propose a notice plan because discovery has been bifurcated and Bozzuto has not yet produced the identities and contact information of Class Members. (*See* Ex-18, Sept. 12, 2025, Hr'g Tr. 8:9–10 (denying as "premature" Ms. Hettinger's request to compel Bozzuto to produce contact information for Class Members).) Ms. Hettinger therefore requests that, if the Court certifies a class, Bozzuto be ordered to produce contact information for all Class Members within 21 days. Ms. Hettinger will then submit a notice plan within 30 days of receiving Bozzuto's production.

As to the factors generally, Ms. Hettinger intends to retain a third-party administration that specializes in administering class actions to design a notice plan to ensure notice is effectively disseminated to all class members. While the typical rule is that the plaintiff bears the cost of class notice, because Bozzuto's liability has already been found in this case those costs should be shifted to Bozzuto. *See, e.g.*, *Bakov. v. Consol. World Travel, Inc.*, 68 F.4th 1053, 1058–59 (7th Cir. 2023) (citing cases "plac[ing] notice costs on the class action defendant once the defendant's liability has been established" and holding decision to do so "rests in the district court's discretion"). Finally, any responses to the notice will be received by the third-party administrator, who will prepare a declaration for submission to the Court detailing class members who have opted out of the case.

**E. The Court should appoint Ms. Hettinger's attorneys as Class Counsel.**

Consistent with Rule 23(g), Ms. Hettinger requests the appointment of her attorneys, Hassan Zavareei and F. Peter Silva II of Tycko & Zavareei LLP and Jason Rathod, Nicholas Migliaccio, and Randolph Chen of Migliaccio & Rathod LLP as class counsel ("Proposed Class Counsel"). Proposed Class Counsel are experienced consumer lawyers, having served as lead counsel in dozens of consumer class cases. Proposed Class Counsel's experience and credentials, as well as those of their firms, are further detailed in their firm resumes. (*See* Ex-10–11.) Proposed

Class Counsel have committed significant time and resources to litigating this matter and will continue to do so throughout this case.

## VIII. CONCLUSION

For these reasons, Ms. Hettinger respectfully requests that this Court grant her motion and enter an order:

(1) certifying this action as a class action and certifying the proposed classes;

(2) appointing Ms. Hettinger Class Representative;

(3) appointing Hassan Zavareei and F. Peter Silva II of Tycko & Zavareei LLP and Jason Rathod, Nicholas Migliaccio, and Randolph Chen of Migliaccio & Rathod LLP as Class Counsel;

(4) requiring Bozzuto to bear the cost of class notice as Bozzuto's liability under Subcount A has already been determined;

(5) directing the parties to confer and submit a joint scheduling order within 14 days;

(6) requiring Bozzuto to produce Class Member information sufficient to provide class certification notice within 21 days; and

(7) directing Ms. Hettinger to submit a proposed notice plan within 30 days of receiving Class Members information from Bozzuto.

Respectfully submitted,

Date: December 5, 2025

*/s/ F. Peter Silva II*
F. Peter Silva II (DC Bar No. 1010483)
Hassan A. Zavareei (DC Bar No. 456161)
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Ave., NW, Suite 1010
Washington, District of Columbia 20006
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
*psilva@tzlegal.com*

Randolph T. Chen (DC Bar No. 1032644)
Jason S. Rathod (DC Bar No. 100082)
Nicholas A. Migliaccio (DC Bar No. 484366)
**MIGLIACCIO & RATHOD LLP**
412 H Street NE
Washington DC 20002
Office: (202) 470-3520
Fax: (202) 800-2730
rchen@classlawdc.com
jrathod@classlawdc.com
nmigliaccio@classlawdc.com

*Counsel for Plaintiff Laura Hettinger and the Putative Classes*