**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| LAURA HETTINGER,<br><br>Plaintiff,<br><br>v.<br><br>BOZZUTO MANAGEMENT COMPANY,<br><br>Defendant. | Civil Action No. 23-3687 (JEB) |

**MEMORANDUM OPINION**

Former D.C. renter Laura Hettinger here seeks to broaden her suit against her building's property-management company for its utility-notice and billing practices. With this Motion for Class Certification, Plaintiff attempts to vindicate not only her rights but also those of similarly situated tenants. The Court concludes that Hettinger's proposed classes are appropriately defined and distill specific legal theories applicable to all class members regardless of minor factual differences. It will thus certify classes to permit current and former tenants to aggregate their relatively small claims for monetary damages. As a former tenant, however, Plaintiff lacks standing to seek forward-looking injunctive relief, and the Court will not certify classes for that purpose. The Court will thus grant her Motion in part and appoint Hettinger as the representative for the damages classes and her attorneys as class counsel.

## I.    Background

### A.    Factual Background

D.C. residents might well be familiar with Bozzuto Management Company, the manager of rental properties in dozens of residential buildings in our city.  See ECF No. 73 (Joint Stip.), ¶ 1.  Bozzuto shepherds potential tenants through every part of its properties' apartment-leasing process: touring, applying, signing a lease, and, after the lease begins, billing tenants for monthly associated costs.  Id., ¶ 6; ECF No. 41 (Am. Compl.), ¶ 60.  Those monthly costs include the "fixed rent" — i.e., the standalone monthly cost of the unit itself, see Am. Compl., ¶ 61 — and certain utility costs for a tenant's water, sewer, HVAC, and trash, which are first "billed by the service provider to" Bozzuto and then passed on to the tenant via a Bozzuto invoice.  Hettinger v. Bozzuto Mgmt. Co., 2025 WL 2029747, at *3 (D.D.C. July 21, 2025) (quotation marks omitted); accord ECF No. 74-7 (Lease) at ECF p. 10 (describing utility-payment process).

The purported disconnect between Bozzuto's pre-lease disclosures and its post-lease billing practices forms the core of this suit.  Hettinger toured a Bozzuto-managed property in June 2021.  See Am. Compl., ¶¶ 57, 60.  She received informational materials, some of which listed a bevy of fees charged upon leasing an apartment: the monthly per-unit rental cost and a series of one-time fees, including a pet fee, amenity fee, and trash fee.  Hettinger, 2025 WL 2029747, at *2; ECF No. 74-6 (Pricing Sheet).  One such document identified a third-party electric provider, the cost for which the "[r]esident" would be "[r]esponsible," and noted that other utilities — HVAC, water, and sewer — would be "billed with [the] month[ly] rent statement."  Pricing Sheet.  Yet Bozzuto's online application — required for consideration for an apartment lease — made no mention of any utility costs that Bozzuto would charge with her monthly rent.  See ECF No. 74-4 (Rental App.); Joint Stip., ¶ 8.

Hettinger filed a rental application — complete with a $75 fee — and received a lease agreement for the apartment unit she sought.  See Am. Compl., ¶¶ 61–63.  The lease contained a Utility Addendum governing charges for water and sewer use.  See Lease at ECF p. 10.  Beyond the variable monthly costs, the Addendum alerted her for the first time to a required $10 "New Account Fee" and a $4.30 monthly service fee — all billed by Bozzuto.  Id.; Am. Compl., ¶ 64.

Despite the newly disclosed fees, Hettinger signed the lease agreement.  See Am. Compl., ¶ 63.  She then moved into her Bozzuto-managed apartment and began receiving bills that included the aforementioned monthly service fee and variable charges depending on her water and sewer usage.  Id., ¶ 66.  What is more, the total amount charged for her water and sewer use at times exceeded the maximum permitted under D.C. law, which caps the usage rates that may be billed to customers.  Id.

 These billing discrepancies are not unique to Hettinger's experience.  From at least December 2020 onwards, application forms to various Bozzuto-managed properties lacked any mention of administrative or variable utility charges included in Bozzuto's monthly tenant bills.  See Joint Stip., ¶ 8.  Evidence in the record also indicates that other tenants were charged monthly water and sewer costs that exceeded the District's statutory maximum per-1,000-gallon rates.  See ECF No. 74-8 (Utility Charge Chart).  Hettinger thus seeks relief here not only for herself but also for similarly situated tenants at Bozzuto-managed properties.

B.    Procedural History

Plaintiff sued Bozzuto in D.C. Superior Court on behalf of herself and a putative class of similarly misled and overcharged fee-payers.  See ECF No. 1 (Not. Removal) at 1.  Bozzuto promptly removed the case, invoking this Court's diversity jurisdiction, id. at 2–7, and moved to dismiss the Complaint.  See ECF No. 10 (Mot. Dismiss).  The Court denied that Motion in large

part, though it dismissed without prejudice a handful of claims that Hettinger does not press here. See ECF No. 18 (Mot. Dismiss Order).  Discovery ensued.

As the case wound its way through this phase of the litigation, the claims and parties involved fluctuated.  Of note, Bozzuto filed a Third-Party Complaint about six months in.  It brought claims against Conservice, LLC, the water and sewer utility provider for Hettinger and many of its tenants, alleging that any liability for overcharging its tenants "would strictly be a consequence of actions or inactions of Conservice" under a preexisting contract.  See ECF No. 35 (Third-Party Compl.), ¶¶ 6–12.  Bozzuto and Conservice later resolved their dispute, and Bozzuto dismissed the Third-Party Complaint without prejudice.  See ECF No. 53 (Volun. Dismissal).

Nearly a year into discovery, the parties cross-moved for partial summary judgment.  See ECF Nos. 46 (Def. MSJ); 50 (Pl. MSJ).  While the Court denied Bozzuto's motion on most counts, it granted Hettinger's cross-motion on Subcount A: that Bozzuto's failure to identify the utility fees to Hettinger at the time she filed her rental application violated both D.C.'s Rental Housing Act and its Consumer Protection Procedures Act.  Hettinger, 2025 WL 2029747, at *9. It held that 1) the monthly utility payments Hettinger paid to Bozzuto were "rent" under the "RHA's statutory definition," id. at *6; 2) the RHA required Bozzuto to disclose the fee at the precise time Hettinger applied for a rental unit, id. at *8; and 3) because Bozzuto undisputedly did not do so, it violated the RHA, which was a *per se* violation of the CPPA in turn.  Id. at *9. The Court thus granted Hettinger summary judgment on that claim.  Id.

C.      Proposed Class Certification

Hettinger now moves for class certification on some of her claims.  See ECF No. 74 (Mot. Class Cert.).  She seeks to certify two classes under both Rule 23(b)(2) — for injunctive

relief — and (b)(3) — for monetary damages: the "Drip-Pricing Class" and the "Overcharge

Class."  The former is defined as follows:

> **Drip-Pricing Class:** All current and former residential tenants at a Bozzuto managed property who filed a rental application while Bozzuto managed that property and who were charged or paid a Service Fee or variable utility charges between December 5, 2020, and August 27, 2025.

Id. at 8.  Liability for this class is premised on two subcounts of the Complaint.  First, Subcount

A — the same subcount on which the Court previously granted Hettinger summary judgment —

alleges that Bozzuto's failure to disclose the monthly utility charges in its application was an

unfair trade practice under the CPPA because the omission violated the RHA.  See Am. Compl.,

¶ 90; Mot. Class Cert. at 8.  Subcount B alleges a separate CPPA violation, claiming that

Bozzuto engaged in an unfair trade practice by stating a lower upfront price on the application

and later revealing the full cost of tenancy (fixed rent and utility costs) after applicants had

invested time, effort, and money into the leasing process.  See Am. Compl., ¶ 90.  Plaintiff

argues that all prospective tenants filled out the same application that lacked mention of utility

fees, and that this omission — no matter what additional information Bozzuto offered

prospective tenants during the pre-application process — misled tenants about the price of their

rental unit in violation of the CPPA.  See ECF No. 78 (Reply) at 11–12.

The second proposed class is:

> **Overcharge Class:** All current and former residential tenants of the Properties at a Bozzuto-managed property in the District of Columbia who were charged or paid a per-1,000 gallon rate for water or sewer service greater than the lawfully established regulatory cap at any point since December 5, 2020.

Mot. Class Cert. at 8.  Hettinger seeks certification of this class for Subcounts G and H of the

Complaint.  The theory underlying Subcount H is that Bozzuto committed a regulatory violation

5

by charging water and sewer fees to some tenants in excess of the D.C. maximum rate, which in turn "constitutes a *per se* violation of the CPPA." Id. at 21 (quoting Hettinger, 2025 WL 2029747, at *2). As to Subcount G, Plaintiff alleges that Bozzuto's overcharging practice constituted an unfair trade practice by levying excessive charges that none of its tenants could avoid because they did not know of the practice until signing a lease and starting their tenancy. Id. at 22–23.

## II.    Legal Standard

To obtain certification under Federal Rule of Civil Procedure 23, a plaintiff must show that the proposed class satisfies all four requirements of Rule 23(a) and one of the three Rule 23(b) requirements. See Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 345 (2011). Rule 23(a) states that a class may be certified only if: 1) the class is so numerous that joinder of all members is impracticable ("numerosity"); 2) there are questions of law or fact common to the class ("commonality"); 3) the claims or defenses of the representative are typical of those of the class ("typicality"); and 4) the class representative will fairly and adequately protect the interests of the class ("adequacy of representation"). Rule 23(b) requires the moving party to show, in addition, that 1) the prosecution of separate actions by or against individual members of the class would create a risk of inconsistent adjudications, 2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole, or 3) questions of law or fact common to the members of the class predominate over any questions affecting only individual members.

In deciding whether to certify a class under Rule 23, a district court must undertake a "rigorous analysis" of whether the requirements of the Rule have been satisfied. Gen. Tel. Co. of

Sw. v. Falcon, 457 U.S. 147, 161 (1982).  "Rule 23 does not set forth a mere pleading standard."

Wal-Mart, 564 U.S. at 350.  Rather, the "party seeking class certification" bears the burden of

"affirmatively demonstrat[ing] his compliance with the Rule — that is, he must be prepared to

prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc."

Id.  A court's analysis of whether a class may be certified "[f]requently . . . entail[s] some

overlap with the merits of the plaintiff's underlying claim," requiring the court to "probe behind

the pleadings before coming to rest on the certification question."  Id. at 350–51; see also Falcon,

457 U.S. at 160 ("[T]he class determination generally involves considerations that are enmeshed

in the factual and legal issues comprising the plaintiff's cause of action.") (quotation marks

omitted).  Because a decision on class certification "requires a thorough examination of the

factual and legal allegations," the court may conduct a "preliminary inquiry into the merits."  In

re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 317 (3d Cir. 2008) (quotation marks

omitted).  The court may thus "consider the substantive elements of the plaintiffs' case in order

to envision the form that a trial on those issues would take."  Id. (quotation marks omitted).  An

order granting class certification "must define the class and the class claims, issues, or defenses,

and must appoint class counsel under Rule 23(g)."  Fed. R. Civ. P. 23(c)(1)(B).

## III.    Analysis

Before undertaking the class-certification analysis, the Court embarks upon a brief detour

to consider Bozzuto's arguments regarding joinder of nonparties.

### A.    Rule 19

The very question of class certification, Bozzuto says, is premature because parties who

would be affected by a class-wide judgment are not joined in this litigation as required by

Federal Rule of Civil Procedure 19.  See ECF No. 76 (Opp. Class Cert.) at 7–10.  That Rule

7

provides, in relevant part, that a person "must be joined as a party if" she "claims an interest" in the litigation that may be "impair[ed] or impede[d]" without her inclusion. See Fed. R. Civ. P. 19(a)(1); see also Opp. Class Cert. at 7. Bozzuto argues that two groups of non-parties fit the bill. See Opp. Class Cert. at 8. Utility provider Conservice, for one, has purportedly agreed to indemnify Bozzuto from all liability arising from its pass-through billing of water and sewer provided by Conservice. Id. The property owners are also absent nonparties, and Bozzuto contends that a judgment in this case could affect owners' ability to contract and communicate with tenants. Id. at 9–10. Because a judgment for Plaintiffs could affect both Conservice and the owners moving forward, Bozzuto contends that those entities "have the right to appear and assert their chosen defenses" before the Court considers Hettinger's Motion for Class Certification. Id. at 7, 10.

The Court cannot concur. Neither Conservice nor the property owners are "required parties" under Rule 19 because Bozzuto itself adequately represents their interests. Where an existing party adequately represents nonparties' interests, "the suit will not impede or impair the nonparties' interests," and the nonparty — by definition — is not "required" under Rule 19(a)(1)(B)(i). Ramah Navajo Sch. Bd., Inc. v. Babbitt, 87 F.3d 1338, 1351 (D.C. Cir. 1996). Bozzuto seeks exactly the same outcome as Conservice and the property owners: resolution of this suit without a judgment of liability or damages assessed against it. The fact that Bozzuto may have indemnification arrangements with either group (or both) does not automatically impute a distinct interest worthy of Rule 19 protection. 16th & K Hotel, LP v. Commonwealth Land Title Ins. Co., 276 F.R.D. 8, 15–16 (D.D.C. 2011) (where absentee's "interests . . . are entirely derivative of the [litigating party]," there is no "interest that would be unprotected in [the nonparty's] absence"). The burden to "show the nature of the unprotected interests of the absent

8

individuals or organizations" lies with the party seeking to add them. See 5C Wright & Miller's Federal Practice & Procedure § 1359 (3d ed. Apr. 2026 update). Bozzuto has offered only general assertions of the nonparties' concern with this matter — such as the property owners' interest in knowing what they "can or cannot say to avoid liability," Opp. Class Cert. at 10 — hardly enough to carry the day where Bozzuto's investment in the suit's outcome mirrors their own.

The late hour of Bozzuto's protest, moreover, weakens its assertion that the Court cannot proceed without these nonparties. This case has been pending for more than two years, and the entities Bozzuto claims are "required" have long been on notice of the litigation and their purported interest in it. Conservice was even impleaded as a third party via Bozzuto until the two resolved the claims between them. See Volun. Dismissal at ECF p. 1. While the D.C. Circuit has not adopted the rule that objections to the absence of required but non-indispensable parties are waived if not made in the defendant's "first responsive pleading," Citibank, N.A. v. Oxford Props. & Fin. Ltd., 688 F.2d 1259, 1262 n.4 (9th Cir. 1982), inexplicable delay should be "considered" in the context of a Rule 19 argument. Ilan-Gat Eng'rs, Ltd. v. Antigua Int'l Bank, 659 F.2d 234, 242 (D.C. Cir. 1981). Here, the Court is unwilling to permit Bozzuto to sandbag Plaintiff's attempts to move the litigation forward by invoking absent nonparties who could have sought to intervene at any time.

This threshold issue dispensed with, the Court now considers the two proposed classes separately.

B.     Drip-Pricing Class

Bozzuto levies two preliminary challenges to Hettinger's Drip-Pricing Class, which the Court addresses before conducting the Rule 23 analysis.

1.    *Standing*

Bozzuto's first challenge is to Plaintiff's ability to show individual and class-wide standing under Article III.  See Opp. Class Cert. at 10–12.  To establish such standing, a plaintiff must have 1) "suffered an injury in fact" that is 2) "fairly traceable" to the defendant's conduct and 3) "likely to be redressed by a favorable decision."  Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016).  Those rules translate to proposed classes differently based on the type of class.  For a Rule 23(b)(2) class, where class-wide injunctive relief is sought, only a single plaintiff with standing is required for class certification.  J.D. v. Azar, 925 F.3d 1291, 1324 (D.C. Cir. 2019); Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin, 174 F.4th 81, 114 (D.C. Cir. 2026) ("[C]ourts may award class-wide injunctive or declaratory relief under Rule 23(b)(2) so long as one member of the class has standing.").  In TransUnion LLC v. Ramirez, 594 U.S. 413 (2021), however, the Supreme Court held that "[e]very class member must have Article III standing in order to recover individual damages."  Id. at 431.  Because Hettinger seeks to certify a class under Rule 23(b)(3) to obtain monetary damages, her standing would not suffice for other class members to claim such relief.

Turning first to Plaintiff's proposed 23(b)(2) class, she must show that she has standing for the injunctive relief she seeks on behalf of the class.  "Plaintiffs . . . bear the burden of showing that they have standing for each type of relief sought."  Coleman ex rel. Bunn v. District of Columbia, 306 F.R.D. 68, 74 (D.D.C. 2015) (quotation marks and alterations omitted).  Hettinger seeks injunctive relief in part to stop Bozzuto from "continuing to engage in unlawful advertising, leasing, and billing practices and implementing related penalties."  Am. Compl. at 33.  But she is no longer a tenant with Bozzuto, and she nowhere alleges that she plans to apply for or rent a Bozzuto-managed property again.  Id., ¶ 11 (Plaintiff "was" tenant at Bozzuto-

10

managed property) (emphasis added); Opp. Class Cert. at 31 (Hettinger "no longer reside[s] at a [Bozzuto-managed] community").  It is black-letter law that a plaintiff lacks standing to pursue a forward-looking injunction as relief for past harm that she has not alleged that she will likely suffer again.  City of Los Angeles v. Lyons, 461 U.S. 95, 105, 111 (1983).  Without standing, Hettinger's proposed 23(b)(2) class for injunctive relief fails.  J.D., 925 F.3d at 1324 ("[T]he one plaintiff with standing must be a class representative.").

The question of standing for a 23(b)(3) damages class, conversely, is aided by this Court's prior summary-judgment Opinion.  There the Court held that Hettinger has demonstrated standing for the injury caused by Bozzuto's failure to disclose the utility fees it would charge in its rental application.  Hettinger, 2025 WL 2029747, at *4, 12.  She has affirmed that she did not know that an additional fixed service fee and variable utility costs would be added to the apartment rental cost in her monthly bill from Bozzuto.  See ECF No. 76-2 (Hettinger Depo.) at 136:11–141:12.  She testified, moreover, that knowledge of those costs would have "been important to [her] decision making process" as she considered how much the apartment "truly was going to cost [her]."  Id. at 141:4–12.  Because Hettinger had paid $75 to apply for a rental before receiving "full information" — that is, how much her apartment would actually cost — the Court found that she had demonstrated a "classic pocketbook injury" sufficient for Article III standing.  Hettinger, 2025 WL 2029747, at *12.

Hettinger's personal standing, however, may not be enough for class-wide certification after TransUnion.  While each member of a Rule 23(b)(3) class must establish standing to recover damages, it is an open question whether "every class member must demonstrate standing before a court certifies a class."  TransUnion, 594 U.S. at 431 & n.4 (formatting altered); see also William B. Rubenstein, 1 Newberg and Rubenstein on Class Actions § 2:3 (6th ed. June 2026

update) (noting post-TransUnion confusion on standing requirements at time of (b)(3) certification); Refugee & Immigrant Ctr., 178 F.4th at 114.  Bozzuto challenges whether the rest of the class can demonstrate an injury in fact.  Its argument centers on the assertion — supported by some evidence in the record — that "many prospective tenants are informed" as a matter of fact "that utilities are not included with rent," regardless of whether they received that information "concurrently" with their applications.  See Opp. Class Cert. at 10–11.  Such tenants face no "cognizable injury" from Bozzuto's application, the reasoning goes: they know that fees incurred by their utility use will be billed to them separate and above their monthly rent, and those fees are indeed charged to them once their lease begins.  Id. (formatting altered).

Even assuming that every putative class member must demonstrate standing at the class certification stage, the Court finds that Hettinger has sufficiently shown injury for all class members.  That is because, under her theory of the case, even prospective tenants who had actual knowledge that some utility costs would be assessed on top of their unit rent would incur a pocketbook injury from Bozzuto's disclosure and billing practices.  Courts have held that "bait-and-switch" schemes like the one detailed in the Complaint can cause "reduced-price sensitivity" in consumers and "lead[] to higher prices" for all.  Rector v. Walmart Inc., 2025 WL 671211, at *5 (D.D.C. Mar. 3, 2025) (citing Kahn v. Walmart Inc., 107 F.4th 585, 601 (7th Cir. 2024)).  That is because consumers are "reluctant to switch" to alternative products when "surcharges are revealed late in the purchase process."  ECF No. 74-14 (Wilcox Rep.), ¶ 17; see also id., ¶¶ 18–20.  Hettinger presents evidence that Bozzuto's late-notice practices caused exactly that hesitation, leading tenants "to spend more on a rental unit than they would have if the charges . . . were disclosed upfront."  Id., ¶ 35.  Decreased consumer price sensitivity yields higher prices.  Cf. Ohio v. Am. Express, 585 U.S. 529, 536 (2018) (higher price sensitivity

means merchants must charge less); see also Airlines for Am. v. Transp. Sec. Admin., 780 F.3d 409, 411 (D.C. Cir. 2015) (courts may recognize "generally applicable economic principles" when they are "self-evident") (quotation marks omitted).  Those higher prices, in turn, "can inflict" the type of "concrete injury" required for standing.  Hettinger, 2025 WL 2029747, at *12 (quotation marks omitted).

A price increase is easy to spot where, as here, the evidence indicates that Bozzuto almost never disclosed that an account fee of $4.30 would be billed monthly to tenants.  See Opp. Class Cert. at 18 (illustrative communications mention utilities but not account fee); but see id. at 20 (one email mentions monthly fee "for using Conservice").  Hettinger sufficiently alleges that once tenants have invested time and non-refundable fees into the application process, they are unlikely to "walk away" after late-breaking price increases, see Am. Compl., ¶ 30, driving the price higher for all.  Kahn, 107 F.4th at 601 (bait-and-switch schemes reduce consumer price sensitivity).  The result is systematically higher prices that everyone — even perfectly informed tenants — must pay.

### 2.    *One-way Intervention*

While the Court's prior summary-judgment decision smoothed the path on standing, it kicked up a different point of contention by granting Hettinger judgment on the merits of Subcount A (the RHA violation).  Hettinger, 2025 WL 2029747, at *9.  Bozzuto now argues that, having sought and gained a merits ruling on that subcount, Hettinger may not "leverage" this success to obtain "one-way intervention" by similarly situated tenants.  See Opp. Class Cert. at 12–13 (citing Fed. R. Civ. P. 23(c) advisory committee's note to 1966 amendment).

One-way intervention "arises when dispositive motions are addressed before class certification motions."  Rivas v. United Am. Sec., LLC, 2026 WL 482531, at *15 (D.D.C. Feb.

13

20, 2026) (quotation marks omitted).  Courts generally discourage resolving claims on the merits before class certification because doing so allows the representative plaintiff to "secure the benefits of a class action" without the procedural protections Rule 23 affords.  Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177 (1974); see Postow v. OBA Fed. Sav. & Loan Ass'n, 627 F.2d 1370, 1381 (D.C. Cir. 1980) (post-merits certification risks allowing class members to "opt to be bound by the judgment if it is favorable to the class, or not to be bound if the plaintiffs have lost").  Rule 23 was thus amended to force each class member to "cast his lot at the beginning of the suit" and avoid situations where a defendant "could win only against the named plaintiff . . . [but] lose against all members of the class."  Premier Elec. Const. Co. v. Nat'l Elec. Contractors Ass'n, Inc., 814 F.2d 358, 362 (7th Cir. 1987).

Bozzuto, however, has waived the protections of the one-way intervention rule.  To the extent that it cries foul at a perceived attempt to "leverage" the Court's prior "favorable ruling" into class-wide relief, see Opp. Class Cert. at 13, it has only itself to blame.  Bozzuto, not Hettinger, sought summary judgment on four claims in advance of the Court-ordered class-certification deadline.  Compare MSJ (filed Feb. 4, 2025), with ECF No. 24 (Scheduling Order) (class certification deadline Mar. 31, 2025).  Hettinger responded by cross-moving for summary judgment as to only two of the four claims.  See ECF No. 50-1 (Pl. MSJ Mem.) at 2.  She also explicitly notified Bozzuto that it had waived the one-way-intervention rule by choosing to seek a merits determination before class certification.  Id. at 4–5.  Such actions hardly evince the type of gamesmanship the Rules sought to prevent.  Because the "rationale" for barring post-judgment class certification "disappears when the defendant himself moves for summary judgment before a decision on class certification," the Court will not apply the one-way-intervention rule to bar certification on the Subcount A claim.  Postow, 627 F.2d at 1382.

14

With these potential stumbling blocks removed, the Court may proceed to Rule 23.

3.      *Rule 23(a) Prerequisites*

a.      Numerosity

A class must be "so numerous that joinder of all members is impractical." Fed. R. Civ. P.
23(a)(1). Although Rule 23 identifies no bright-line floor, courts have coalesced around an
understanding that a proposed class size of 40 likely satisfies this prerequisite. Johnson v.
District of Columbia, 248 F.R.D. 46, 52 (D.D.C. 2008) (quotation marks omitted). Bozzuto does
not dispute that the Drip-Pricing Class would be sufficiently numerous. See generally Opp.
Class Cert. at 17–35 (numerosity not challenged). Nor could it: the parties have stipulated that
Bozzuto's uniform rental application across its properties lacked mention of utility service fees
or variable costs for four years. See Joint Stip., ¶¶ 1, 5, 8. By conservative estimate, hundreds of
tenants applied for a Bozzuto-managed lease in that time and were charged undisclosed fees,
thus qualifying them for class membership. Tracking them down and joining each as a named
party, moreover, presents the type of logistically impractical challenge that Rule 23 is meant to
address. DL v. District of Columbia, 302 F.R.D. 1, 11 (D.D.C. 2013) ("difficulty or
inconvenience of joining all members of the class" can make class action appropriate) (quotation
marks omitted). The class readily checks this box.

b.      Commonality

"The crux of this case is commonality." Wal-Mart, 564 U.S. at 349. To satisfy this
prerequisite, a plaintiff must show that "there are questions of law or fact common to the class."
Fed. R. Civ. P. 23(a)(2). Ancillary questions like "did all the tenants rent Bozzuto-managed
properties" do not suffice: "[c]ommonality requires the plaintiff to demonstrate that the class
members have suffered the same injury." Wal-Mart, 564 U.S. at 349–50 (quotation marks

omitted).  The common question must be sufficiently meaningful to the overall litigation that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  Id. at 350.

The parties hotly dispute whether factual differences across tenants make consequential common questions — with common answers — possible to locate.  Although framed as typicality, predominance, or ascertainability arguments, Defendant's key contention boils down to this: tenants received a range of information from Bozzuto during the pre-application touring process.  See, e.g., Opp. Class Cert. at 18–19, 21; id. at 25 (contending that "problems of individual proof render the drip-pricing class infeasible") (quotation marks omitted and formatting altered).  Some tenants received pricing sheets that varied by rental property and disclosed anticipated utility charges in different ways.  Id. at 18–19 (citing various pricing sheets).  Others communicated with Bozzuto representatives via email and asked about utility charges.  Id. at 20–21 (providing estimated utility cost).  Still others used Bozzuto's AI tool, "Meet Elise," which may have put some customers on notice of their utility responsibilities.  Id. at 19.  The variations in what information class members in fact received, Bozzuto contends, make it impossible to ask questions like, "Was the application omission material?" or, "Were prospective tenants misled?" and provide answers common to the class.  Id. at 25.

The Court acknowledges the factual differences Bozzuto points to and the record evidence supporting their existence.  As to Subcount A, however, those differences do not affect the relevant (and common) features of the class.  Recall that this subcount alleges Bozzuto's liability under the CPPA by dint of its separate violation of the Rental Housing Act's requirement that landlords disclose all rental charges at the time of a prospective tenant's application.  See Am. Compl., ¶ 90; Hettinger, 2025 WL 2029747, at *9.  What different class

16

members knew or were told before applying, therefore, has no impact on the question of whether Bozzuto violated the RHA by failing to include utility charges on its website or rental application.  Indeed, the Court previously rejected Bozzuto's argument that a pricing sheet given to Hettinger during her tour could satisfy the RHA.  See Hettinger, 2025 WL 2029747, at *8 (concluding RHA "mandate[s] disclosure at the precise moment when a prospective tenant files the application") (quotation marks omitted).

If, hypothetically, some websites or applications for Bozzuto-managed properties during the relevant period did notify prospective tenants of their required utility charges, that variation could threaten commonality.  Cf. In re OnStar Contract Litig., 278 F.R.D. 352, 378 (E.D. Mich. 2011) (no class certification where class lacked common misleading or omitted disclosure).  But Bozzuto does not contend that such differences exist.  Nor could it: the parties have stipulated that neither the websites nor the applications of sampled properties contained utility information between December 2020 and late August 2025.  See Joint Stip., ¶¶ 8–9.  The Drip-Pricing Class thus satisfies commonality on Subcount A's theory of liability.

Nor do the realities of what some class members knew or learned about utility charges during the pre-application stage threaten commonality when assessing Subcount B — unfair trade practice in violation of the CPPA.  To prevail on that subcount, Hettinger will seek to show at trial that 1) Bozzuto "fail[ed] to state" or "us[ed] ambiguity" regarding 2) "material facts" that 3) "have a tendency to mislead" consumers.  See Mot. Class Cert. at 15 (quoting D.C. Code § 28-3904 (f), (f-1)) (quotation marks omitted); see also Hettinger, 2025 WL 2029747, at *9–10.  Whether a trade practice is both material and misleading is assessed under a "reasonable consumer" standard.  Saucier v. Countrywide Home Loans, 64 A.3d 428, 442 (D.C. 2013).  A "material" fact is one that a reasonable person "would attach importance to . . . in determining

17

his [or her] choice of action in the transaction in question." Id. (alteration in original) (quoting Restatement (Second) of Torts § 538(2)). Hettinger has presented evidence that the full price Bozzuto invoiced tenants each month — including utilities — would indeed be "important" to a reasonable consumer comparing potential apartments. See Wilcox Rep., ¶¶ 14, 17 (discussing national survey of renters and impact of price revelations). Plaintiff's expert reports that price tends to be one factor that influences prospective tenants' decisions — a conclusion readily supported by common sense. Id., ¶ 23; see also Krukas v. AARP, Inc., 376 F. Supp. 3d 1, 41 (D.D.C. 2019) (product's "price, and its components, are factors that . . . may likely be material to a reasonable consumer").

So, too, would the question of whether an objective, reasonable consumer would be misled by the omission of utility charges from a rental application prompt an answer common to the class. The question is not whether Hettinger herself — or any other class member — was misled. E.M. v. Shady Grove Reprod. Sci. Ctr. P.C., 496 F. Supp. 3d 338, 409 (D.D.C. 2020). Bozzuto offers a host of arguments in support of its theory that a utility-price omission would not be — and, in fact, was not — misleading to many prospective tenants. See generally Opp. Class Cert. at 18–21, 23–24 (citing record evidence that many tenants inquire about utilities and therefore were on notice of charges, rendering omission not misleading). Hettinger counters with her own expert evidence that "consumers tend to forget pricing information" over time or are likely to erroneously recall prices when presented with differing ones. See Wilcox Rep., ¶ 27. A gap between tenants' knowledge that utilities are included in the price of a Bozzuto-managed apartment and an application rental price without those fees included could therefore be misleading.

18

To be clear, the answer to both questions could be that a reasonable consumer would <u>not</u> find the price omission material or misleading.  Bozzuto will have the opportunity to present its myriad piecemeal disclosures at trial, have witnesses testify to their general knowledge that utility charges are part and parcel of apartment rent, and bring its own expert analysis to bear. The point is that the relevant answers are common to the entire class — thus warranting the aggregation of tenant claims to answer these questions once, not many times over.

c.        Typicality

When commonality is met, typicality usually follows.  <u>Falcon</u>, 457 U.S. at 157 n.13 ("The commonality and typicality requirements of Rule 23(a) tend to merge.").  This prerequisite assesses whether the named plaintiff's facts and legal claims reflect unnamed class members' modal experience or present outlier considerations that risk skewing the litigation.  <u>Id.</u>  The less remarkable a plaintiff's story when compared to absent class members, the more likely that typicality will be met.  <u>Lindsay v. Gov't Emps. Ins. Co.</u>, 251 F.R.D. 51, 55 (D.D.C. 2008) ("If the class representative's claims arise from the same events, practice, or conduct, and are based on the same legal theory as those of other class members, the typicality requirement is satisfied.") (alterations removed) (quotation marks omitted).

Hettinger epitomizes the Drip-Pricing Class.  She submitted an application that made no mention of utility fees and was required to pay those fees as a Bozzuto tenant — thus suffering the same injury as any other tenant during the relevant time period.  <u>See</u> Joint Stip., ¶¶ 6–8; Am. Compl., ¶¶ 7, 64.  Her utility invoices — neither overly inflated nor unusually small — are the basis of her damages calculations.  <u>Compare</u> Am. Compl., ¶ 66 (Hettinger example utility bills), <u>with</u> Utility Charge Chart (comparable billing rates for other tenants).  Hettinger's name could be

19

substituted for that of most other class members without material impact on the lawsuit's underlying facts or arguments.  The proposed class easily clears the typicality bar.

Bozzuto rejoins that the "individualized leasing experience at BMC-managed properties" precludes a finding that Hettinger's claims are standard examples of other tenants' claims.  See Opp. Class Cert. at 34.  As with the commonality prong discussed above, Bozzuto focuses on irrelevant differences.  Hettinger's entire theory on behalf of the class is that no matter what pre-application information prospective tenants received, the omission of utility costs come application time both constituted a statutory violation of the RHA and would have misled an objectively reasonable consumer.  See Reply at 11–14.  Typicality requires only, therefore, that Hettinger experienced the same omission that caused the alleged harm for the rest of the class members.  See Falcon, 457 U.S. at 156 ("[A] class representative must . . . possess the same interest and suffer the same injury as the class members.") (quoting E. Tex. Motor Freight Sys., Inc. v. Rodriguez, 431 U.S. 395, 403 (1977)) (quotation marks omitted); Spurlock v. Wexford Health Sources, Inc., 175 F.4th 232, 247 (4th Cir. 2026) (class representative's claim need not "be perfectly identical" to other members' claims but he must have "experienced the same alleged [] injury") (quotation marks omitted).  She did, so the class satisfies Rule 23(a)(3).

d.      Adequacy of Representation

Along with typicality, representative parties must show that they will "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  One component of adequate representation is quite literal: proponents of class certification must demonstrate that the appointed class counsel is sufficiently experienced and skilled to manage procedurally complex class litigation.  See 7A Wright & Miller's Federal Practice & Procedure § 1769.1 (4th ed. Apr. 2026 update); Fed. R. Civ. P. 23(g) advisory committee's note to 2003 amendment

20

(court must "assess[] proposed class counsel as part of the certification decision").  Bozzuto does not dispute that Hettinger's proposed class counsel is duly qualified.  See generally Opp. Class Cert. at 17–35.  The Court credits Plaintiff's counsels' prior experience in managing consumer-class-action cases, see ECF Nos. 74-12 (Tycko & Zavareei Resumes); 74-13 (Migliaccio & Rathod Resumes), and finds that they would suitably represent the class as its counsel.

This prerequisite also requires the absence or minimization of intra-class conflicts.  If one set of class members has an interest in, say, preserving any settlement money received for future use while the other has an incentive to spend now, a representative from one group cannot adequately address the other's needs.  Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 626 (1997).  Courts have declined to certify classes where vast differences in members' interests would require counsel to choose between conflicting outcomes that would disadvantage part of the class.  Compare Mayfield v. Dalton, 109 F.3d 1423, 1427 (9th Cir. 1997) (no certification where some class members opposed policy and others "wished [it] fully enforced"), with J.D., 925 F.3d at 1318 (pregnant class representatives who sought abortion could adequately represent anti-abortion pregnant class members because anti-abortion members "would not be compromised" by class-wide relief).

The Court sees no such conflicts here.  At root, the class members all suffered the same alleged injury — violation of their statutory right to notice of their full rental price — and seek the same remedy — money damages.  Because the class is bounded by a set time period, there are no future members whose interests diverge from their current counterparts.  Cf. Amchem, 521 U.S. at 626 (Rule 23(a)(4) not satisfied where some members seek "ample, inflation-protected fund" over "generous immediate payments").  Nor has either party alleged significant factual differences across the class that would put members at odds with each other.  See supra

Section III.B.3.b.  The representative Plaintiff — Hettinger — and the proposed class counsel will thus represent the interests of the entire class without conflict.

### 4.      *Rule 23(b) Requirements*

Satisfying Rule 23(a) is a necessary but insufficient requirement for ultimate class certification.  Every class must also be certified under one of Rule 23(b)'s enumerated types.  Hettinger seeks certification under both Rule 23(b)(2) and (b)(3) to cover the injunctive and damages relief she seeks on behalf of the class.  See Mot. Class Cert. at 11, 31.  Rule 23(b)(2) permits courts to grant class-wide injunctive relief where a defendant "has acted . . . on grounds that apply generally to the class."  No matter the class's suitability for certification under Rule 23(b)(2), however, a "class representative" must have "standing to seek each form of relief requested in the complaint."  J.D., 925 F.3d at 1324 (quotation marks omitted).  As previously discussed, Hettinger has no standing as a former tenant to seek forward-looking injunctive relief governing Bozzuto's future advertising or billing practices.  See *supra* Section III.B.1.  The Court will thus deny certification of the Drip-Pricing Class under Rule 23(b)(2).

Hettinger also seeks certification under Rule 23(b)(3) to obtain money damages.  That section of the Rule requires that common factual or legal questions "predominate" across a class such that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Rule 23(b)(3) offers a non-exhaustive list of factors for courts to consider, including 1) "class members' interests in individually controlling" the litigation; 2) the extent of any pre-existing litigation; 3) the forum's suitability; and 4) any management difficulties stemming from aggregation.

The Drip-Pricing Class is an ideal candidate for Rule 23(b)(3) certification.  Such classes are superior where many individuals face "small recoveries."  Mace v. Van Ru Credit

Corp., 109 F.3d 338, 344 (7th Cir. 1997).  Certification under Rule 23(b)(3) overcomes the lack

of "incentive for any individual to bring a solo action" by "aggregating" claims "into something

worth someone's . . . labor."  Id.  The Drip-Pricing Class fits the bill.  Recovery amounts to

"[t]reble damages, or $1,500 per violation, whichever is greater."  D.C. Code § 28-

3905(k)(2)(A)(i).  While no paltry sum, even the maximum possible damages calculation —

three times a tenant's monthly utilities paid from 2021 to present, see Mot. Class Cert. at 27

(citing ECF No. 74-18 (Olsen Rep.), ¶ 24) — would be swamped by the time and expense of

individual litigation.  See 7AA Wright & Miller's Federal Practice & Procedure § 1779 & n.25

(3d ed. Apr. 2026 update) (class actions superior where "economics of the situation make it

impossible for the aggrieved members to vindicate their rights by separate actions" and citing

cases where individual recovery was in hundreds or low thousands).  The relatively low damages

make it unlikely that class members would have an interest in "individually controlling the

prosecution or defense of separate actions."  Fed. R. Civ. P. 23(b)(3)(A).  Nor do any of the other

Rule 23(b)(3) factors strike discord in Hettinger's class-action proposal: no management

challenges or individual interests are foreseeable where there are no relevant differences across

the class.  Nor are there any downsides to aggregation in this district, where all the relevant

events occurred and the Court is unaware of any prior litigation by putative class members.  See

Rule 23(b)(3)(A)–(D).

　　　Bozzuto argues that the class action method is not superior here because the process of

identifying the class would be too inefficient to yield benefits from aggregation.  Bozzuto notes

that sorting tenants into class members and non-class members presents some administrative

difficulty.  See Opp. Class Cert. at 31–32 (class is not ideal for certification because it is not

"ascertainable").  Tenants might have leased with a prior management company before Bozzuto

assumed management over the building, and long-term residents might have begun a lease prior to the class period.  Id.  Neither group would be part of the class, but records of those tenants would be littered among internal records of tenants who are class members.  That a comprehensive review of Bozzuto's records is required to locate tenants who fall within the class definition is undeniable.  The Court agrees with Hettinger, however, that sifting through tenants requires a series of "yes-or-no reviews."  Reply at 19.  Easily verifiable data points like when the tenant's lease started, whether Bozzuto managed the property at the time, and whether it charged them for utility service or variable costs are all that is required to determine class membership. Id.  Because "objective criteria" define the Drip-Pricing Class, In re McCormick & Co., Inc., Pepper Prods. Mktg. & Sales Pracs. Litig, 422 F. Supp. 3d 194, 243 (D.D.C. 2019) (quotation marks omitted), and consultation with standard records of a property-management company could answer whether a tenant is a class member, the administrative difficulties Bozzuto raises do not undercut the superiority of the class-action method.

The predominance requirement, moreover, weighs in favor of class certification here. Often discussed together with commonality, predominance moves beyond the threshold requirement for a single, material common question and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  Amchem, 521 U.S. at 621. Every question relevant to Bozzuto's liability (or lack thereof) on Subcounts A and B is common to the class.  As discussed above, open questions remain about whether omitting utility charges from a rental application or website would be both material and misleading to the objectively reasonable consumer.  But those questions will be answered in one fell swoop, not piece by piece.

24

Defendant raises one more distinction among class members that could splinter the cohesive class unit: differing damage calculations.  Even if all class members were harmed by Bozzuto's failure to disclose utility fees contemporaneously with the rental application, tenants who otherwise knew of the possibility of such fees could receive "at best a claim for statutory damages," while others might seek treble their total utilities paid.  See Opp. Class Cert. at 29. The "mini-trials" that would be required to sort out which class members would receive what damages, Bozzuto maintains, would void any efficiency gained by proceeding as a class action. Id.

The Court disagrees.  The formulae Plaintiff advances for calculating damages would not require mini-trials.  She first notes that the minimum statutory award to each class member would be $1,500 per CPPA violation — easily calculable and administrable.  See Mot. Class Cert. at 26; Reply at 15.  Another potential basis for damages would be a refund (with or without trebling) of the application fee — a simple multiplication problem.  See Mot. Class Cert. at 27. Even were the class to prevail on its theory that damages should equal the total service fees and utilities paid, availability of that remedy would not turn on whether an individual class member in fact knew that he would have to pay utilities.  E.M., 496 F. Supp. 3d at 409 (actual reliance not required for CPPA remedy).  That damages calculation, too, would involve a simple mathematical formula based on Bozzuto's payment records.  See Mot. Class Cert. at 27.  The D.C. Circuit has held that "the mere fact that damage awards may require individualized fact determinations is insufficient by itself to preclude class certification."  McCarthy v. Kleindienst, 741 F.2d 1406, 1415 (D.C. Cir. 1984).  Especially where, as here, plaintiffs advance a formula for calculating damages that requires no intensive individual inquiry, disparate damages awards need not destroy predominance.  Hoyte v. District of Columbia, 325 F.R.D. 485, 495 (D.D.C.

2017).   Should episodic variations in individual class members' damages — like a pre-existing damage waiver or release between Bozzuto and a tenant, see Opp. Class Cert. at 31–32 — arise, Bozzuto can assert such defenses during a later stage of litigation or in a claims-administration process.  Mullins v. Direct Digit., LLC, 795 F.3d 654, 671 (7th Cir. 2015) ("As long as the defendant is given the opportunity to challenge each class member's claim to recovery during the damages phase, the defendant's due process rights are protected.").  The common questions swamp minor damages variations.  The Court will certify Hettinger's proposed Drip-Pricing Class under Rule 23(b)(3).

C.    Overcharge Class

As with the Drip-Pricing Class, Bozzuto brings a threshold challenge to the permissibility of certifying the Overcharge Class before pressing certain Rule 23 requirements.  The Court considers each in turn.

1.    *Fail-safe Class*

While Rule 23 places myriad explicit requirements on a putative class, other limitations cabin gambits by plaintiffs to bake early merits determinations into the class-certification process.  Bozzuto contends that the Overcharge Class violates one such limit — the bar on certifying fail-safe classes.  Recall the proposed class definition:

> **Overcharge Class:** All current and former residential tenants of the Properties at a Bozzuto-managed property in the District of Columbia who were charged or paid a per-1,000 gallon rate for water or sewer service greater than the lawfully established regulatory cap at any point since December 5, 2020.

Mot. Class Cert. at 8.  Bozzuto takes issue with the phrase "greater than the lawfully established regulatory cap."  Opp. Class Cert. at 36.  To conclude that a tenant has been charged a greater

than lawful — *i.e.*, unlawful — rate, it says, is to impermissibly determine the underlying merits of Plaintiff's allegations before sorting tenants into or out of the class.  Id.

Some courts have indeed declined to certify classes where an individual's membership in the class is contingent on prevailing on the merits.  See, e.g., Jamie S. v. Milwaukee Pub. Schs., 668 F.3d 481, 497–98 (7th Cir. 2012) (class certification inappropriate where only common question is "bottom-line liability question" of "[w]hether [Defendant] failed in its obligations" as to each member).  The D.C. Circuit has explained that a fail-safe class is one whose definition is "circular" — *e.g.*, "a class definition that encompasses 'all those whom Company X defrauded'" premises class membership on a finding that Company X indeed committed fraud.  In re White, 64 F.4th 302, 313 (D.C. Cir. 2023).  Bozzuto argues that the Overcharge Class puts the proverbial "cart" of liability before the "horse" of class definition in just this way.

The Court is skeptical that Hettinger's proposed class definition presents any such concerns.  The phrase "lawfully established" modifies "regulatory cap" — meaning that the relevant rate ceiling is the one enacted through D.C.'s regulatory process.  Tenants whose utility bills were greater than that enacted maximum rate are thus class members.  And whether their bills were "greater than" the maximum rate is a factual question; evidence in the record indicates that bills to some tenants did indeed exceed the per-1,000-gallon rate.  See Utility Charge Chart. Whether those overages were legally permissible is a separate question that may be resolved in Bozzuto's favor or not, as discussed below.  But membership in the class requires only receipt of an excessive bill, not an early determination of that bill's legality.

To the extent any lingering doubts remain about the precise class definition, there is an easy solution.  A fail-safe problem is usually "one of wording, not substance."  In re White, 64

27

F.4th at 314.  Plaintiff has proposed an altered class definition that deletes the legal

characterization as follows:

> **Overcharge Class:** All current and former residential tenants of the Properties at a Bozzuto-managed property in the District of Columbia who were charged or paid a per-1,000 gallon rate for water or sewer service greater than the operative Multi-Family rates set out in D.C.M.R. tit. 21, § 4100.3 (water) and § 4101.1 (sewer), as amended at any point since December 5, 2020.

Reply at 24.  This class definition will eliminate any confusion regarding what benchmark a

tenant's utility bills must exceed for that tenant to be a class member.  Cf. In re White, 64 F.4th

at 315 (remanding to district court to address "readily curable defect" in class definition).  The

Court will therefore adopt this proposed Overcharge Class definition and analyze its suitability

for certification under Rule 23 accordingly.

### 2.      *Rule 23(a) Prerequisites*

The Overcharge Class readily meets Rule 23(a)'s requirements for aggregation; indeed,

Bozzuto offers little in the way of dispute.  As with the Drip-Pricing Class, numerosity is

apparent when taken over the dozens of rental buildings with hundreds of tenants that Bozzuto

managed during the nearly five-year class period.  See Joint Stip., ¶¶ 1, 9.  Hettinger, on behalf

of the class, seeks an answer to a question common to all tenants who received a water or sewer

bill that exceeded D.C.'s rate cap: was the overcharge permissible or a regulatory violation of the

CPPA?  See Mot. Class Cert. at 20 (citing D.C. Code § 28-3905(k)(1)(A)).  That question

resolves Bozzuto's liability on Subcount H for the entire class — either its overcharging practice

violated D.C.'s regulations, and the CPPA in turn, or it did not.

Common questions likewise govern the resolution of Subcount G, Plaintiff's unfair-trade-

practice claim.  Where an allegedly unfair trade practice does not fit one of the enumerated

examples under D.C. Code § 28-3904, courts refer to the three-factor balancing test applied to such claims under the Federal Trade Commission Act.  Scott v. Apple Inc., 757 F. Supp. 3d 1, 15 (D.D.C. 2024).  That test assesses whether the practice 1) is "likely to cause substantial injury" that 2) cannot "reasonably [be] avoid[ed] by consumers" and 3) is "not outweighed by countervailing benefits to consumers or to competition."  Id. (quotation marks omitted).  Each of these factors can be evaluated with respect to the entire class because Bozzuto employed the same charging practices across its properties.  See Utility Charge Chart (examples from sampled properties).  If the charging practices were broadly similar, whether the harm they caused was "substantial," "avoidable," or balanced by countervailing benefits can be answered with reference to the entire universe of overcharged tenants — that is, the class.

Bozzuto's main concern about class certification, moreover, is that its charges reflect additional fees assessed by the utility provider beyond the per-1,000-gallon rate and are thus permissible.  See Opp. Class Cert. at 38–39.  It also disputes whether a secondary feature of Hettinger's unfair-trade-practice claim — i.e., the "deprivation[] of legal protections" the class would have received had its members been billed by the utilities provider, not Bozzuto — is viable given the buildings' metering set-ups.  Id. at 39.  Those questions, however, are merits ones.  Defendant might be right: the fees it charged customers may have been well within the bounds of D.C. law, and there may be no legal difference between bills assessed by Bozzuto versus the utility provider.  The point at class certification, however, is not to discern what the correct answer is; it is only to ensure that the answer will be common to the class.  Wal-Mart, 564 U.S. at 350 ("common contention" matters at class certification, and its "truth or falsity" is resolved later).

Hettinger has demonstrated that she satisfies typicality because she is one of the group who received utility bills exceeding the rate cap. See Am. Compl., ¶¶ 39, 66. No variations in injury or factual differences pose barriers to her serving as the representative plaintiff for the Overcharge Class. The same uniformity fulfills Rule 23(a)(4)'s adequate-representation requirement: the Court can discern no intra-class conflicts, and Bozzuto has raised none, that would thwart Hettinger's ability to represent the entire class. The Overcharge Class thus meets Rule 23(a)'s prerequisites.

3.      *Rule 23(b) Requirements*

So, too, does the Overcharge Class fit the aims of certification under Rule 23(b). As discussed above, the Court cannot certify a class under Rule 23(b)(2) for injunctive relief because Hettinger lacks standing for forward-looking injunctive relief as a former tenant. See *supra* Section III.B.1. In any event, the damages claims make up the bulk of Hettinger's prayer for relief, see Am. Compl. at 32–33, making certification as a Rule 23(b)(3) class more appropriate. Taylor v. Dist. of Columbia Water & Sewer Auth., 241 F.R.D. 33, 47 (D.D.C. 2007) (where "monetary claims predominate," certification under Rule 23(b)(3) is preferred).

The predominance and superiority requirements of Rule 23(b)(3) are met. The legal questions are entirely common to the Overcharge Class, with little factual difference across its members. Damages for the Overcharge Class are discernible, easily calculable, and relatively small — hallmarks of an ideal (b)(3) class for monetary relief. Hoyte, 325 F.R.D. at 494–95. The Court will thus certify the Overcharge Class as a (b)(3) class.

D.      Notice

Finally, because it now certifies a class under Rule 23(b)(3), the Court "must direct to class members the best notice that is practicable." Fed. R. Civ. P. 23(c)(2)(B). The proponents

of class certification typically bear the cost of such notice and, in this district, must propose a notice plan.  See Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 358 (1978) (representative party bears notice expense); LCvR 23.1(c) (requiring plaintiff notice plan).  In lieu of a notice plan, Plaintiff asks the Court to order Bozzuto to produce "the identities and contact information" of class members within 21 days of its Order.  See Mot. Class Cert. at 33.  She also asks that the Court shift the cost of notice to Bozzuto, subverting the standard rule.  Id.

The Court will order Defendant to produce the identities and contact information of its current and former tenants between December 5, 2020, and August 27, 2025.  See Fed. R. Civ. P. 23(d)(1)(B) (court may give orders to require notice).  Bozzuto's only objection to providing that information is that it cannot "determin[e] who is and is not a proper class member" without "immense time and effort."  Opp. Class Cert. at 33.  That argument is based on the premise that tenants who knew about the utility charges from a non-application source are not in the Drip-Pricing Class — a premise the Court previously rejected.  All current and former tenants who fall under either class definition are class members, and Bozzuto must produce their contact information.

The Court will not, however, shift the costs of providing notice to Bozzuto.  The Supreme Court has confirmed that "the representative plaintiff should bear all costs relating to the sending of notice" and that "courts must not stray too far from th[at] principle."  Sanders, 437 U.S. at 359.  Plaintiff argues that cost shifting is warranted because this Court has already found Bozzuto liable to the representative Plaintiff (Hettinger) on Subcount A.  See Mot. Class Cert. at 33.  But Defendant correctly notes that three other liability counts are as yet undecided, see Opp. Class Cert. at 41, and the Court sees no reason to depart from the well-established principle that each party bears its own freight.  It will thus order Bozzuto to produce the names and contact

information of class members within 21 days of this decision and order Plaintiff to file a notice

plan 30 days after receipt of the contact information.

## IV.    Conclusion

For the foregoing reasons, the Court finds that class certification under Rule 23(b)(3) will

be the most efficient and effective way to resolve this litigation moving forward.  It will

therefore grant Plaintiff's Motion for Class Certification as to two damages classes, Motion to

Appoint Class Representative, and Motion to Appoint Class Counsel.  It will further order

Bozzuto to produce the names and contact information of class members by August 5, 2026, and

Hettinger to file a notice plan by September 4, 2026.  A separate Order so stating shall issue this

day.


/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  July 15, 2026