**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **LAURA HETTINGER,** individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>**BOZZUTO MANAGEMENT COMPANY,**<br><br>*Defendant,*<br><br>and<br><br>**CONSERVICE, LLC,**<br><br>*Proposed Defendant-Intervenor.* | Civil Action No. 23-3687 (JEB)<br><br>CLASS ACTION |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF CONSERVICE, LLC TO INTERVENE AS DEFENDANT

Proposed Defendant-Intervenor Conservice, LLC ("Conservice") stands to bear the consequences of this case without any voice in it. Plaintiffs' "Overcharge" claims challenge the water and sewer charges that Conservice calculated as the third-party utility billing provider, and Defendant Bozzuto Management Company ("Bozzuto") contends that Conservice must indemnify it for any resulting liability—exposure that includes alleged statutory damages of $1,500 per violation across thousands of class members. (ECF No. 76 at 8-9.) Worse still, Bozzuto, which insists that it "has no role in the computation of the water and sewer bills," has left those charges largely undefended to date. (ECF No. 78-2 at 3-4.) As a result, the Court certified the Overcharge Class without the benefit of facts that demonstrate the Overcharge Class cannot be maintained: D.C. Water and Sewer Authority ("DCWASA") billed the named Plaintiff's building at the "Commercial" rate, not the Multi-Family rate that defines the class; Conservice allocates costs

through methods that vary by building, raising individualized questions that cannot be resolved class-wide; and the named Plaintiff agreed in writing to pay a share of "all costs" under an allocation formula she acknowledged was fair and reasonable.

Each requirement for intervention as of right is satisfied. Conservice bears a direct financial interest in the Overcharge claims; as Bozzuto itself has put it, "Conservice has an obvious interest in Plaintiff's claims." (ECF No. 76 at 8.) That interest will be impaired if liability is fixed class-wide before Conservice is heard, leaving it to face an indemnity claim built on findings it never had the chance to contest. An adverse ruling could also be invoked against Conservice in materially similar cases elsewhere. And the implications reach beyond Conservice's immediate litigation: the Overcharge claims attack a standard allocation method that third-party billing providers across the industry use to divide utility costs fairly among tenants. Declaring that method unlawful would upend industry practice nationwide.

And Bozzuto, which has pressed its defense of the Drip-Pricing claims all the way to interlocutory review while treating the Overcharge claims as Conservice's problem, does not adequately represent that interest in this case. The Motion also is timely. Conservice moved promptly once Bozzuto's inadequate representation became clear and before any merits ruling on the Overcharge claims, and its participation will not delay the case or prejudice any party.

The Court should grant intervention as of right under Rule 24(a)(2) or, alternatively, permissive intervention under Rule 24(b)(1)(B).

## BACKGROUND

Conservice is well known to the Parties. Plaintiff subpoenaed Conservice in August 2024 for documents regarding its utility fee and water and sewer calculations. (ECF No. 38 at 1.) And, in November 2024, Bozzuto impleaded Conservice, alleging that any liability on the water, sewer,

and submetering subcounts would "strictly be a consequence of actions or inactions of Conservice" under the parties' August 2017 Master Service and Marketing Agreement ("MSMA"). (ECF No. 35 ¶ 9.)

In making these arguments, Bozzuto relied on Section 11 of the MSMA, which Bozzuto alleges requires Conservice to indemnify it against "all liability, claims, damages, losses, suits, fines, penalties, costs and expenses" arising from the services defined in the MSMA's "Scope of Work." (*Id.* ¶ 10.) Bozzuto alleged that liability for the Overcharge claims fell within this Scope of Work because the alleged wrongdoing "would strictly be a consequence of actions or inactions of Conservice." (ECF No. 35 ¶¶ 9, 12, 18, 22.) Bozzuto asserted no third-party claim with respect to the Drip-Pricing allegations, which are based on an alleged violation of rental laws and Bozzuto's alleged failure to disclose information in its own leasing papers and/or application portal, or any other counts. (*See id.*)

Bozzuto later dismissed its Third-Party Complaint without prejudice. (ECF No. 53.) Because Bozzuto remained the only Defendant, and any Overcharge judgment would be entered against it in the first instance, Conservice expected that Bozzuto would reasonably defend the lawful billing practices at the heart of the Overcharge Class claims. Class certification signaled otherwise: Bozzuto's litigation incentives and practices with respect to the Overcharge claims differ from Conservice's interests. In opposing certification, for instance, Bozzuto devoted most of its brief to the Drip-Pricing Class, giving the Overcharge Class only cursory treatment. (*Compare* ECF No. 76 at 16-34, *with id.* at 35-40.)

That neglect left the Court to certify the Overcharge Class on an incomplete and inaccurate record—one that omitted at least three facts critical to whether the class can be maintained. (ECF No. 82 at 27-29.) *First*, Conservice uses different methods across its properties, including Partial

Allocation, Full Allocation, and Utility Rate, each of which fairly apportions the building's actual "house bill" among its tenants in a number of distinct ways. That variation goes to the heart of commonality and typicality, and to whether the Overcharge claims can be resolved together at all. Yet, Bozzuto never presented these methodologies to the Court, let alone the differences among them.

*Second*, the named Plaintiff could never be billed at the rate on which her class is defined. The Overcharge Class covers only tenants allegedly charged more than the Multi-Family rate set forth in D.C.M.R. tit. 21, § 4100.3 (water) and § 4101.1 (sewer). (ECF No. 78 at 22.) But documents Conservice produced in response to Plaintiffs' subpoena show that DCWASA billed named Plaintiff Laura Hettinger's building as a "Commercial" customer, not at the Multi-Family rate. (Ex. A (Conservice00000293-Conservice00000304 at Conservice00000299).) Because her water and sewer service was never charged the Multi-Family rate even by DCWASA, her alleged overcharge cannot be measured against it, and her claim is not typical of the class she was certified to represent. No party has put this evidence before the Court.

*Third*, Plaintiffs agreed to the very charges they now challenge. The Overcharge theory rests on the premise that tenants could be charged only for consumption. But the Utility Addendum that Plaintiff Hettinger signed with her lease provides that each tenant will pay their share "of utilities and service provided and *all costs*." (ECF No. 74-7 at BOZZUTO 002765) (emphasis added). She also agreed that "using a calculation or allocation formula as a basis for estimating total utility consumption is fair and reasonable" and that the "allocation method may or may not accurately reflect actual total utility consumption for Tenant." (*Id.*) This Utility Addendum is an exhibit to Plaintiff's original complaint, but Bozzuto never put Plaintiffs' express agreement to pay those costs through an allocation formula before the Court.

These gaps in the record matter because the stakes are substantial, both in this case and well beyond it. The Overcharge Class includes thousands of class members, and Plaintiffs seek statutory damages of $1,500 per violation. (ECF No. 74-1 at 9.) Utility billing practices are also the subject of several other proceedings in both state and federal jurisdictions, most of them putative class actions brought against property owners and managers challenging substantially similar billing practices.

## ARGUMENT

### 1. Conservice Is Entitled to Intervene as of Right Under Fed. R. Civ. P. 24(a)(2).

Pursuant to Rule 24(a)(2), "the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). Thus, in this Circuit, intervention as of right should be granted where the movant establishes: (1) the application is timely; (2) it has a legally protected interest in the action; (3) the action threatens to impair that interest; and (4) no party to the action is an adequate representative of the applicant's interests. *Karsner v. Lothian*, 532 F.3d 876, 885 (D.C. Cir. 2008) (quoting *SEC v. Prudential Sec. Inc.*, 136 F.3d 153, 156 (D.C. Cir. 1998)).

"[T]he D.C. Circuit has taken a liberal approach to intervention." *Wilderness Soc'y v. Babbitt*, 104 F. Supp. 2d 10, 18 (D.D.C. 2000); *see also Nuesse v. Camp*, 385 F.2d 694, 701 (D.C. Cir. 1967) (explaining that Rule 24(a)(2) was "obviously designed to liberalize the right to intervene in federal actions"). That approach reflects Rule 24's core purpose: protecting nonparties whose interests may be affected by litigation in which they have no voice. *See Wilderness Soc'y*, 104 F. Supp. 2d at 18.

Conservice satisfies each factor. It moved promptly once it became apparent, over the last several weeks, that Bozzuto would not protect Conservice's interests in the Overcharge Class claims. It has a direct interest in the legality of its own billing and faces a direct financial exposure through its potential indemnity obligation to Bozzuto and customers in other cases. And Bozzuto, which already sued Conservice once over these same claims and failed to present an adequate defense to the Overcharge claims, can no longer adequately represent these interests.

***(a) Conservice's Motion is timely under all circumstances.***

Rule 24 requires that a motion to intervene be "timely." Fed. R. Civ. P. 24(a), (b)(1). A timeliness analysis is context-specific, and "is to be judged in consideration of all the circumstances." *United States v. Brit. Am. Tobacco Austl. Servs.*, 437 F.3d 1235, 1238 (D.C. Cir. 2006) (citation omitted). There are four guiding factors that are to be weighed in evaluating timeliness: (1) the amount of time that has elapsed; (2) the purpose for which intervention is sought; (3) the need for intervention as a means of preserving the applicant's rights; and (4) the probability of prejudice to those already parties in the case. (*Id.*)

***Time elapsed.*** Elapsed time is measured not from the filing of the complaint but from when the movant knew or should have known that its rights would be directly affected by the litigation. *See Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003); *Hodgson v. United Mine Workers of America*, 473 F.2d 118, 129 (D.C. Cir. 1972) ("it is settled–particularly where intervention is sought as of right–that the amount of time which has elapsed since the litigation began is not in itself the determinative test of timeliness."). Where the movant reasonably relied on an existing party to protect its interests, the relevant period runs from when it became apparent that the party might not protect the movant's interests. *See United Airlines, Inc. v. McDonald*, 432 U.S. 385, 394–96 (1977) (post-judgment motion timely where filed promptly

after the movant learned the named plaintiffs would not appeal); *Smoke v. Norton*, 252 F.3d 468, 471 (D.C. Cir. 2001) (reversing denial of intervention as untimely where applicants moved promptly after the government signaled it might not appeal, because the existing party's representation became potentially inadequate only at that point);; *Roane v. Leonhart*, 741 F.3d 147, 151-52 (D.C. Cir. 2014) (reversing a finding of untimeliness that focused on elapsed time).

Until class certification, Conservice reasonably expected that Bozzuto, as the only Defendant and the party against which any Overcharge judgment would be entered in the first instance, would defend the utility billing practices at issue. The class certification briefing raised serious concerns on that front and in opposing certification, Bozzuto left unaddressed each of the three facts described *supra* Background. (*See* ECF No. 76 at 35-40.) Even so, Conservice reasonably expected that Bozzuto might still seek relief as to the Overcharge Class as certified. In October 2026, Conservice produced additional documents to the parties regarding its billing methods. Over the last several weeks, however, it became apparent that Conservice's interests in the Overcharge Class claims were not being adequately protected. Conservice moved promptly thereafter.

***Purpose and need.*** Conservice seeks intervention for a proper purpose: to defend its own billing calculations, which form the basis of the Overcharge Class claims and class membership. *See United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1294-95 (D.C. Cir. 1980) (holding that it is proper to intervene even at a late stage if the "inadequacy of the representation" did not come to light until later). Bozzuto's own filings show why intervention is necessary to achieve that purpose. Bozzuto has told the Court that "Conservice is the entity responsible . . . for managing water and sewer bills." (ECF No. 42 at 2; ECF No. 78-2 at 3-4.) Having assigned that responsibility to Conservice, Bozzuto has declined to defend the billing methods and has instead

focused on the Drip-Pricing claims. Indeed, Bozzuto sought interlocutory review of the Drip-Pricing Class alone, after barely challenging the Overcharge Class. *See Hettinger v. Bozzuto Mgmt. Co.*, No. 26-8004 (July 29, 2026). Intervention is, therefore, the only way these core issues will be squarely presented before the Overcharge claims are decided, rather than after, when Bozzuto seeks indemnity for the outcome. *See Am. Tel. & Tel. Co.*, 642 F.2d at 1295 (intervention was "essential as a means of preserving" MCI's rights because of "the obvious injustice of having [MCI's] claim erased or impaired by the court's adjudication without ever being heard").

***Prejudice.*** Neither Plaintiffs nor Bozzuto will be prejudiced by Conservice's intervention. *First*, the Court has not decided whether the alleged overcharges were lawful. In certifying the class, the Court expressly reserved that question, calling it a "merits" issue. (ECF No. 82 at 27, 29.) Conservice's participation in this case will help this Court decide those open merits questions without disturbing any prior rulings. *See, e.g.*, *Foster v. Gueory*, 655 F.2d 1319, 1324 (D.C. Cir. 1981) (finding that intervention caused no prejudice when the motion filed ten months after the complaint asserted no new causes of action); *Harrington v. Sessions (In re* Brewer), 863 F.3d 861, 872 (D.C. Cir. 2017) (finding intervention timely after denial of class certification and noting that the fact that "intervenors *could* have intervened earlier" does not mean they "*should* have intervened earlier") (emphasis in original). *Second*, while Conservice will seek to alter the class, this is neither unusual nor will it cause improper delay. In fact, Rule 23(c)(1)(C) expressly contemplates that certification will be revisited as the record develops; thus, Plaintiffs cannot claim prejudice from bringing a party into the case whose defenses would bear on whether the certified Overcharge Class definition holds up. *Third*, Conservice's involvement will not create any unfair surprise; Plaintiffs have actively sought Conservice's participation. For example, Plaintiff served a 23-request subpoena on Conservice in August 2024. (ECF No. 38 at 1.) Conservice later took

part in negotiations over the "Utility Fee Data and Per-Gallon Data," (ECF No. 42 at 2), and Plaintiff Hettinger asked this Court to order Conservice to produce documents. (ECF No. 42-1.) As recently as September 8, 2026, Plaintiffs again sought Conservice's billing records, citing the merits issues now before the Court. Having Conservice participate formally will only aid this Court in its ultimate resolution of the merits, giving the Court a full record of how the challenged charges were calculated, which is the central question on the Overcharge claims.

***(b) Conservice has legally protected interests in this action.***

Conservice has two independent interests at stake in the Overcharge Class claims. First, it has a direct financial interest in any judgment for which Bozzuto will seek to hold Conservice financially responsible. And second, it has a direct interest in asserting the lawfulness of its own billing practices.

Financial exposure is an obvious interest because Bozzuto has pleaded that any Overcharge liability is "strictly [] a consequence of actions or inactions of Conservice" under the MSMA. (ECF No. 35 ¶ 9.) Indeed, Bozzuto has doubled down on that claim, openly stating that "Conservice has an obvious interest in Plaintiff's claims." (ECF No. 76 at 8.)

Separately, Conservice has a direct interest in the questions the Overcharge Class will resolve, because those questions concern Conservice's own conduct and legal issues impacting the scope of its rights and obligations in other cases. Conservice calculated the per-gallon water and sewer charges at issue. Whether those charges exceeded any applicable regulatory limit, whether they reflect a pass-through of the utility provider's actual charges, and whether any resulting charge was unfair are the questions the Overcharge Class will litigate or at least profoundly influence. (ECF No. 82 at 27-29.) These same billing methods are being challenged in other proceedings and

employed throughout the country by various third-party billing providers. (*See supra* Background.)

***(c) Disposing of this action without Conservice's presence would impair those interests.***

In determining whether a movant's interest will be impaired, "the courts in this Circuit look to the practical consequences to the movant of denying intervention." *Atl. Refinishing & Restoration, Inc. v. Travelers Cas. & Sur. Co. of Am.*, 272 F.R.D. 26, 30 (D.D.C. 2010) (internal quotations and citation omitted). Both of Conservice's interests would be impaired here.

***Potential indemnity exposure.*** In *Atlantic Refinishing*, the court allowed a general contractor, as principal on a surety bond, to intervene because it "could nonetheless be forced to indemnify the defendant for the debt claimed by the plaintiff without an opportunity to legally dispute its liability." (*Id.* at 30.) Denying intervention "would be to deprive the petitioner of an opportunity to raise arguments and defenses before the adjudication of its own liability." (*Id.*) The amount of any class-wide judgment on the Overcharge claims would be established without Conservice's participation, and Plaintiffs have noted their intention to seek statutory damages of $1,500 per violation for each class member, the merits of which turn on Conservice's billing methods alone.

Nor is it enough that Conservice could contest its liability later in an indemnity action. *Atlantic Refinishing* rejected similar arguments noting that, "[i]t is also insufficient that the petitioner may have additional recourse in the future if it were to defend against an indemnification claim." (*Id.*); *see, e.g.*, *Schoenborn v. Wash. Metro. Area Transit Auth.*, 247 F.R.D. 5, 8 (D.D.C. 2007) (holding that "post hoc remedies," including challenging an award in probate court, "provide insufficient protection"); *Nat. Res. Def. Council v. Costle*, 561 F.2d 904, 910 (D.C. Cir. 1977) ("[I]t

is not enough to deny intervention under 24(a)(2) because applicants may vindicate their interests in some later, albeit more burdensome, litigation."). To be sure, Conservice has, and will assert, defenses to indemnity at the appropriate time. However, practically, by the time Bozzuto sues on the indemnity provision in the MSMA, the size of the judgment and the findings about Conservice's billing practices will already be fixed, which will seriously impact Conservice's risk and exposure.

***Unfavorable precedent.*** An adverse judgment would create unfavorable precedent that would impair Conservice's ability to defend its rights against similar claims that are being pursued across the country. *Roane*, 741 F.3d at 151 (stating that intervention was necessary where "unfavorable precedent" would be established limiting success in future suits). Rulings in this case have the potential to be used against other property managers and their utility management providers (many of which use Conservice). Plaintiffs' counsel is pursuing materially similar claims here in the District of Columbia, *Bosley v. GREP Atlantic*, LLC, No. 2023-CAB-007340 (D.C. Super. Ct.), and similar claims have been brought elsewhere. (*See supra* Background.) Should this Court resolve the Overcharge claims without Conservice's participation, the practical implication will be that the party with the most at stake in those questions will have had no opportunity to defend them.

***Invalidating standard industry practice.*** The impairment extends beyond this case because, at bottom, Plaintiffs' Overcharge claims attack the standard allocation approach that third-party utility billing providers, including Conservice, have used throughout the country for decades. Plaintiffs' Overcharge claims rest on "comparing two numbers": the water and sewer figures reported on tenant invoices, and DCWASA's published per-gallon rates for water and sewer consumption. (*See, e.g.*, Reply in Supp. of Class Certification at 23, ECF No. 78.) Because the

invoice figure was higher, Plaintiffs contend that Conservice inflated the price of each gallon consumed and charged tenants more for consumption than D.C. law permits. But the invoice figure is not a consumption rate. It is a blended allocation of all permissible water and sewer costs, combined to generate the charge for each rental unit. Passing along these costs through an allocation formula is not only fair and reasonable, as Plaintiff Hettinger herself agreed, but also standard industry practice. (ECF No. 74-7 at BOZZUTO 002765.)

Begin with a basic premise. A utility bill is not simply a consumption rate multiplied by the number of gallons that pass through a tenant's faucet. DCWASA bills are no different; they include a range of charges associated with water and sewer service: fixed fees, such as metering and account charges; municipal charges designed to address shared, citywide needs, such as the Clean Rivers Impervious Area Charge and stormwater fees; and volumetric water and sewer charges based on the building's measured consumption. DCWASA presents these charges to each Bozzuto building in a single "house bill" that aggregates all costs for all tenants in the building. Those costs must then be equitably attributed to each tenant, which is the task Conservice performs.

Plaintiff Hettinger's apartment illustrates how allocation works and why it is the backbone of utility billing. Her building used the Partial Allocation method, under which Conservice calculates water and sewer charges from the building's house bill and the tenant's individual consumption. The house bill for her building is reproduced below.

| | |
|---|---|
| **CURRENT CHARGES - COMMERCIAL** | |
| Metering Fee 6X1" | $547.52 |
| Water System Replacement Fee 6X1" | $1,292.14 |
| Water Services 1040.48 CCF X $4.91 | $5,108.76 |
| Sewer Services 1040.48 CCF X $10.64 | $11,070.71 |
| Clean Rivers IAC 48.30 ERU X $18.40 | $888.72 |
| **DC GOVERNMENT FEES** | |
| DC Government PILOT Fee 1040.48 CCF X $0.56 | $582.67 |
| DC Government ROW Fee 1040.48 CCF X $0.19 | $197.69 |
| DC Govt Stormwater Fee 48.30 ERU X $2.67 | $128.96 |
| **Total Current Charges** | **$19,817.17** |
| **OTHER CHARGES AND CREDITS** | |
| Backflow Prev. Assembly Fee 9 X $6.70 | $60.30 |
| Food Service Est. Fee 1 X $13.70 | $13.70 |
| **Total Other Charges and Credits** | **$74.00** |
| **TOTAL CURRENT BILL** | **$19,891.17** |

(Ex. A (Conservice00000293-Conservice00000304 at Conservice00000303)) (highlighting added).

Conservice then organizes these costs as either a water-related charge or a sewer-related charge. In this example, Conservice grouped as water charges: water system, water services, backflow, DC Pilot, and DC Row. These totaled $7,789.08. Conservice grouped as sewer charges: sewer services, Clean Rivers, DC Stormwater, and Food Service. These totaled $12,102.09. The aggregate of these charges equaled, and did not exceed, the total DCWASA charged the building.

Once Conservice has the total costs for water and sewer, it then calculates how to fairly apportion those costs to the tenants. In this case, to calculate each tenant's *pro rata* share, Conservice divides the total water and sewer costs, respectively, by the building's total usage in

gallons, as reported on the master meter.[1] This produces a weighted average of all costs incurred for sewer or water for tenants in the building.

| Charge | Provider Expense | Provider Usage | Rate |
|---|---|---|---|
| Sewer | $12,102.09 | 778279.04 | 0.0155498 |
| Water | $7,789.08 | 778279.04 | 0.0100081 |

This per-gallon allocation rate is then applied to each tenant based on that tenant's own consumption. Conservice reads each tenant's submeter to determine the gallons used during the billing period and multiplies that figure by the allocation rate to arrive at the final charge.

| Calculation |
|---|
| Rate ($0.01555) x Meter usage (3078) = Sewer Charge ($47.86) |
| Rate ($0.010008) x Meter usage (3078) = Water Charge ($30.80) |

These charges are then passed along to the tenant with no markup. The charges calculated above are Plaintiff Hettinger's, and her Conservice bill, reproduced below, reflects exactly those amounts.

**CURRENT UTILITY CHARGES**

| SERVICE TYPE | SERVICE PERIOD | CHARGES |
|---|---|---|
| HVAC | 12/01/2021 - 01/01/2022 | $13.30 |
| Sewer | 12/01/2021 - 01/01/2022 | $47.86 |
| Trash | 12/01/2021 - 01/01/2022 | $10.00 |
| Water | 12/01/2021 - 01/01/2022 | $30.80 |

[1] DCWASA reports total billed consumption in hundred cubic feet ("CCF"), but Conservice converts it to total gallons.

(Ex. B (Conservice00000001-Conservice00000002 at Conservice00000001).) The result is fair and predictable: the tenant bears the costs of providing water and sewer service, in proportion to her own use of that service. If that method is unlawful, as Plaintiffs claim, then so is the allocation approach that billing providers nationwide rely on, and a ruling to that effect, entered without Conservice, would impair Conservice's ability to defend, and use, the same practice everywhere.

***(d) Bozzuto no longer adequately represents Conservice's interests.***

The final requirement "is not onerous." *Crossroads Grassroots Pol'y Strategies v. FEC*, 788 F.3d 312, 321 (D.C. Cir. 2015) (citing to *Dimond v. District of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986)). A movant need only show that representation of its interest "'may be' inadequate; and the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972). A movant "ordinarily should be allowed to intervene unless it is clear that the party will provide adequate representation for the absentee." *Am. Tel. & Tel. Co.*, 642 F.2d at 1293. Further, just because two parties have "general alignment" that is not enough to warrant denying intervention. *Crossroads*, 788 F.3d at 321 ("general alignment" between the movant and an existing party is not dispositive). Conservice easily meets this standard.

Bozzuto's interests in the Overcharge claims diverge from Conservice's in ways that go beyond litigation strategy. Bozzuto has already sued Conservice over these very claims, alleging that any Overcharge liability is Conservice's alone. (ECF No. 35 ¶ 9.) Although Bozzuto dismissed that Third-Party Complaint without prejudice (ECF No. 53), it continues to press the same position, disclaiming any role in computing the water and sewer bills. (ECF No. 78-2 at 3-4.) A party that expects to shift any Overcharge judgment to Conservice has little incentive to defend the billing methods and every incentive to distance itself from them. Bozzuto's conduct

confirms as much: it gave the Overcharge Class cursory treatment in opposing certification and sought interlocutory review of the Drip-Pricing Class alone. (*See supra* Background.) Conservice, therefore, "should not need to rely on a doubtful friend to represent its interests, when it can represent itself." *Crossroads*, 788 F.3d at 321.

That divergence has already left the record incomplete. Bozzuto never presented the three facts described *supra* Background, each of which bears on whether the Overcharge Class can be maintained and each of which Conservice is positioned to raise.

*First*, Conservice's allocation methods vary by property. Because buildings differ and utility codes and regulations vary by jurisdiction, Conservice used three methodologies at the relevant Bozzuto-managed properties: Partial Allocation, Full Allocation, and Utility Rate. Each apportions the building's actual house bill in a different way, so whether any tenant was overcharged depends on which method applied to that tenant's building. That variation goes to commonality and typicality, yet Bozzuto never presented it.

*Second*, Plaintiff Hettinger's own claim is not typical of the class she represents. The Overcharge Class is defined by reference to the "operative Multi-Family rates set out" in the D.C. regulations. (ECF No. 82 at 28.)

> **Overcharge Class:** All current and former residential tenants of the Properties at a Bozzuto-managed property in the District of Columbia who were charged or paid a per-1,000 gallon rate for water or sewer service greater than the operative Multi-Family rates set out in D.C.M.R. tit. 21, § 4100.3 (water) and § 4101.1 (sewer), as amended at any point since December 5, 2020.

(*Id.*) But DCWASA did not bill Plaintiff Hettinger's building, and in turn, her unit, at the Multi-Family rate at all. (*See* Ex. A (Conservice00000293-Conservice00000304 at Conservice00000303).) DCWASA charged Plaintiff Hettinger's building at the Commercial rate.

| CURRENT CHARGES - COMMERCIAL | |
|---|---|
| Metering Fee 6X1" | $547.52 |
| Water System Replacement Fee 6X1" | $1,292.14 |
| Water Services 1040.48 CCF X $4.91 | $5,108.76 |
| Sewer Services 1040.48 CCF X $10.64 | $11,070.71 |
| Clean Rivers IAC 48.30 ERU X $18.40 | $888.72 |
| DC GOVERNMENT FEES | |
| DC Government PILOT Fee 1040.48 CCF X $0.56 | $582.67 |
| DC Government ROW Fee 1040.48 CCF X $0.19 | $197.69 |
| DC Govt Stormwater Fee 48.30 ERU X $2.67 | $128.96 |
| Total Current Charges | **$19,817.17** |
| OTHER CHARGES AND CREDITS | |
| Backflow Prev. Assembly Fee 9 X $6.70 | $60.30 |
| Food Service Est. Fee 1 X $13.70 | $13.70 |
| Total Other Charges and Credits | **$74.00** |
| TOTAL CURRENT BILL | **$19,891.17** |

(*Id.*) Plaintiff Hettinger therefore could not have been charged, or overcharged, based on the Multi-Family rate, and any amount by which her charges exceeded that benchmark reflects DCWASA's own classification of her building.

Finally, Plaintiff Hettinger expressly agreed to the allocation of "all costs" she now challenges. (ECF No. 74-7 at BOZZUTO 002765; ECF No. 1-1, Ex. 1.) The Utility Addendum, which Plaintiff Hettinger signed in connection with her rental agreement, discloses that each tenant will pay their "allocated share of the utilities and services provided *and all costs*." (*Id.*)

> 2. If an allocation method is used, we or our billing company will calculate your allocated share of the utilities and services provided and all costs. Under any allocation method, Tenant may be paying for part of the utility usage in common areas or in other residential units as well as administrative fees. Both Tenant and Owner agree that using a calculation or allocation formula as a basis for estimating total utility consumption is fair and reasonable, while recognizing that the allocation method may or may not accurately reflect actual total utility consumption for Tenant. Where lawful, we may change the above methods of determining your allocated share of utilities and services and all other billing methods, in our sole discretion, and after providing written notice to you. More detailed descriptions of billing methods, calculations and allocation formulas will be provided upon request.
>
> If a flat fee method for trash or other utility service is used, Tenant and Owner agree that the charges indicated in this Agreement (as may be amended with written notice as specified above) represent a fair and reasonable amount for the service(s) provided and that the amount billed is not based on a monthly per unit cost.

(*Id.*) (highlighting added).

Hettinger also expressly agreed that "using a calculation or allocation formula as a basis for estimating total utility consumption is fair and reasonable" and agreed that the "allocation

method may or may not accurately reflect actual total utility consumption for the Tenant." (*Id.*) Therefore, nothing material was omitted, and nothing was ambiguous: tenants were told they would pay an allocated share of all costs, and they were charged such an allocation.

> residential units as well as administrative fees. Both Tenant and Owner agree that using a calculation or allocation formula as a basis for estimating total utility consumption is fair and reasonable, while recognizing that the allocation method may or may not accurately reflect actual total utility consumption for Tenant. Where lawful, we may change the above methods of determining

(*Id.*) (highlighting added). These points have never been properly raised, underscoring the need for intervention to protect Conservice's rights.

***(e) Conservice has standing, though it need not show it.***

An intervenor that seeks the same relief as an existing party need not establish its own standing. *See Institutional S'holder Servs. v. SEC*, 142 F.4th 757, 764 n.3 (D.C. Cir. 2025); *Amgen Inc. v. Kennedy*, No. 24-3571 (JEB), 2026 U.S. Dist. LEXIS 14868, at *4 (D.D.C. Jan. 27, 2026) (Boasberg, C.J.). Nonetheless, Conservice has standing. Its injury runs through the indemnity provision of the MSMA. Bozzuto has alleged that MSMA Section 11 makes Conservice liable for "all liability, claims, damages, losses, suits, fines, penalties, costs and expenses" arising from its utility billing services, (ECF No. 35 ¶ 10), and demanded judgment for the full amount of any damages plus its fees related to Overcharge claims (*id.* ¶¶ 22-23). A financial injury is a classic injury-in-fact. *See Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017). Conservice's injury is directly traceable to the Overcharge Class claims, and a judgment in favor of Defendant and Proposed Defendant-Intervenor would redress this injury. Plaintiffs seek from Bozzuto $1,500 per violation for the Overcharge Class claims. With an Overcharge Class numbering in the thousands and Plaintiffs seeking damages on a per-violation basis, Conservice

faces a concrete and substantial risk of injury by virtue of its exposure to Bozzuto's asserted indemnity claim.

2. **Alternatively, Permissive Intervention Under Fed. R. Civ. P. 24(b)(1)(B) Is Proper.**

In addition to qualifying for intervention as of right, Conservice also meets the requirements for permissive intervention under Rule 24(b). Rule 24(b)(1)(B) provides that the Court may permit intervention by a party that "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B); *see also Peters v. District of Columbia*, 873 F. Supp. 2d 158, 211–12 (D.D.C. 2012) (internal citations omitted).

In evaluating such motions, courts consider factors including timeliness, potential prejudice or delay to the existing parties, and whether the intervenor's claims or defenses substantially overlap with those in the main action. *See EEOC v. Nat'l Childs. Ctr., Inc.*, 146 F.3d 1042, 1046-47 (D.C. Cir. 1998). Substantial overlap can promote efficiency by consolidating related legal and factual issues into a single proceeding. *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1235–37 (D.C. Cir. 2004).

Courts possess "wide latitude" in allowing permissive intervention, *Nat'l Childs. Ctr.*, 146 F.3d at 1046, but must consider "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). *See also Nat'l Childs. Ctr.*, 146 F.3d at 1045; *Arizona v. California*, 460 U.S. 605, 615 (1983), *decision supplemented*, 466 U.S. 144 (1984) (granting intervention based on the absence of any showing that the rights of the original parties would be prejudiced or the litigation unduly delayed).

For the reasons discussed herein, Conservice satisfies this standard. It intends to challenge the merits of Plaintiff's Overcharge theory and to join Bozzuto's defense, presenting arguments that arise from the same facts. *See Ass'n of Wash. Bus. v. EPA*, No. 23-cv-3604 (DLF), 2024 U.S.

Dist. LEXIS 114090, at *33 (D.D.C. June 28, 2024) (permitting intervention where intervenors sought to "offer defensive arguments" and "seek the same relief as defendant," which "easily satisf[ied]" the "claim or defense" requirement). Conservice's defenses turn on the very questions the Overcharge Class will litigate, as shown *supra* Parts 1(c)-(d). Because Conservice seeks to assert defenses rather than new claims, no independent jurisdictional basis should be required; in any event, the Court's jurisdiction over this removed action extends to Conservice's defenses. *See* 28 U.S.C. §§ 1332(d), 1367(a).

For the reasons stated in Part 1(a), intervention will not unduly delay or prejudice the original parties: the merits phase has not begun, no dispositive-motion schedule exists, and Conservice will abide by the Court's schedule and coordinate with Bozzuto to avoid duplication. Conservice will also significantly contribute to the just adjudication of these claims by supplying evidence about its billing methods that no existing party has presented. Therefore, Conservice qualifies for permissive intervention. *See, e.g.*, *Sierra Club v. Van Antwerp*, 523 F. Supp. 2d 5, 9-10 (D.D.C. 2007); *Duke Energy Field Servs. Assets*, *L.L.C. v. FERC*, 150 F. Supp. 2d 150, 153 (D.D.C. 2001).

**3. <u>Conservice Should Be Permitted to File Its Answer or Other Responsive Pleading Within Ten Days of the Court's Order Granting Intervention.</u>**

Rule 24(c) requires that a motion to intervene "be accompanied by a pleading that sets out the claim or defense for which intervention is sought," and Local Civil Rule 7(j) requires that the pleading accompany the motion. *See* Fed. R. Civ. P. 24(c). Courts in this Circuit, however, have routinely held that intervenors are not required to file a standalone Rule 7-style pleading as long as the filing makes the intervenor's interest apparent and does not unduly prejudice the parties' abilities to address the intervention request. *See MGM Global Resorts Dev., LLC v. U.S. Dep't of the Interior*, No. 19-2377, 2020 WL 5545496, at *6 (D.D.C. Sept. 16, 2020) (rejecting a Rule 24(c)

objection based on party's decision not to attach a pleading, emphasizing that courts "have not applied this rule particularly rigidly"); *see also Microsoft*, 373 F.3d at 1236 n.19 (citing *McCarthy v. Kleindienst*, 741 F.2d 1406, 1416 (D.C. Cir. 1984)); *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 395 F. Supp. 3d 1, 21 n.4 (D.D.C. 2019) (citing *Spring Constr. Co. v. Harris*, 614 F.2d 374, 376-77 (4th Cir. 1980)) (granting intervention notwithstanding that the intervenors did not "include with their motion to intervene a copy of their proposed answer to the Complaint").

That standard is met here. This Motion sets out Conservice's interests and neither Plaintiffs nor Bozzuto will be prejudiced in their ability to respond to it. Should this Court permit Conservice's intervention, Conservice will submit an Answer and Affirmative Defenses to the First Amended Complaint as a Defendant-Intervenor. The Answer will respond to allegations directed at Conservice's billing and will state that allegations directed solely to Bozzuto's conduct, including its pre-application disclosures, require no response from Conservice and, to the extent a response is required, are denied.[2]

## CONCLUSION

For the foregoing reasons, Conservice respectfully moves that the Court grant its Motion to intervene as of right under Rule 24(a)(2) or, alternatively, permit Conservice to intervene under Rule 24(b)(1)(B); grant Conservice leave to file its Answer and Affirmative Defenses within ten days of the Court's order granting this Motion; and direct the parties to confer with Conservice regarding a proposed post-certification schedule.

---

[2] An answer to Bozzuto's Third-Party Complaint is not available. Bozzuto dismissed that pleading by notice under Rule 41(a)(1)(A)(i), without court order. (ECF No. 53.) And the MSMA commits any dispute between the two parties to binding arbitration. (MSMA, Submetering Terms of Service § IV.E); *see also Morgan v. Sundance, Inc.*, 596 U.S. 411, 417-19 (2022).

Dated: November 3, 2026

Respectfully submitted,

*/s/ Graham Cronogue*
Graham Cronogue (Bar No. 1044036)
Ashley Calcagno (Bar No. 90029279)
Sabrina Rubis (*Pro Hac Vice Forthcoming*)
BLANK ROME LLP
1825 I Street NW
Washington, DC 20006
Telephone: (202) 772-5886
E-mail: graham.cronogue@blankrome.com
Email: ashley.calcagno@blankrome.com
Email: sabrina.rubis@blankrome.com

*Attorneys for Proposed Defendant-Intervenor*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 3, 2026, I caused a true and correct copy of the foregoing MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF CONSERVICE, LLC TO INTERVENE AS DEFENDANT to be served via electronic mail on all counsel of record via the Court's CM/ECF system.

Dated: November 3, 2026

*/s/ Graham Cronogue*
Graham Cronogue